# UNITED STATES OF AMERICA
# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

WILLIAM P. YOUNGWORTH, IV,  }
WILLIAM P. YOUNGWORTH, III,  }
PLAINTIFFS,  }

     }   CIVIL ACTION No. 05-30108. MAP

v.  }

MARK A. GENTILE, AKA MARIO STILETTO,  }
MARYANNE PAICOPOULOS, AKA-  }
MARY E. YOUNGWORTH,  }
CHRISTINE HOYT,  }
CAROLE M. CRISTO,  }
SCOTT GRIFFIN,  }
CHIEF OF POLICE DAVID P. DARRIN  }
FOR THE TOWN OF SPENCER,  }
"SAFETY PLAN ADVOCATE" (NAME-  }
UNKNOWN) FOR THE EAST BROOKFIELD-  }
DISTRICT COURT,  }
JAMES M. GENTILE,  }
JOHN J. CONTE,  }
THOMAS REILLY,  }
NANCY A. ALTERIO,  }
TOWN OF SPENCER,  }
COMMONWEALTH OF MASSACHUSETTS  }

## COMPLAINT

## INTRODUCTORY STATEMENT

This is a claim for damages arising out of actions and inactions by the above identified

defendants who have deprived the plaintiffs of their Constitutionally Guaranteed Rights

protected by the United States Constitution.

## PARTIES

1.  The plaintiffs, William P. Youngworth IV (hereinafter identified as "W.P.Y., IV"), a

minor child and biological son of co-plaintiff William P. Youngworth, III (hereinafter

identified as "W.P.Y., III"), a disabled widower, both reside in the Commonwealth of Massachusetts in the City of Springfield.

2.  The defendant, Mark A. Gentile, AKA Mario Stiletto (hereafter identified as "Gentile"), at all times relevant herein acted in the capacity as a 'caretaker' for the plaintiffs William P. Youngworth, III (a disabled 45 year old male) and his child, co-plaintiff William P. Youngworth, IV (a minor child 13-years of age), who upon information and belief resides in Massachusetts.

3.  The defendant, Maryanne Paicopoulos, AKA Mary E. Youngworth (hereinafter identified as "Paicopoulos"), at all times relevant to the allegations set forth in this complaint acted as a co-caretaker to the plaintiffs and a co-conspirator with Gentile and who upon information and belief resides in Massachusetts.

4.  The defendant, Christine (middle name unknown) Hoyt, at all times relevant to the allegations of this complaint, was the property owner of a four unit apartment building located at 25 Clark Street, Spencer, Massachusetts, the landlord of the plaintiffs under a binding lease agreement and a co-conspirator with defendants Gentile and Paicopoulos and who upon information and belief resides in Massachusetts.

5.  The defendant, Carole M. Cristo, at all times relevant to this complaint, was employed as a non judicial official of the East Brookfield District Court and is employed as an Administrative Account Clerk and upon information and belief resides in Massachusetts.

6.  The defendant, Scott Griffin, at all times relevant to the allegations herein, was employed as a police officer in the town of Spencer, Massachusetts and upon information and belief resides in Massachusetts.

7.  The defendant, "The Safety Plan Advocate" (identity withheld from the plaintiffs)

(true name unknown), at all times relevant herein was employed at the East Brookfield District Court and upon information and belief resides in Massachusetts.

8.   The defendant, David P. Darrin, at all times relevant herein, was employed as the Chief of Police for the Town of Spencer, Massachusetts and upon information and belief resides in Massachusetts.

9.   The defendant, James M. Gentile, at all times relevant herein, was employed as an Investigator for the Massachusetts Attorney General's Office, Worcester Division and upon information and belief resides in Massachusetts.

10.   The defendant, John J. Conte, at all times relevant herein, was employed as the District Attorney for Worcester County Massachusetts and upon information and belief resides in Massachusetts.

11.   The defendant, Thomas Reilly, at all times relevant herein, was employed as the Attorney General for the Commonwealth of Massachusetts, and upon information and belief resides in Massachusetts.

12. The defendant, Nancy A. Alterio, at all times relevant herein, was employed as the Commissioner for the Massachusetts Disabled Persons Protection Commission and upon information and belief resides in Massachusetts.

13.   The Town of Spencer is a municipality in Massachusetts.

14.   The Commonwealth of Massachusetts is a municipality located in the Commonwealth of Massachusetts.

## JURISDICTION

15.   This action is brought pursuant to 42 U.S.C. sections 1983 and the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Jurisdiction

is founded upon 28 U.S.C. sections 1331 and 1341 (3) and (4) and the aforementioned

Constitutional and statutory provisions. Plaintiffs further invoke the pendant Jurisdiction

of this Court to hear and decide claims arising out of State Law.

## FACTS COMMON TO ALL COUNTS

16. The plaintiffs, William P. Youngworth, IV, is a thirteen year old minor child who

resides with his father, co-plaintiff, William P. Youngworth, III, a 45 year old disabled

widower, suffering from infra orbital nerve entrapment, optic nerve damage, trigeminal

neuralgia, dipolpia, chronic problems with both his legs that require vascular surgery to

correct, a torn rotator cuff, sleep apnea which causes W.P.Y., III to stop breathing

numerous times each evening as he sleeps, and post traumatic stress disorders that causes

W.P.Y., III to be a chronic sleepwalker, which has resulted in numerous injuries due to

accidents that have occurred while he was sleepwalking.

17. Plaintiff, William P. Youngworth, III was incarcerated until 10/13/2000 when the

Massachusetts Supreme Judicial Court ordered his release from confinement.

18. On 11/24/97, Judith M. Youngworth (Mother of plaintiff, W.P.Y., IV and wife of

plaintiff W.P.Y., III) died suddenly. Plaintiff W. P. Y, IV was alone with his mother at the

time of her death. Mrs. Youngworth died almost immediately after retuning home on the

date of her death. Prior to her succumbing to an accidental drug overdose, she had

traveled to the Massachusetts Correctional Institute at Concord Massachusetts.

Accompanying her was W.P.Y., IV and a Boston Herald Reporter named Tom Mashberg.

The purpose of this trip to Concord was to visit W.P.Y., III and discuss Mr. Mashberg's

planned coverage of future reporting about W.P.Y., III, and his refusal to submit to the

extortive techniques being employed against him by depriving him of his freedom and

family by incarcerating him under highly dubious circumstances. Mashberg discussed certain book projects he had "lined up" and an upcoming feature he was writing for Vanity Fair Magazine about W.P.Y., III and the "mystery of the missing artwork". Previous to this, Mashberg had heavily covered this story and used W.P.Y., III's name in fictionalized accounts which were created by his design to redeem his career after being dismissed by the Boston Globe Newspaper for "source creating" and cribbing other writer's work.

19.  Mashberg and his employers had previously compensated the Youngworth family for allowing him to embellish upon his reporting. Mashberg was using this visit to discuss future compensation that the Youngworth family would receive in these various projects Mashberg had solicited. During this visit, W.P.Y., III observed that Judith Youngworth was speaking in a slurred manner and was obviously heavily intoxicated. Seizing upon Mrs. Youngworth's condition, W.P.Y., III asked Mashberg what substance Mrs. Youngworth was under. Mashberg informed W.P.Y., III that he had driven his wife to Chelsea, Ma. and "got her something", explaining that Mrs. Youngworth was "cracking up" over the incarceration of her husband (W.P.Y., III). W.P.Y., III asked Mashberg not to do anything like that again and for him to drive her back home and stay with her until he was sure she would be safe from the effects of the substance she ingested.

20.  Later that evening, shortly after Mashberg had driven W.P.Y., IV and Mrs. Youngworth to their Randolph, Massachusetts residence, Judith Youngworth, after putting W.P.Y., IV to bed (W.P.Y., IV then only six years old), expired. Mashberg, despite his promise, never came into the Randolph home to watch Mrs. Youngworth and alone, with a six year old child who was asleep, collapsed and died while attempting to get help from the Youngworth's property caretaker Burt Babbin, who resided in the

caretakers quarters situated on the first floor of the complex.

21.   The following morning W.P.Y., IV awoke and after calling for his mother discovered his mother dead on the floor. W.P.Y., IV had spent hours trying to awake his deceased mother. Upon her not responding to W.P.Y., IV's attempts to arouse her, W.P.Y., IV went to the Youngworth's live-in properties caretaker, (Burt Babbin) and informed him that "something was wrong with his mother". Mr. Babbin went upstairs to the Youngworth's living quarters and quickly determined that Mrs. Youngworth was dead. Babbin summoned the police to the Youngworth residence located at 233 South Main Street, Randolph, Massachusetts.

22.   The death of Mrs. Youngworth and the incarceration of W.P.Y., III, a few days prior to his wife's death, left W.P.Y., IV without parental care. The Massachusetts Department of Social Services took custody of W.P.Y., IV, who was then six years old. Upon the Massachusetts Supreme Judicial Court releasing W.P.Y., III, he quickly established a new residence in Western Massachusetts in a home located at 29 Ingersoll Grove, Springfield, Massachusetts. W.P.Y. IV's custody was returned to his father from the Department of Social Services in under 60 days.

23.   W.P.Y., IV was severely emotionally harmed by the circumstances of his Mother's death and the three years spent in the Foster Care System. W.P.Y., IV entered therapy due to the above circumstances. Upon W.P.Y., III's release from incarceration, he kept W.P.Y., IV in therapy where he had made significant progress in coping with his post traumatic stress issues prior to the actions of the defendants.

24.   Prior to 1997, W.P.Y., III and his late wife were successful Arts & Antiques dealers throughout the United States, while they resided at 15 Lakeview Ave., Newton,

Massachusetts. The Youngworth family was operating several retail antique stores in the Boston area. The acquisition of the Randolph property was part and parcel to the Youngworth family's plans to enter into semi-retirement and gear down their operation to wholesale dealing to the trade.

25.   W.P.Y., III was convicted of charges in Norfolk County and incarcerated thereafter. This conviction was obtained at all costs to bring pressure to bare on the Youngworth family to attempt to extort information from W.P.Y., III regarding a robbery of a Boston Museum which occurred in 1990. W.P.Y., III was targeted by Investigators after a Boston Tabloid published a series of mostly fictionalized accounts about W.P.Y., III's knowledge concerning the whereabouts of certain artwork that, to date, still remain missing.

26.   In April of 2002, while W.P.Y., III was attempting to re-enter employment in his profession, he was seriously injured in an automobile accident prior to reaching his destination of a business located in Worcester, Massachusetts, which exclusively deals in rare coins and stamps.

27.   As a result of injuries W.P.Y., III sustained in this automobile accident, the right zygomatic arch, orbit and maxilla, previously sutured with steel wire, were re-injured, causing the majority of the present disabilities W.P.Y., III suffers from.

28.   From April 2002 to present date, W.P.Y., III has been unable to pursue employment and has been ruled disabled by both the Social Security Administration and the Massachusetts Rehabilitation Commission.

29.   Since sustaining the injuries in the April 2002 automobile accident, W.P.Y., III and co-plaintiff W.P.Y., IV have needed the services of various individuals to act in the capacity as caretakers to assist them with the basic aspects of their day to day lives.

30. W.P.Y., III has been treated with various regiments of narcotic pain medications for approximately two years to date. W.P.Y., III has now been on several hundred milligrams of Morphine daily, for approximately 18 months, to combat the chronic pain he suffers from. Additionally, W.P.Y., III is a patient of the Baystate Pain Clinic in Springfield, Massachusetts. To date, W.P.Y., III has undergone several nerve blocking surgical procedures. Thus far, W.P.Y., III's treatments have been unsuccessful. W.P.Y., III's vision is rapidly decaying as he suffers from "low vision" due to permanent dipolpia caused by his injuries. At present, the only options available to W.P.Y., III is a radical Neurosurgery which would result in the removal of all his nerves in the right side of his face. Physicians for W.P.Y., III have strongly urged him not to undergo this surgery.

31. At present, W.P.Y., III is under the care of numerous physicians and therapists, as is W.P.Y., IV, who has suffered a severe emotional set back as a result of the conduct of two specific caretakers, their co-conspirators, and other individuals who will be individually identified within this complaint, along with their deliberately indifferent and discriminatory actions which recklessly disregarded the rights of the plaintiffs.

32. During the summer of 2002, W.P.Y., III's health was in rapid decline. Defendant Gentile, then a resident of Worcester, Massachusetts, learned of the plaintiffs' situation and came to visit W.P.Y., III at his Springfield home. Gentile was immediately impressed with the plaintiffs' living situation, which was a 29 Room Victorian mansion located in the Historic McKnight District of Springfield.

33. Gentile started to make daily trips from Worcester to the plaintiff's home in Springfield over the next few weeks. At this time, Gentile was doing poorly in where he had no monies or assets of any kind. The plaintiffs would feed Gentile during his visits as

he would make it known to the plaintiffs that he was living in a "dilapidated shack" in

Spencer, Massachusetts and was only surviving on "handouts" from family members.

Gentile informed the plaintiffs that at times he was forced to eat squirrels.

34.   Each time Gentile visited he would cook meals, drive the plaintiffs (using their

automobiles) to the market, and generally assisted the plaintiffs with household chores and

medical appointments that the plaintiffs could not attend to left to their devices.

35.   The plaintiffs gave Gentile one of their automobiles, clothing, and small sums of

money. Gentile would convey his gratitude for the plaintiffs' acts of charity.

36.   The plaintiffs were grateful for Gentiles' visits and help he would give each time he

came, which was now becoming a daily event, with Gentile often times staying in the guest

wing of the plaintiffs' home. During the times Gentile was not present, the plaintiffs would

receive help from a Donna M. Miner. Ms. Miner was (and remains to date) an

extraordinarily kind person who, despite her own severe limitations due to her own

disabilities, would also help the plaintiffs anyway she could.

37.   The plaintiffs were grateful for any help they could get from anyone. W.P.Y., III's

vision was failing him with more frequency. Operating a motor vehicle was becoming

almost impossible for W.P.Y., III. In addition to his visual issues, the then untreated

chronic pain W.P.Y., III was suffering from was causing him drastic weight loss,

insomnia, and severe anxiety attacks. W.P.Y., III's failing health was causing a negative

impact to the mental health of W.P.Y., IV who, after already experiencing the death of

one parent, was gravely worried that now his father was terminally ill.

38.   Despite the severe distress W.P.Y., IV was under due to the health situation of his

father, he would dress himself every morning, keep his room in an immaculate state of

order and remained on the Honor Society with his schooling obligations.

39.   The plaintiffs' move to Western Massachusetts from their native greater Boston area, isolated them from all past friends and associates. The plaintiffs were attempting to start a new life in Western Massachusetts. A life beyond the media frenzy of the still unsolved case of the missing art work stolen from a Boston, Massachusetts museum. A Boston based tabloid was actively attempting to purchase any information they could obtain about the plaintiffs. This tabloids' aggressive pursuit of the plaintiffs was, and to date still is, fueled by a vendetta a 'reporter' employed by this tabloid declared against W.P.Y., III after his decision to jettison this 'reporter' (Mashberg) from his life. This tabloid pursuing the plaintiffs runs Internet ads seeking information about the plaintiffs.

40.   This vendetta campaign being waged by the Boston tabloid, is the sole creation of Mashberg who, after gaining professional success for his stories about W.P.Y., III, had become an Editor for this tabloid in addition to the tabloid's Union Stewart. Mashberg's stories about W.P.Y., III had made W.P.Y., III's name a cottage industry. In many cases various documentary filmmakers, novel authors and real journalists have made millions of dollars by the use of W.P.Y., III's name. To further illustrate this situation, past associates of W.P.Y., III and even his former Attorney, have sold the rights to their 'stories' to Mandalay Pictures by simply exaggerating their relationships to W.P.Y., III.

41.   Gentile had previously expressed a very keen interest about the affair Mashberg created a virtual circus over. Prior to 2002, Gentile approached a trustee of a certain Boston museum seeking to participate in collecting a five million dollar reward being offered by him for the return of certain artwork they claim was stolen from them. Trustees for this museum contacted Attorney Richard P. Branson, Counsel for the plaintiffs, and

requested Attorney Branson's intervention from any more unwelcomed approaches by Gentile.

42.    According to Gentile, as conveyed to Attorney Branson by a museum trustee, " he was the contact person" for the then incarcerated W.P.Y., III. Gentile made extortive demands in his 'visit' to this individual. These demands ranged from demanding sums of "up front" monies toward the reward being offered, to the" immediate release from prison of W.P.Y., III". Lastly, Gentile stated that if his demands were not met he would "burn the artwork".

43.    W.P.Y., III eventually confronted Gentile about this report by Attorney Branson. Gentile stated that the recount of his visit to the museum trustee was, in fact, correct. Gentile stated that he was just trying to "help out" W.P.Y., III who was, in fact, in a dire situation. W.P.Y., III attempted to make Gentile understand that the situation was extremely complex and he was very fortunate that he was not charged with attempted extortion for his actions.

44.    Shortly after Gentile started his now daily trips to Springfield, the plaintiffs developed a certain appreciation for the assistance Gentile rendered during his visits. W.P.Y., IV bonded very closely with Gentile and soon started calling him "Uncle Mark" as Gentile continued to ingratiate himself with the plaintiffs.

45.    Soon after Gentiles' visits started, the plaintiffs moved to a smaller residence in the same McKnight community. The plaintiffs moved one street over to 198 Florida Street, Springfield, Massachusetts. This residence was a 13 room Victorian home, slightly more practical for the plaintiffs' living needs.

46.    Within days after this move, Gentile offered to stay with the plaintiffs and assist them

on a permanent live in basis. The plaintiffs found this offer to be to their advantage in where his assistance eased the plaintiff's daily responsibilities. Prior to this point, the plaintiffs were going it alone and attempted to maintain their independence.

47.   The move to 198 Florida Street, Springfield, Massachusetts, was never intended to be a long term situation. W.P.Y., IV had just graduated from the Milton Bradley Elementary School and would be starting Middle School after the end of that summer. During 2002, a Teacher in the Springfield Public School System was brutally murdered by a Middle School student after simply requesting that the student remove his hood.

48.   W.P.Y., III had decided that enrolling W.P.Y., IV in the Springfield Middle School System was not conducive to W.P.Y., IV's education. The plaintiffs are of the Jewish faith. Springfield has an excellent Catholic school system but not appropriate for W.P.Y., IV. The only Jewish educational alternatives available to the plaintiffs in the Springfield area is an Orthodox Yeshiva in Longmeadow, Massachusetts. The plaintiffs are reform Jews and neither is fluent in Hebrew, a prerequisite for enrolling in a Yeshiva. Due to the plaintiff's concerns they made great sacrifices in leaving the city of Springfield.

49.   During July of 2002, Gentile and the plaintiffs made great efforts to find rental housing in the City of Northampton. After weeks of searching, no suitable housing could be found in that City.

50.   Gentile and the plaintiffs eventually found housing in the nearby Town of Easthampton, Massachusetts. After researching the public school system of that community, Gentile and the plaintiffs rented a three-bedroom apartment on 42 Chapman Ave., in Easthampton, Massachusetts. The plaintiff's ultimate plans was to purchase property in the Northampton area after finding assurance that they would find peace prior

to putting down permanent roots in the area.

51.  After getting settled into the new home, W.P.Y., III enrolled W.P.Y., IV in the White Brook Middle School of Easthampton. Immediately afterward, the Easthampton Police Dept. sent an Officer to the Plaintiff's new residence to inquire of the property owner "if a man named Youngworth had just moved in and they were simply conducting a census".

52.  The plaintiffs had placed more trust and responsibility in Gentile. Soon after moving to Easthampton, the plaintiffs gave Gentile power to handle their financial affairs. Gentile had no assets or income. Gentile was supported by the plaintiffs and their incomes generated by the plaintiff's insurance benefits they received as survivor's from Judith M. Youngworth. The plaintiffs were owed $107,500 from a mortgage they held on a New York property housing a Beverage Company.

53.  This mortgage was delinquent in its' interest payments and the entire principle of this mortgage was past due, becoming mature, and due in full in August of 2002. Gentile was successful in getting some past interest payments from the parties bound by this mortgage. Gentile was also successful in getting some small principle reduction payments from the corporation owing the plaintiffs this debt. The interest payments as prescribed within the mortgage the plaintiffs granted the New York based Corporation, amounted to approximately $1,000 per month. Along with the income from the plaintiffs' insurance benefits and the interest and principle payments from their mortgage, the plaintiffs generated additional funds by selling off valuables within the inventory they possessed that mainly consisted of a valuable collection of rare coins.

54.  The plaintiffs allowed Gentile to retain their monies for the purposes of paying the

households' bills and managing their living expenses.

55. Approximately a month had past after the move to Easthampton when Gentile started making day trips to his native Worcester, Massachusetts. On certain days Gentile would spend overnights away from the home. Gentile was fulfilling all the obligations of the plaintiffs needs and all monies under his control belonging to the plaintiffs were closely accounted for by Gentile.

56. After a few weeks of Gentile taking his trips to Worcester, Gentile requested W.P.Y., III accompany him to Worcester stating that W.P.Y., III, being a virtual "shut-in was unhealthy for him". During the trips to Worcester, Gentile started introducing W.P.Y., III to a vast number of various people whom he claimed were all related to him. Gentile was displaying W.P.Y., III to numerous persons in an obvious scheme to legitimize himself with these people as a means to boost his character by showing them that he was doing well, and no longer living in a condemned shack, wearing rags for clothing, and had become a person of means for his befriending the plaintiffs. Soon Gentile was offered a job managing a large restaurant which, at the time, was in a dire situation due to mismanagement. The restaurant, according to Gentile, was the property of the Evangalista family whom Gentile claimed was yet another "member of his family". This business was named D'Errico's. Gentile had previously worked at this establishment but left describing the Evangalista's "too difficult to work with" with the entire family "using the place as their own piggybank".

57. Gentile stated to W.P.Y., III that his taking this job offer would not effect Gentile assisting the plaintiffs as their caretaker and fiduciary manager. Additionally, Gentile would be receiving a salary of one thousand dollars per week, paid to him in cash and

under the table. D'Errico's, a business situated on East Central Street in Worcester, Massachusetts, is an entity owned by the Evangalista Family Trust, Inc. D'Errico's is a complex that contains several businesses including two bakeries, one food market, and the restaurant.

58.   D'Errico's daily operations manager is a Joseph Evangalista. Mr. Evangalista is also the majority shareholder for the family trust. The offer made to assume management of the restaurant to Gentile was made by Mr. Evangalista.

59.   At the time Mr. Evangalista made the job offer to Gentile, D'Errico's restaurant was heavily in debt and on the verge of closing due to a series of bad business decisions, employee theft(s), and serious mismanagement. The restaurant was draining the other resources within the D'Errico's complex. If the restaurant could not be rehabilitated into a profit making venture, the property it is situated on would have to be liquidated. Since there was a heated dispute amongst the Evangalista family, many members having felt cheated according to Gentile, selling the property was not an option since it would start a "feeding frenzy" amongst the family members who were all waiting for some financial relief by the long beleaguered Trust being run by Joseph Evangalista, whom had enraged other members of his own family, all of which was long past due support from the business in which they held interest by virtue of inheritance.

60.   D'Errico's is located in the Shrewsbury Street section of the City of Worcester. Many members of the Gentile family operate various businesses in that neighborhood. According to Gentile, he was also related to the Evangalista family. Many times Gentile would tell the plaintiffs about his "huge" family with many members being "entrenched" within the Worcester City Government.

61.  Gentile informed the plaintiffs that his taking this job would allow him to contribute to the household's expenses and, thereafter starting his job, he would start contributing to the household's expenses by paying half of the bills, which up until this time, the plaintiffs had been paying from their incomes.

62.  Gentile assured the plaintiffs that he would return home each evening and all the plaintiffs' needs, which Gentile attended to, would not be effected by his taking on the job as the manager of D'Errico's.

63.  Gentile, in fact, accepted the Manager's position at D'Errico's Restaurant. For approximately the next 60 days, Gentile did commute back and forth from Easthampton to Worcester daily. Gentile had the New York loans' interest payments being made directly to him on a regular basis. Gentile would use these interest payments to pay the $975.00 per month rent due for the Easthampton home. Gentile was making his part of the financial contributions, as per the new agreement upon his receiving his now $1,000 per week cash salary, by paying the household's utility bills, the vehicles insurance payments (which by this date the plaintiffs had transferred they're personal vehicles to Gentile's name), and bringing home the households' necessary groceries and supplies. The plaintiffs retained their survivor benefit insurance payments for their incidental needs. Previously, the plaintiffs would turn these insurance payments over to Gentile to pay their living expenses prior to the period of time that Gentile had no income and was completely dependant upon the plaintiffs for his basic needs.

64.  On or about November of 2002, W.P.Y., III was experiencing a new and more severe threshold of pain with the onset of the cold weather. W.P.Y., III was making constant and almost daily complaints about this new level of pain to his then Primary Care

Physician, Sherri Cheung, MD. , of Springfield Medical Associates. Doctor Cheung was giving W.P.Y., III huge sample packages of Vioxx to combat his complaints, but soon this medication had caused side effects, which effected W.P.Y., III negatively. Additionally the Vioxx did nothing to alleviate his chronic pain complaints.

65. Doctor Cheung would have W.P.Y., III come to her office for examination. Doctor Cheung would never actual examine W.P.Y., III and instead farmed him out to her Physician's Assistant (herein the P.A.). W.P.Y., III complained about the ineffectiveness of the Vioxx, its side effects, and his ever increasing pain to the P.A.

66. W.P.Y., III's complaints were met with indifference by Doctor Cheung's P.A., a situation that greatly distressed him.

67. In addition to W.P.Y., III's not being able to get his Doctor to treat him in a meaningful manner, Gentile was starting to fail to return home. Gentile was leaving the plaintiffs without basic staples for the household and he was growing neglectful about his responsibilities to the plaintiffs and the household. This would often force W.P.Y., III to travel to Worcester and track down Gentile in order to get Gentile to take care of his part of the household's responsibilities. Gentile would always blame the demands of managing the restaurant for neglecting to honor his responsibilities to the Easthampton household and the plaintiffs. At this point it only took polite requests to compel Gentile to attend to the matters that needed his attention.

68. During these trips to find Gentile made to Worcester from Easthampton, (a fifty mile drive from Easthampton), and after concluding the business with Gentile, Gentile would often desire to discuss the museum affair and certain offers coming to W.P.Y., III to do interviews, "speak to book and movie people", and put the dialogue about this museum

affair back on track with officials. W.P.Y., III would discourage Gentile's ambitions to "cash in" on the affair that caused the ruination of the Plaintiff's lives. W.P.Y., III reminded Gentile of a meeting they both attended with a Mr. Larry Potts, the former Deputy Director of the FBI, and now the Executive Vice President for Investigative Group International. This meeting was held in Worcester, Massachusetts when Mr. Potts flew into that city upon Gentile convincing W.P.Y., III to meet with him.

69.   W.P.Y., III found Mr. Potts to be a sincere person who remained sensitive to what the plaintiffs had been put through behind the museum robbery investigation, but, as W.P.Y. III reminded Gentile, Mr. Potts, despite his good will, was unable to make any breakthrough in the stalemate between W.P.Y., III and the United States Attorneys' "no deals" posture.

70.   In October of 2002, Gentile found that D'Errico's was in desperate need of a cash infusion to simply keep the "doors open" from debts incurred on the business prior to Gentile taking over management.

71.   Gentile was applying constant pressure on the New York based Corporation owing the plaintiffs delinquent monies on the now past due note, repayment of the entire principle in its express terms contained within the mortgage held by the plaintiffs. Gentile went to several family members seeking a loan to bail out the restaurant. Each person Gentile approached seeking financial help refused his requests based upon the fact that Joseph Evangalista had a bad reputation in repaying loans. Gentile, threatening foreclosure proceedings against the New York Corporation owing the plaintiffs monies on the delinquent mortgage, was able to squeeze another principle reduction payment of the mortgage. The corporation promised the plaintiffs $25,000 toward the reduction of the

principle, but ultimately only raised $18,000 for the plaintiffs.

72.   Gentile begged the plaintiffs for a loan of these monies ($18,000)" to keep the doors of D'Errico's open". Without these monies, the utilities to the restaurant were going to be terminated, and vendors threatening suit for past services were stating they would not wait any longer for payment.

73.   Prior to W.P.Y., III granting Gentile the loan of the $18,000, W.P.Y., III wanted to examine the records of the business. Upon arriving at Gentile's office to inspect the state of the business, he was met by a huge pile of unorganized paperwork relating to the restaurant's operation. Gentile stated that he was "so busy running the place he had no chance to pull his office together".

74.   W.P.Y., III observed Gentile working very hard to turn the business around from its downward spiral. Gentile was still having to deal with the staff of the restaurant, mostly being comprised of Evangalista family members, who were stealing more of the businesses' receipts then what was being turned in to Gentile.

75.   The plaintiffs did lend Gentile the $18,000 to give him some breathing room to turn the place around. Upon lending Gentile these monies, the plaintiffs left Gentile alone as he would become upset when anyone tried to suggest cost cutting and more sensible business practices. One matter W.P.Y., III saw to was going to Polar Beverages of Worcester and had the Coke products, then being served by D'Errico's replaced with a line of beverage products that were as good as anything Coke had to offer, for a fraction of Coke's costs, with Polar having a far better reputation in serving their customers' accounts when Coke's business practices were often insensitive to small businesses' needs. This one small action increased the business's revenues by several hundred dollars per week, according to

Gentile.

76.    Soon after making the initial business loan to Gentile, Gentile fell back into a now clear pattern of neglecting the plaintiffs' basic needs. W.P.Y., III informed Gentile it would be the "last time" he would come to Worcester to "chase him" to get the simplest of matters attended to. Gentile apologized and yet again proceeded to explain about all the problems he was having. Gentile asked W.P.Y., III if he could raise yet more money to "help out the restaurant". W.P.Y., III stated that all his cash assets, which was the money for W.P.Y., IV's education, was tied up in the mortgage. Gentile asked W.P.Y., III to borrow money from his in-laws or W.P.Y., III's Attorney, Marvin Siegel. When W.P.Y., III said these option were out of the question, Gentile then asked W.P.Y., III to "sell the rights to his life story" or approach a museum trustee. Again, W.P.Y., III stated that these proposals were not options that could be exploited for Gentile's needs. W.P.Y., III pressed the real reason why he had made this trip. W.P.Y., III stated to Gentile that he was ill, (something which seemed to escape Gentile's attention) and could not take on any of these problems. But, since Gentile appeared more concerned with D'Errico's instead of his commitment to acting as a caretaker to the plaintiffs, that he would need to help W.P.Y., III figure out some alternative to fill the void that Gentile's attention to D'Errico's (as opposed to the plaintiff's basic needs) caused. W.P.Y., III stated that he needed help at the home so "little Billy" (W.P.Y., IV) would be assured clean clothes for school and meals that were conducive to W.P.Y., IV's special dietary requirements. Gentile, fully knowing all the issues being factors that forced W.P.Y., III's need to bring help into the home, told W.P.Y., III to find suitable "live in" help and Gentile would see that this new obligation was met, by him, out of his salary from the restaurant, as long as

this help could be obtained for a reasonable cost.

77.    As with the $18,000 loan the plaintiffs made to Gentile, the previous principle

reductions and past due interest payments, all monies that came under Gentile's control

that were the property of the plaintiffs, were collected from the New York based

this help could be obtained for a reasonable cost.

77.   As with the $18,000 loan the plaintiffs made to Gentile, the previous principle reductions and past due interest payments, all monies that came under Gentile's control that were the property of the plaintiffs, were collected from the New York based corporation owing the plaintiffs the debts from the mortgage that Gentile was supervising. The plaintiffs never had control of these monies at any time. The payments came directly from the debtor in this matter and went straight to Gentile for various reasons set out in the above.

78.   It took the plaintiffs several weeks to find an individual who would act in the capacity as a live-in Nanny for W.P.Y., IV, in addition to a caretaker to W.P.Y., III. By way of the plaintiff's most trusted friend, Donna M. Miner of Springfield, Massachusetts, the plaintiffs approached a Darlene Cowlan, then of Springfield, and a person who came into Ms. Miner's home to assist her with house keeping chores, with their proposal. The proposal made to Ms. Cowlan was that if she would come live with the plaintiffs, she would be given her own room, Gentile's bedroom since he now almost never came home, and when he did, would sleep on the living room sofa. The full details of the proposal made to Ms. Cowlan were that if she would take the job, she would be given free room and board, a completely furnished room with her own cable television within it, her automobile insurance paid, all her automobile expenses and maintenance paid by Gentile and the Plaintiffs due to having to provide transportation for the plaintiffs (Ms. Cowlan could not drive the Plaintiff's vehicle that was a heavy-duty cargo van formerly used in their antiques business), all her food would be provided, and a salary of $250.00 per week. This was predicated on allowing Ms. Cowlan to keep her daytime home cleaning

contracts which she had developed and maintained long prior to meeting the plaintiffs.

79.  Ms. Cowlan was not attracted by the small salary the plaintiffs were offering but, she desired to move out of Springfield and away from a former boyfriend that she was residing with and was often abusive toward her.

80.  After several weeks of considering the Plaintiff's offer, Ms. Cowlan decided to take the plaintiffs up on their offer precipitated by an altercation with her abusive boyfriend.

81.  Ms. Cowlan, almost immediately, eased the plaintiff's burdens. Ms. Cowlan and W.P.Y., IV bonded very quickly, as had become a habit of his, explained by one of his therapist, as his having experiencing such devastating losses in his life he would quickly gravitate towards people close to him that treated him kindly, as a replacement for family.

82.  The $18,000 loaned to Gentile was supposed to have been paid back under the terms of a verbal agreement. The understanding of this agreement was that the loan was to be repaid to the plaintiffs out of the restaurant's income in the increments of one thousand dollars per week commencing in January of 2003.

83.  Starting on or about November of 2002, Gentile became involved in some type of illegal drug activity to supplement the income of the struggling restaurant. W.P.Y., III had no knowledge or involvement in Gentile's illegal enterprise. Gentile only informed W.P.Y., III of the fact that he had been buying and selling large amounts of marijuana on or about January of 2003. According to Gentile, as he recounted to W.P.Y., III, " a member of his family, belonging to the Worcester law enforcement community, tipped him off that the Massachusetts State Police" CPAC Unit based out of the Grafton State Police barracks were conducting surveillance on Gentile and his associates for dealing in large amounts of various illegal drugs.

84.   Gentile told W.P.Y., III that this same source, a relative, further informed him that the informants for the State Police was a woman named "Sabrina", a waitress working at D'Errico's (Joseph Evangalista's first cousin), and a street prostitute named "Adam" whom Gentile was involved in a sexual relationship with. According to Gentile's source, feeding him information directly from the State Police's files on the investigation, both of these informants each went to the State Police to inform them of Gentile's activities separately. In addition to the drug-dealing allegation, each claimed that Gentile had told them that, through his family, he was "connected to the Mafia".

85.   As a result of the Massachusetts State Police's information concerning Gentile's illegal activities, the Massachusetts State Police commenced an investigation keeping Gentile and several associates of his on around the clock surveillance. The plaintiffs found their home under surveillance as well, as it was Gentile's listed home address with his Probation Officer.

86.   Given the infrequency Gentile came and went from the Easthampton home, the surveillance on the plaintiff's home quickly faded away. The Massachusetts State Police focused their attention on Gentile's friends and associates who associated with him on a daily basis in the City of Worcester.

87.   One such individual, Timothy Savage, of Worcester, was ensnared in this investigation initiated by Gentile's claims to waitresses and street prostitutes. During the height of this investigation, Mr. Savage was stopped and searched by the State Police. Found in Mr. Savages' automobile was a pocketknife (illegal in Massachusetts) along with ten Methadone pills. An illegal Class "A" Narcotic drug in Massachusetts.

88.   Mr. Savage told W.P.Y., III that he was extremely upset behind being arrested as a

result of the State Police's investigation into Gentile. To compound Mr. Savage's ire was his claim to W.P.Y., III that Gentile, who often borrowed his automobile, "had left these illegal items in his car". Apparently Gentile would use the Methadone to barter for sex with the State Police's informant "Adam".

89.  Mr. Savage was employed managing a parking garage for the A.G. Edwards Building in downtown Worcester. Prior to Gentile's actions, getting Mr. Savage arrested, Mr. Savage was in talks with the owner of the parking concession. Mr. Savage was optimistic that he was going to be offered a chance to buy this business. With these plans now ruined, Mr. Savage grew even angrier behind being arrested due to Gentile. Over the arrest, Mr. Savage was informed that he would not be offered the parking concession.

90.  Soon after Mr. Savage answered to these charges in his initial court appearance. He was informed that the Commonwealth was intending to prosecute him under the harshest penalties of law that they could. Mr. Savage was without enough funding to hire an Attorney capable of assisting Mr. Savage out of the situation that Gentile had placed him.

91.  Shortly after Savages' arrest, Gentile came to W.P.Y., III stating that he needed the $18,000 he borrowed from the plaintiffs to get Savage a lawyer. This point in time was beyond the agreed upon January 2003 that Gentile was supposed to start repaying this loan back to the plaintiffs. Gentile kept putting off the repayment program which was agreed upon previously, citing that the "Department of Revenue was on his back" but, right after settling that issue he would get "on track" with repaying the Plaintiffs the $18,000 he borrowed from them.

92.  W.P.Y., III having little choice then to allow him to use the previous loan to get Savage an Attorney. W.P.Y., III could see that Gentile was doing well at the restaurant.

Each shift was generating $2,000 on the average giving the restaurant a net income of $4,000 per day. Savage and Gentile retained Attorney Sean Murray of Worcester. Gentile paid Attorney Murray a small cash retainer promising to pay him another $15,000 "over the next few weeks", according to Attorney Murray in a talk with W.P.Y., III.

93.  No charges due to this investigation that got Savage arrested, were ever brought against Gentile himself. W.P.Y., III spoke to Gentile about the affair in which the State Police had started the investigation. W.P.Y., III conveyed his sentiments to Gentile "that he wanted nothing to do with whatever it was Gentile was involved with". Additionally, W.P.Y., III reminded Gentile that he borrowed money from the Plaintiffs to settle debts at his business and not to become a drug dealer.

94.  W.P.Y., III asked Gentile about this street prostitute named "Adam". W.P.Y., III asked Gentile if this was the same "Adam" Gentile had brought to the Easthampton home one evening when W.P.Y., III had $380.00 stolen from the nightstand of his bedroom while he was showering the next morning. Gentile, defending "Adam", said it was, but W.P.Y., III never proved that "Adam" had stolen the money from his bedroom.

95.  Gentile's sexual preferences were never an issue to the plaintiffs. Gentile, except with his closest friends, always desired to keep his sexual life from his family and his neighbors in the Shrewsbury Street area who, for the main part, were "Old World Italians" and might think ill of Gentile behind his gay lifestyle, according to fears that Gentile expressed to W.P.Y., III.

96.  After Mr. Savage's arrest, Gentile stated to W.P.Y., III that "he was going to focus all his energies on the restaurant", after the close call with Savage's arrest. To the observations of W.P.Y., III which, in reality, were only calls he made to Gentile during

hours he was supposed to be at the restaurant, Gentile was doing just that.

97.   During the first few months of 2003, Gentile informed W.P.Y., III that Mr.
Evangalista and Gentile had formed a new "S" Corporation to run the debt ridden
restaurant under. According to Gentile, and in a later talk to Mr. Evangalista taking place
approximately one week later, both of these parties informed W.P.Y., III that breaking out
the restaurant into a new corporation was designed to solve numerous problems. One was
to dodge certain debts owed to various vendors, but, amongst other reasons, the most
important of which, was to put the business in a posture where Gentile would be issued a
20-year lease making the property valueless to other members of the D'Errico's family
who were seeking monies they were due from interest they held by way of the Family
Trust that Larry Evangalista (the father and founder of the family business, now deceased)
had created to see that his family were all financially taken care of. This lease was to be
issued by Joseph Evangalista. According to both Gentile and Evangalista the name of the
new "S" Corporation was named" Mario Stiletto, Inc", a street name Gentile went by. By
issuing a 20 year lease to Gentile by Mr. Evangalista, the property would be made
"valueless" as an asset to the majority of the Evangalista family who were all looking for
money from the Family Trust. W.P.Y., III had heard different versions of stories of whom
wronged whom within the Evangalista family. The only things W.P.Y., III was certain of
was that Joseph Evangalista was the majority shareholder and he oversaw the daily
operations of the D'Errico's complex, with the exception of the restaurant that Gentile
assumed management of, pursuant to what he called, was a "non-interference" clause.

98.   During the first few months of 2003, the Massachusetts Department of Revenue
(herein "DOR") was aggressively seeking meal tax payments from the restaurant for not

only since Gentile took over management, but for the unpaid meal taxes that had not been
paid prior to Gentile taking over the business. W.P.Y., III having run numerous businesses
during his career, asked Gentile "exactly how much he the owed DOR". Gentile was
unsure and he was disputing the entire matter. Gentile stated that he had yet another
"cousin" who worked with the DOR's Worcester office and "he would buy him some time
to work it out".

99.  W.P.Y., III knew Gentile's vast family was entrenched in Worcester politics.
D'Errico's had many obvious code violations, but inspectors would always look the other
way. The customer's restrooms had no hot water to wash with, the restaurant was always
freezing, food that was too old to sell from the market would end up being sent to the
restaurant where it was prepared and served to customers. The entire staff of the kitchen
was comprised of illegal aliens. None of the workers in the restaurant were on the books
with any employee payments ever being made to the State. The restaurant had rodent
infestation but, yet, as Gentile always stated, "no one ever bothered him" due to his
family's "connections".

100.  As Gentile managed to keep the DOR appeased with minimal payments, he was
keeping up with the plaintiffs needs. Ms. Cowlan was working out well and Gentile was
diligently working on getting the New York Corporation to pay off the debt they owed the
plaintiffs. W.P.Y., III found that he had to pay Ms. Cowlan's salary as opposed to Gentile,
whom had previously assumed this obligation, but when brought to Gentile's attention he
promised to make it right as soon as he was capable.

101.  As settlement of monies owed by the New York Corporation to the plaintiffs
seemed to be coming to a resolution, Gentile made a proposal to W.P.Y., III, whom

Gentile knew was looking for investments to place these monies to ultimately pay for

W.P.Y., IV's education.

102.  W.P.Y., III had spoken to representatives of A.G. Edwards, Mellon Investments,

and Prudential Securities.  W.P.Y., III's research showed him nothing but a bleak market

for persons then seeking investments geared toward the growth W.P.Y., III sought for his

child's educational needs.

103.  W.P.Y., III had informed Gentile, that upon being repaid the monies owed the

Plaintiffs, he would be looking for some sort of income property to invest in.  Gentile then

proceeded to lie out a plan "he had been considering".  This plan involved increasing the

restaurant's output by installing additional pizza ovens and obtaining a fleet of vehicles to

aggressively pursue a "take out" business.  That business would revolve around attracting

the lunch/dinner take out business with the approximately "50,000 hospital workers that

were employed at the various hospitals all within approximately one mile from

D'Errico's".

104.  Gentile showed W.P.Y., III the increase in the restaurant's business since he had

aggressively pursued catering.  Gentile had indeed managed to increase the revenue of the

restaurant by an average of ten thousand dollars per week.  This was done by Gentile

focusing on catering over the last several months, after placing all his energies in the

restaurant, as opposed to his illegal activities of the previous months.

105.  W.P.Y., III reminded Gentile that he did not desire to be "chasing his money again",

as he was still waiting repayment of the previous loan that Gentile claimed went to

Savages' legal fees.

106.  Gentile informed W.P.Y., III that he was "catching up with his back taxes" and

since Mr. Evangalista's C.P.A. set up the new corporation that Gentile would soon hold a

20-year lease on the restaurant. In short, Gentile informed W.P.Y., III that he had to keep

"stomping out" fires from Evangalista's mismanagement of the business with the profits

from the restaurant. Gentile reminded W.P.Y., III that he was, in fact, now contributing

toward the household's bills since he fell into their debt over the eighteen thousand

dollars. This fact could not be disputed and neither could Gentile's new hyper attention to

the plaintiff's needs. However, since Gentile was in default with repaying monies

borrowed from the plaintiffs, W.P.Y., III reminded him that this "burden" was one of his

own creation. A fact Gentile freely acknowledged. But in reminding Gentile that he was

obligated to contribute his fair share in paying for his own housing, W.P.Y., III pointed

out to Gentile that as far as he could see, it looked as if Gentile was merely paying his

share of the bills with monies belonging to the plaintiffs. The plaintiffs needed a steady

reliable repayment schedule in order to obtain decent health insurance and pay for W.P.Y.,

IV's Hebrew schooling in order to complete his Bar Mitzvah on his thirteenth birthday.

107.   Gentile made a point out of the amount of publicity that was still being generated

over the museum affair back in Boston. Gentile, who earned a Masters' Degree in

Elizabethan English while he was incarcerated, (via a correspondence course that Boston

University was then offering to the state's prisoners), stated to W.P.Y., III that he was

"sitting on a story that had value" and he should allow Gentile to produce a treatise to

approach literary agents with.

108.   W.P.Y., III discouraged Gentile's ambitions fearing inflaming the entire affair once

again. W.P.Y., III had enjoyed some peace he found in the Northampton area and

commented on how well W.P.Y., IV was doing, desirering to do nothing to upset this

balance. In discussions W.P.Y., III did have with various persons following the museum mystery, W.P.Y., III attempted to convey that he was no longer involved with the affair and had no power to bring closure to the affair. This statement was one that always ended up on various editing room floors and it seemed that anything W.P.Y., III did to put the museum affair to rest, once and for all, never put that message forth.

109.    Gentile, who up to this point, basically honored what he promised to with the Plaintiffs. There were exceptions when Gentile fell behind on matters such as paying utility bills and getting supplies out to the Easthampton home from Worcester. While at times an aggravation, Gentile always seemed to have a reasonable excuse that did revolve around the hectic goings on at the restaurant.

110.    Gentile, seeking the funding he called "the key to making his business a success", made an attractive proposal to W.P.Y., III. Gentile's proposal was that if the plaintiffs allowed him to borrow the balance of the monies being owed, and soon to be repaid by the debtors to the plaintiffs, that Gentile would give the Plaintiffs the following benefits in exchange for the loan:

A.    Gentile was promised a 20-year lease on the property that housed the restaurant after settling the DOR debts, which, Gentile stated "he was close to completing paying off his past due taxes".

B.    Gentile, upon receiving the balance of the monies owed the plaintiffs, would infuse these funds into the business to obtain the equipment necessary to get the "take-out" business off the ground. He would saturate the area hospitals with his menus and advertise his new take out menu in the local paper, radio stations, the Internet and take advantage for the heavy traffic that past the restaurant each day with new highly visible signs.

C.  In exchange for the plaintiffs granting Gentile this loan (a second one), Gentile would

assume all the plaintiffs living expenses. Upon Gentile receiving his lease from Mr.

Evangalista, the loan granted by the plaintiffs would convert into an annuity, which would

pay the plaintiffs living expenses (capped at $1,500 per month) for the term of his lease,

20 years.

D.  The principle amount that Gentile would be liable for to the plaintiffs was the sum of

$100,000, with Gentile also paying an outstanding loan owed to Donna M. Miner. This

$100,000 figure incorporated the $18,000 that Gentile had previously borrowed (and yet

not repaid) from the plaintiffs. The monies Gentile would give Ms. Miner were funds

owed to her by W.P.Y., III and promised to be repaid upon the plaintiffs collecting the

proceeds of the outstanding mortgage.

E.  That upon Evangalista issuing Gentile the 20-year lease, Gentile would make monthly

principle reduction payments on the $100,000 owed to the plaintiffs in monthly

installments (interest waived in lieu of the twenty-year annuity). Gentile would pay out

towards the plaintiffs' living expenses, not to exceed $1,500 per month. At anytime during

the term of the twenty year annuity, the plaintiffs reserved the option of receiving the

amount of $1,500 per month, due no later than the beginning of the second week of every

month, during the term of the annuity, that the entire initial principle of $100,000 would

be paid off within 24 payments being due to the plaintiffs on the first day of every month.

That non payment of the principle amount, or the express terms of the annuity, to the

plaintiffs for two consecutive months would constitute a breach of contract and by default

thereof the amount due the plaintiffs would be accelerated giving the plaintiffs several

options of their choosing to cure the default. The least drastic of options were the

plaintiffs' attorney would (unopposed) step into the business and act as a receiver for a debtor in possession. The most drastic of measures where the plaintiffs would be assigned the twenty-year lease assigned to Gentile, or whatever corporation he held the lease in. This agreement was to be specifically spelled out within a promissory note executed upon Gentile collecting the balance of monies due the plaintiffs with Gentile waiving all legal recourse in the event of a default of the loan. Lastly, the $1,500 per month annuity payments would commence within thirty days of receiving the second loan from the plaintiffs regardless if he had executed the lease with Mr. Evangalista or not.

111.    W.P.Y., III discussed the aspects of Gentile's proposal with his Attorney, Marvin Siegel of Boston, Massachusetts. The first question Attorney Siegel had for W.P.Y., III was "if he trusted Gentile". To which W.P.Y., III stated, in the strongest terms, that he did. Attorney Siegel stated that the terms conveyed to him by W. P. Y., III sounded like an "excellent proposition". Attorney Siegel just asked W.P.Y., III to allow him to review any instruments regarding this agreement prior to W.P.Y., III signing them.

112.    One May, 22, 2003, Gentile settled the balance of the debt owed to the  plaintiffs by the New York Corporation owing them the delinquent debt from the aforementioned mortgage. In accordance with the prearranged financial agreement, as spelled out specifically in the above, between Gentile and the plaintiffs (with W.P.Y., III, acting for his minor child and co-plaintiff, W.P.Y., IV), Attorney Charles O'Connor of Worcester, Massachusetts (representing a Dennis Crowley of Paxton, Massachusetts, the individual lending the New York Corporation the funds to settle the debt owed to the plaintiffs), issued a seventy five thousand dollar cashiers' check made payable to  W.P.Y., III.

113.    In accordance with above loan agreement, W.P.Y., III endorsed the cashier's check

over to Gentile. Together, W.P.Y., III and Gentile walked across the street from D'Errico's and deposited the cashier's check into Gentile's account at the Banknorth Branch on Shrewsbury Street, Worcester, Ma. This deposit was made on 5/22/04, the very same day W.P.Y., III received the payment from Attorney O'Connor.

114. Immediately after making this deposit on 5/22/04, W.P.Y., III and Gentile went back across the street to Gentile's office, and executed the promissory instrument previously agreed upon. During the process of the execution of the promissory instrument, W.P.Y., III informed Gentile that, aside from the annuity payments that he was still obligated to pay his portion of the household's expenses. Gentile stated that he clearly understood that this agreement in no way obviated his own obligations to the household's expenses.

115. Previous to W.P.Y., III receiving the balance of the debt owed to the plaintiffs, and previous to the plaintiffs loaning Gentile the eighteen thousand dollars during October of 2002, and with Gentile acting in his capacity as a caretaker to the plaintiffs, each W.P.Y., III and Gentile executed durable Power of Attorney documents which, in the event of certain unusual or unforeseeable events, gave W.P.Y., III and Gentile cross durable power of attorney powers. Gentile and W.P.Y., III went to the Main Branch of the Easthampton Savings Bank and had one of the bank's Officers, a Dennis R. Kahelalis, Notary Public, notarized certain documents which, at that point, would give each W.P.Y., III and Gentile certain legal protections. This document was executed on August 9, 2002. A matter of days after Gentile and the plaintiffs moved to Easthampton. During August of 2002 the debt owed the Plaintiffs became mature. Back then, according to the debtors owing the Plaintiffs the monies mentioned numerous times in the above, the monies owed to the

plaintiffs "would be settled in a matter of days". These cross durable Power of Attorney documents executed between W.P.Y., III and Gentile, were a hastily thrown together document(s) designed to protect the welfare of W.P.Y., IV, in the event of something happening to W.P.Y., III. On Gentile's part, the document was designed so that W.P.Y., III could retrieve any monies or properties belonging to the Plaintiffs if they were under his control in the event something happened to Gentile.

116. Gentile, after obtaining the funding from the plaintiffs on 5/22/03, busied himself by buying equipment for the restaurant, which included new lighted signs for the outside of the building, and settling more debts owed by the business.

117. Approximately two weeks after the Plaintiffs lent Gentile the second amount of money, he got into an argument with Mr. Evangalista's common law wife, a Lady Jane Silva, whom is a Brazilian National. Ms. Silva worked very hard at D'Errico's Market, in addition to holding down a second full time job. On June 8th, 2003, a Sunday morning, the one day a week the restaurant is closed, Ms. Silva observed from the market that Gentile, and another man with him, were bringing a known street prostitute into the closed restaurant. Ms. Silva had witnessed this prostitute on the premises prior to this date and took a notable exception to these persons' presence on the property. The last time Ms. Silva caught this prostitute on the D'Errico's complex, the prostitute was discovered in her office at the market.

118. Gentile and his party, including the prostitute, had locked themselves in the restaurant after entering it. Ms. Silva became upset seeing this very same prostitute back on the Complex's property, after she informed all persons working there that "she never wanted to see this person back on the property." Upon Gentile refusing to open the

restaurant's doors (after her pounding on it to get his attention) to expel the prostitute,

Ms. Silva went and got a key to the restaurant door. Upon entering, she found Gentile and

demanded that he remove the prostitute from the property. Gentile and Ms. Silva got into

a heated dispute when Gentile grabbed Ms. Silva, threw her to the floor, and attempted to

cut her throat with a knife he carried on his belt.

119.   Ms. Silva, somehow avoided serious injury, got to her feet and immediately went to

the Worcester Police Department where she reported that "Gentile had tried to kill her".

Ms. Silva made a complete statement to the Worcester Police, who immediately

proceeded to East Central Street (D'Errico's Restaurant), to arrest Gentile for assault

with intent to murder in addition to numerous other charges. The police did observe a

wound on Ms. Silva's neck that was caused by the knife slash Gentile made on the throat

of Ms. Silva.

120.   According to Mr. Evangalista, who called W.P.Y., III at his home, moments after

"no less than 30 police officers" responded to the restaurant looking for Gentile to arrest

him. Gentile had fled the scene by the time the police arrived. Mr. Evangalista was frantic

and asked W.P.Y., III to come to Worcester immediately.

121.   Leaving W.P.Y., IV with Ms. Cowlan, W.P.Y., III rushed to Worcester.

122.   By the time W.P.Y., III made it to Worcester (D'Errico's), the police had came and

went. Upon W.P.Y., III finding Mr. Evangalista in his office within the market, he

attempted to sit Evangalista down to inquire as to what had happened. Evangalista knew

little except that Ms. Silva had gone next door to the restaurant upon her observing

Gentile bringing a person into the then closed restaurant that she believed was a prostitute.

That an argument broke out between Silva and Gentile and that Gentile had thrown Silva

to the floor and tried to cut her throat. Mr. Evangalista was visibly shaken. He did not

know what to do.

123.  W.P.Y., III said he would try to find Gentile and, at the very least, get to the

bottom of what happened. As W.P.Y., III started to leave the market with Mr. Evangalista

walking him to his automobile, Ms. Silva pulled up in her vehicle, having her sister in her

car along with her. Ms. Silva was visibly upset and started screaming at Mr. Evangalista

about having that "psycho" Gentile working there and Mr. Evangalista making choices

favoring Gentile over her, stating that this was due to Gentile keeping "him (Mr.

Evangalista) supplied with cocaine".

124.  Seeing Ms. Silva's distress, W.P.Y., III tried to speak with her to see if she was all

right. Ms. Silva had always been kind to W.P.Y., III and his son. At that moment all W. P.

Y, III could do was ask Ms. Silva if he could help her in any way. To that question, she

responded to the affirmative, asking W.P.Y., III to keep that "lunatic Gentile" away from

her. She had told W.P.Y., III that Gentile had people driving by her home slowly. Ms.

Silva took this as some type of implied threat. W.P.Y., III promised Ms. Silva that he

would track Gentile down and no harm would come to her.

125.  W.P.Y., III was successful in locating Gentile a few hours later in Worcester. Upon

asking Gentile why he had attacked Ms. Silva, Gentile started using profanities to describe

Ms. Silva. Gentile stated that Silva was "interfering in his business" and flew into a

diatribe about different things Ms. Silva had supposedly done which had previously upset

him. W.P.Y., III made his feelings known to Gentile that he was to leave Ms. Silva alone

and attacking Ms. Silva was a despicable action. Gentile needed to be reminded by

W.P.Y., III that Ms. Silva came to this country with nothing and had worked very hard to

keep the market operating without ever being paid a penny for her work. Additionally, Gentile was now becoming upset for being berated in front of his "gang" of Worcester cronies. Despite Gentile being spoken to in a very harsh tone by W.P.Y., III, he made it clear to Gentile's friends who were present, that if anyone bothered Ms. Silva, that he would personally take actions to protect her.

126.    Trying to get Gentile to focus on now being a wanted fugitive and what he was going to do about it, Gentile told W.P.Y., III that he was going to see Ms. Silva "did not make it to court to testify against him". W.P.Y., III stated to Gentile that "he was talking foolish" and he better get an attorney to face the charges tomorrow (Monday) in court. W.P.Y., III told Gentile he gave Ms. Silva his word that no one was going to harm her.

127.    Mr. Evangalista and Gentile asked W.P.Y., III to take over the running of the restaurant until the warrants pending against Gentile could be "taken care of". W.P.Y., III stated that he (as they knew) had health issues and simply driving could pose a danger during the times W.P.Y., III's vision would fail him.

128.    W.P.Y., III told Gentile that he would cover him at the restaurant under the condition that he leaves Ms. Silva alone. Gentile said he would but was going to "lay-low" for whatever time it took to get the charges now pending against him "bagged" through his "connections".

129.    W.P.Y., III did manage the restaurant for approximately two weeks. Doing so greatly taxed his health. Several separate times, while commuting back and forth to the restaurant, W.P.Y., III would be forced to pull over and wait until his vision came into focus enough so he could drive. During the two weeks of running the restaurant, W.P.Y., III discovered that between catering orders and the daily revenues of the business, that it

would bring in $4,000 per day on the average.

130.   Gentile did get the pending warrants against him "taken care of" after Ms. Silva signed an affidavit recanting her initial statement to the police. Gentile had worded this affidavit, typed it up and got Ms. Silva to sign it under duress.

131.   Upon the warrants being dropped against Gentile, who once again credited his "connections", he resumed management of the restaurant. Prior to Gentile doing so, the asset manager for the D'Errico's families trust, offered Gentile's job to W.P.Y., III. W.P.Y., III politely declined citing his health and the fact that he simply could not do such a thing to his friend (taking Gentile's job). The only reason  W.P.Y., III filled in for Gentile was only to protect his assets then invested in the restaurant and really knew nothing about running a restaurant. The Evangalista asset manager told W.P.Y., III how impressed he was with him and despite W.P.Y., III not having any experience in ever running a restaurant, he had managed to hold things down fine in the absence of Gentile. W.P.Y., III credited the waitress "Michelle" for showing him what the job entailed.

132.   In August of 2003, Ms. Cowlan was forced to resign her position with the plaintiffs.

133.   W.P.Y., III, now placed on Morphine for his trigeminal nerve pains needed a replacement for Ms. Cowlan immediately.

134.   Now in addition to needing another live-in caretaker and W.P.Y., III's worsening condition, W.P.Y., III was gravely concerned over the loan made to Gentile. Since Gentile's working himself into the plaintiffs' lives, W.P.Y., III realized that he had exercised poor judgment in befriending Gentile. While not being educated in the area of mental health it was becoming more obvious, by the passing of time, that Gentile had a serious personality disorder.

135.   The Plaintiffs, now without the benefit of anyone to help them in their day to day living, informed Gentile that since they had no friends or family within 100 miles of Boston, that they would have to place an ad in the paper to obtain new live-in help. Gentile suggested that he might be able to find a new person and to give him a few days to look into it.

136.   The date then being August, 2003, W.P.Y., III pressed Gentile about the issuing of the lease on the restaurant and his anxiety over getting the loan repaid before he (Gentile) ended up in some other trouble and the plaintiffs would be stuck running the restaurant just to recover their funds. Gentile stated that Evangalista's CPA had "screwed up the paperwork on the new corporations' filing". Gentile stated to W.P.Y., III that the CPA had filed for an Employee Identification Number with the Internal Revenue Service, but neglected to file the new corporation with the Massachusetts Department of Revenue. Because of the mistake, they were now seeking a "double penalty" on the back meal taxes owed since forming the new corporation to run the restaurant under.

137.   Within two days after the Plaintiffs told Gentile they would need to place an ad to find a new live-in caretaker, Gentile came back to the plaintiffs and informed them that "he got" W.P.Y., III's sister and W.P.Y., IV's aunt, Mary Ann Paicopoulos, AKA Mary E. Youngworth  to agree to come up from Florida and act as their caretaker.

138.   W.P.Y., III immediately rejected Gentile's proposal. Paicopoulos and W.P.Y., III had been estranged for eighteen years. She had just been released from a Florida Prison. Additionally, she had been a crack cocaine addict for many years and was diagnosed suffering from several mental illnesses.

139.   Paicopoulos, since her release from prison, had been calling the Plaintiffs' home

several times per week. Paicopoulos had developed a relationship via the telephone with her nephew W.P.Y., IV. She had sent him small gifts and presents over the few months prior to August 2003. W.P.Y., III was then considering her request to come and visit them during the holidays, but had serious reservations about letting her into the plaintiff's life on a live-in basis.

140.    Upon learning about the rejection by W.P.Y., III of Paicopoulos coming to act in the capacity of a live-in caretaker, she began a persistent calling campaign to the plaintiffs. The gist of her calls was that she was a "changed person", she was in therapy and her illnesses were all well under control with medications, that she had not "touched drugs" since being released from prison and, lastly, she was a "changed person deserving another chance". Most compelling was her plight that she was then complaining that she was forced to live at her father's (W.P.Y., Jr.) and" he was acting cruel to her".

141.    Paicopoulos and Gentile relentlessly sought W.P.Y., III's capitulation on his position about her taking on the role of the plaintiff's caretaker. Soon W.P.Y., IV started to beg his father to let his aunt come and stay with them.

142.    While W.P.Y., III was considering the persistent requests regarding the topic of Paicopoulos coming to live with the plaintiffs, he injured himself. W.P.Y., III, due to past traumatic injuries, is a chronic sleepwalker. He needs to be watched at night as he has taken severe falls and had other accidents in the house during the evenings due to his sleepwalking bouts. These sleepwalking events caused W.P.Y., III's main fears in where he insisted on having constant live-in help.

143.    With W.P.Y., III now having medications in his home that could be lethal if taken in his sleep, which he had done prior with other medications on several occasions, had

numerous other fears that made the presence of a live-in caretaker an absolute necessity.

144.   Upon Gentile being called by W.P.Y., IV and being informed that "his dad had a big lump on his head from falling in his sleep" (again), Gentile gave W.P.Y., III no option about Paicopoulos coming to the plaintiff's home. Within three days of W.P.Y., III's sleepwalking accident, Paicopoulos showed up on the plaintiffs' doorstep.

145.   W.P.Y., III was surprised that Gentile was in touch with Paicopoulos. For all he (W.P.Y., III) knew, Gentile had only answered the phone once or twice when Paicopoulos had called their home. What W.P.Y., III did not know, was that both Gentile and Paicopoulos were speaking frequently without W.P.Y., III's knowledge.

146.   Prior to Paicopoulos showing up at the Plaintiff's home, any discussions with Gentile about Paicopoulos centered on the subject about Paicopoulos being a humiliation to W.P.Y., III due to Paicopoulos' past history of being a common streetwalker and crack addict. While Paicopoulos' drug addiction and profession were merely a source of embarrassment for W.P.Y., III, Paicopoulos' past actions had greatly harmed W.P.Y., III. In addition, Paicopoulos had abandoned her very own children, something W.P.Y., III had never forgiven her for.

147.   Paicopoulos settled into the plaintiffs' home. Prior to her doing so, W.P.Y., III forewarned her that he would have a very low threshold of tolerance towards her past behavior.

148.   Paicopoulos was informed about the financial contract he held with Gentile. W.P.Y., III further explained how Gentile would need to be faxed a shopping list every Saturday so Gentile could bring the various items the household needed home on the following Sunday, his day off.  W.P.Y., III also informed Paicopoulos that "Little Billy"

liked to do that as one of his chores and frequently Gentile was subject to "space out" the things he needed to do for the plaintiffs. During the times he (Gentile) did such things, that it would be necessary to go to Worcester, and if Gentile was not around, simply go into the market and take the groceries, but to be sure they made a slip up front at the cash register, to give to Gentile for payment.

149.   Paicopoulos seemed to be a changed person to W.P.Y., III on the surface. As was consistent with the habit W.P.Y., IV had developed, he was thrilled to know his Aunt and bonded quickly with her.

150.   At the end of the first month of Paicopoulos arriving at the plaintiffs' she observed Gentile's habit of neglecting the plaintiff's obligations in favor of the restaurants'. Paicopoulos suggested that W.P.Y., III make some contingent plans for W.P.Y., IV in the event W.P.Y., III's illness turned out to be terminal. Documents were crafted by W.P.Y., III in the event of his death or incapacitation. These documents, drafted but never executed, made W.P.Y., IV's custody in the charge of Paicopoulos, as she requested W.P.Y., III to set forth in writing. W.P.Y., III, still having reservations about Paicopoulos, decided to leave the documents unsigned assuming that anything happening to W.P.Y., III would be something that would not be sudden, like in the death of Judith Youngworth. The last thing W.P.Y., III would ever want to happen again, was W.P.Y., IV ending back in the custody of the state. W.P.Y., III drafted the documents, showed Paicopoulos where they would be found in the event of something happening, and instructed her to get the documents to him for his signature.

151.   With approximately one month passing since Paicopoulos' arrival, she received a call from her son "William" Paicopoulos whom she had left behind in Florida.

Apparently, William had a minor altercation with the authorities in Florida and he was on probation, which had been originally transferred from Massachusetts. Due to the Florida arrest his probation supervision in Florida was terminated and sent back to Massachusetts for violation disposition.

152.  Paicopoulos asked W.P.Y., III if William could come up from Florida and stay for no longer than two weeks. It seemed highly unlikely that a probation violation based upon this incident would result in any incarceration. Thereafter, William's sister would find him his own apartment in the Milford, Massachusetts area, where his father's family resided.

153.  W.P.Y., III allowed William to come and stay at the plaintiff's home.

154.  Within days of William's arrival, he and his mother (Paicopoulos) started fighting with arguments escalating to physical altercations. Paicopoulos went to the Easthampton Police and obtained an Emergency Restraining Order citing that William had assaulted her. W.P.Y., III observed no such happening. Upon directing a sharp rebuke towards Paicopoulos for bringing such a problem to the plaintiffs' home, Paicopoulos, stated that she was "sick of the kid". W.P.Y., III made a point out of telling Paicopoulos that, in his observations, she had always been the aggressor in these fights between them.

155.  Paicopoulos went to the Northampton District Court the following Monday after the issuance of the Emergency Restraining Order. After speaking to a court official she had William committed to a State Hospital for observation.

156.  W.P.Y., III informed Paicopoulos of his distaste for the actions that she had taken against her own son, considering she had abandoned him for the majority of his life.

157.  Paicopoulos, claiming that the plaintiffs' truck was too hard for her to drive, was provided with an automobile more to her liking. Upon Paicopoulos obtaining a vehicle,

she started to make trips from the plaintiff's home. Shortly after Paicopoulos started

taking her trips from Easthampton, she would begin a pattern where she would stay out all

night only returning in the mornings with valuable items and a lack of a logical explanation

as to their origins.

158.  W.P.Y., III informed Paicopoulos that, whatever she was up to during these

evenings spent away from the plaintiffs home, to cease the activities. Just prior to

Paicopoulos spending this unexplained time away from the home, she claimed she fell

down the second floor staircase leading down from the landlords' second floor dwelling.

W.P.Y., III brought her to the Cooley Dickenson Emergency Room where, after X-rays,

she was released being bruised but not showing any broken bones.

159.  Paicopoulos continued to claim that she was having pain from her shoulder. Upon

W.P.Y., III taking her back to the Emergency Room at the Cooley Dickenson Hospital, a

fracture was detected in her shoulder. As soon as Paicopoulos arrived in Massachusetts

W.P.Y., III attempted to obtain Mass Health Insurance for her, but Mass Health was

refusing to properly accept her applications numerously filed.

160.  One night, after Paicopoulos had left for one of her evenings outside the home,

Paicopoulos failed to return. The plaintiffs failed to hear from her for over two days.

W.P.Y., III found his medications missing during Paicopoulos' absence.

161.  Paicopoulos eventually contacted the plaintiffs stating that she was locked up in the

Cooley Dickenson Psychiatric Ward. ,a lock down unit. W.P.Y., III later that day, while

rounding up items Paicopoulos had requested be brought to her at the hospital, saw his

Pairpoint Lamp, which was part of the furnishings within the bedroom she was staying in

at the plaintiff's home, was missing. When W.P.Y., III brought Paicopoulos the items she

requested brought to the Psychiatric Ward, he asked her about the whereabouts of his medication and Pairpoint Lamp (an extremely valuable antique). She replied that she had attempted to commit suicide using all of W.P.Y., III's medication. She was going to sell his lamp, but never did, and it was in her car that was in the hospital parking lot.

162.   W.P.Y., III went down to Paicopoulos' automobile in the hospital parking lot. He found the car unlocked, the passenger side fender and front grill damaged, and the lamp, which she claimed was in the car, missing.

163.   W.P.Y., III went to the Security Officers at the Hospital and stated that his sister, who was admitted to the hospital, stated a very valuable antique lamp was in her car that was locked. That W.P.Y., III had found the car unlocked and the lamp, which Paicopoulos stated was in a box in the car, missing.

164.   W.P.Y., III called Gentile and informed him of what Paicopoulos had done. Gentile stated that he would go to the hospital that evening and speak with her. W.P.Y., III told Gentile that she (Paicopoulos) should go back to Florida and that the plaintiffs simply could not have any additional grief that she was already bringing to the plaintiff's lives.

165.   Gentile came to see W.P.Y., III and stated that Paicopoulos' conduct was caused due to her "being off her meds" and that issue was being taken care of by the hospital. Additionally, Paicopoulos, according to Gentile, needed something to do and just sitting around in Easthampton was "driving her crazy". W.P.Y., III did not find Paicopoulos' excuses compelling and still wanted her to return to Florida.

166.   In October 2003 W.P.Y., III was referred by his neurologist, Dr. John O'Connor of Northampton, Massachusetts, to Doctor Kasandra, a neurosurgeon at the Massachusetts General Hospital in Boston.

167.   Doctor Kasandra examined W.P.Y., III after which the doctor determined that the injuries W.P.Y., III suffers from were "too posttraumatic" for the type of surgery Dr. O'Connor referred him for. Doctor Kasandra referred W.P.Y., III to Dr. Aquadro of the Mass. General Hospitals' Pain Clinic, for other types of surgery.

168.   Being apparent that W.P.Y., III was going to become a patient of a Boston hospital, it became necessary for the plaintiffs to move closer to Boston. Additionally, Gentile had employed Paicopoulos at the restaurant as a waitress.

169.   The plaintiffs found a new residence at 25 Clark Street Unit 1F in Spencer, Massachusetts. The plaintiffs found this dwelling through a "for rent" sign posted in the front yard of 25 Clark Street Spencer, Mass. While in the company of Paicopoulos, they ventured to Spencer to check out the schools in the community.

170.   Gentile had recommended Spencer to the Plaintiffs, as he had a good familiarity with the community from his family owning the shack on Lake Whittemore.  The Gentile family had a 30-year history with the town. Spencer was within 45 minutes of Boston, as opposed to the two-hour drive from Easthampton. According to the information W.P.Y., III was provided by the Mass General Pain Clinic, the treatments would be over a several month period, with W.P.Y., III undergoing several surgical procedures within that time period.

171.   The plaintiffs desired the housing unit they happened upon. The foremost reason was that 25 Clark Street, Spencer, was within a 100-yard walk from the Knox Trail Middle School. Without W.P.Y., III driving and Paicopoulos' proven instability, this apartment would be perfect for the plaintiffs.

172.   W.P.Y., III wrote the phone number down which was displayed on the "For Rent"

sign on the Clark Street property. Upon returning home, W.P.Y., III called the phone

number which was on the "for rent" sign. There was no answer so, W.P.Y., III left a

message on the recording device.

173.   The following day, on or about approximately the third week of October, 2003, the

plaintiffs received a reply from the message left on the recording machine. The response

was from a woman calling herself "Chris". W.P.Y., III stated to Chris that they were

interested in renting her apartment. Whereupon W.P.Y., III, and "Chris" set an

appointment for the following Saturday to view the "two different apartments" Chris had

for rent.

174.   That following Saturday the plaintiffs, with Paicopoulos, traveled from

Easthampton to Spencer to view the two apartments for rent. Initially W.P.Y., III was the

only one of their party that went in to view the apartments.. "Chris", who formerly

introduced herself as Chris Hoyt, first showed W.P.Y., III the first of the two first floor

units she had for rent. This first unit was a two-bedroom apartment with a built-in trundle

type bed in the back apartment. W.P.Y., III explained that he had so much furniture that

the built-in bed wouldn't be needed. Hoyt thereafter showed W.P.Y., III the second first

floor apartment. Herein "Unit 1F".

175.   While W.P.Y., III found the unit small, the unit was immaculate and would be

suitable for the plaintiffs needs. W.P.Y., III called W.P.Y., IV in from the car to see if he

liked the apartment. W.P.Y., IV met Ms. Hoyt, looked around and said to his Father that

he did. Thereafter W.P.Y., III told his son to go back to the car so he could talk to Ms.

Hoyt.

176.   Ms. Hoyt asked some background questions of W.P.Y., III. In response to Ms.

Hoyt's questions, W.P.Y., III proceeded to explain that he had lost his wife and was presently living in Easthampton. He stated that he first rented the unit, but became involved with the property owner who had offered him a partnership in the property. He went on to inform Ms. Hoyt that he took up his present landlord with her offer and it turned out to be a mistake. At present, they were not getting along and he thought it best to cut his losses and move on.

177.  Ms. Hoyt asked W.P.Y., III about his income. He responded that he was the financier of a Worcester restaurant named D'Errico's and his living expenses were paid by way of a note he held on the business. In addition to that income he also received insurance benefits from his late wife for both his son and himself. W.P.Y., III went on to explain that he was an antique dealer by profession, but he was injured in a car accident and now disabled.

178.  W.P.Y., III informed Ms. Hoyt on the spot that he wanted the apartment. Ms. Hoyt asked about whom would be in the household. W.P.Y., III responded that his sister, who worked at the restaurant, acted as a caretaker to him and his son. W.P.Y., III explained that she would be around "periodically" but was most likely going back to their father's in Florida whom she also helped out as he was in poor health as well. W.P.Y., III stated that there was Mark Gentile, who owned the restaurant (the business), but he would never be at the apartment, as he was single and preferred to stay at quarters he had converted out of the back office of the restaurant. Additionally, Gentile maintained 11 Delude Ave., Spencer, Ma. as his legal residence.

179.  W.P.Y., III stated that Mr. Gentile's name would be on the lease, as he would be paying Ms. Hoyt the monthly rent and therefore a legally obligated party to the contract of

the lease.

180.  Ms. Hoyt was visibly pleased that she had just rented one of her empty units. Ms.
Hoyt stated that she was leaving for Australia in a few weeks and if W.P.Y., III wanted
the unit he should act right away or be forced to wait until she returned.

181.  W.P.Y., III wanted W.P.Y., IV to be enrolled in his new school before the
Thanksgiving school vacation. W.P.Y., III informed Ms. Hoyt that he would get Mr.
Gentile to bring her a check as soon as he could tear him away from the restaurant.

182.  The plaintiffs informed Ms. Javonovic that this would be their last month there and
they were moving within the month. When the plaintiffs and Gentile rented the
Easthampton dwelling, they paid Ms. Javonovic the last months' rent in advance. Because
of that, she would not be receiving a rent payment that month as she had already been
prepaid. Ms Javonovic was the owner of the plaintiff's Easthampton home in which they
had been renting.

183.  Ms. Javonovic was upset that W.P.Y., III was moving and they could not "work
things out". Her response was hostile and within a few days of W.P.Y., III's notice, she
served him and Gentile with notices to quit.

184.  Thereafter, she started shutting the plaintiffs' heat off at night, with temperatures
dropping into the twenties during the times she did so. Ms. Javonovic was heavily drinking
during this period and showed up several times at the plaintiffs' door to start fights.
During one of these episodes she picked up a crystal ashtray belonging to W.P.Y., III and
struck W.P.Y., III with it. W.P.Y., III pinned her against a wall in the back staircase and
called for her roommate "Kevin" to come down and get her.

185.  Several days after the above incident, the plaintiffs and Paicopoulos were out of

their home for some reason. Upon returning home, W.P.Y., III discovered that Javonovic had came into his dwelling during his absence from the home. She had returned a cordless drill and the charging unit. Paicopoulos, upon entering the room she stayed in, called for W.P.Y., III. Upon W.P.Y., III responding to his sister, she showed him that a Sentry Safe (which was stored in the closet of the bedroom she was staying in) had been taken out of the closet and forced open. The tools used to do so were left next to the broken open safe. These tools were a large screwdriver and a claw hammer. Upon this discovery, the Plaintiffs and Paicopoulos started an inventory search of their home. Upon the completion of their search they discovered several items missing. Included in the items missing were several hundred dollars in cash and approximately 100 Morphine tablets that had just been prescribed to W.P.Y., III by his physician. W.P.Y., III quickly deduced that the person(s) in their home was either Javonovic, her roommate "Kevin", or both. W.P.Y., III made this assumption because W.P.Y., III's drill and charger had been borrowed by Javonovic some weeks prior. Previous to the day that the plaintiffs and Paicopoulos went out, W.P.Y., III had left a note on Javonovic's door for her to return his drill and charger.

186.   W.P.Y., III called the Easthampton Police Department to report the break in to his home along with the theft and the break in of a safe. The safe used to store W.P.Y., III's narcotic medication. One Easthampton patrolman responded to the plaintiffs' home. W.P.Y., III showed him the broken safe, the tools (untouched) lying next to the safe, and gave the officer a list of what had been stolen. W.P.Y., III informed this officer who had came into his home (that day), why he was sure of it (the return of the drill).

187.   This officer did not record what W.P.Y., III stated was taken. The officer did not go upstairs to ask Javonovic or "Kevin" if they had been in his home. The officer simply

stated he would "file a report" and left.

188.  W.P.Y., III called his Doctor's office the following day to replace his medication. His physician, David M. Slack, M.D. of Easthampton, requested W.P.Y., III provide him with a police report for his records prior to replacing the medication.

189.  W.P.Y., III went to the Easthampton Police Department to get a copy of the police report. W.P.Y., III had numerous 'encounters' with this police department upon them finding out that W.P.Y., III had moved to "their town". W.P.Y., III was informed that "no report had been made over the incident".

190.  W.P.Y., III returned to his Doctor's office to inform him of the news he received from the Easthampton Police. While waiting in Doctor's Slack's outer waiting room, W.P.Y., III, nervous that Dr. Slack would not refill his medication without the police report, happened to pick up that day's local newspaper that is left in the lobby for waiting patients, and in the "Police Blotter" section was mention of the break-in of the plaintiffs home.

191.  Dr. Slack, having been previously informed by W.P.Y., III that the Easthampton Police were "hassling him", accepted the newspaper article in lieu of the police report which the police refused to provide W.P.Y., III.

192.  On 11/18/04, Gentile met with Christine Hoyt at the direction of W.P.Y., III, and gave her a check in the amount of seventeen hundred dollars in the form of a personal check. This amount represented payment for the first month, last month's rent and a security deposit. Hoyt gave Gentile a receipt for the payment of the rental of Unit 1F 25 Clark Street Spencer, Ma.

193.  Hoyt called W.P.Y., III and informed him that Gentile had came by and gave her the

check and the Plaintiffs could start moving in anytime they wanted. Hoyt further informed
W.P.Y., III that Gentile had a key to the apartment and she had left extra keys with the
lease agreements for W.P.Y., III to complete, along with some other papers that related to
the lease of unit 1F. Hoyt explained that she would be leaving for her vacation in a few
days and upon her returning she would collect the lease and papers needing his and
Gentile's signatures.

194.   Gentile was not available to assist the plaintiffs in moving and left the burden to the
Plaintiffs and Paicopoulos to the moving task. The plaintiffs used their cargo van to
accomplish the moving job and did not complete the move to Spencer until the first week
of December, 2003.

195.   W.P.Y., III enrolled W.P.Y., IV in the Knox Trail Middle School and he started
attending that school approximately the first week of December.

196.   Prior to moving, W.P.Y., III had his telephone, cable television, and Internet service
transferred from Easthampton to Spencer. W.P.Y., III had to obtain a new gas and electric
utility provider as his Easthampton providers did not offer service in Spencer.

197.   W.P.Y., III gave Gentile the final bills needing payment from his former gas and
electric utility providers. Gentile, upon receiving these bills from W.P.Y., III, said he
would see to their payments "immediately".

198.   Gentile was pleased, at first, by the Spencer move. His pleasure was based by the
fact that the monthly bills would be substantially less in Spencer than in Easthampton.
Alone, the Spencer Apartment was three hundred dollars less per month than the nine
hundred and seventy five dollars per month rent Gentile was then paying for the
Easthampton home. The plaintiff's were pleased that now being closer to D'Errico's

would represent less aggravation to them when Gentile neglected to do something. As well, W.P.Y., III, now growing impatient and skeptical with Gentile performing on the loan agreements, was less anxious being closer to the restaurant in the event Gentile defaulted and he would have to step in to recover his monies.

199.  With the plaintiffs now within 15-minutes from D'Errico's, W.P.Y., III was seeing Gentile on a more frequent basis. In W.P.Y., III's visits with Gentile, W.P.Y., III was placing pressure on Gentile to get his lease completed with Evangalista. Gentile was responding to W.P.Y., III's requests with claims that "Things were being held up by Evangalista's CPA's mistakes and Evangalista's Asset Managers' failure to craft a lease document".

200.  W.P.Y., III, after speaking to Gentile about the lease situation, went to have another of the then numerous discussions concerning the lease with Evangalista. W.P.Y., III reminded Evangalista that the money Gentile borrowed from the Plaintiffs was what saved the business and the origins that the funds came from were for his child. W.P.Y., III was seeking the repayment schedule to start taking effect so that the funds could be invested in some sort of income property.

201.  Evangalista, stated to W.P.Y., III "that the lease would be worked out very shortly", and for W.P.Y., III not to be "so concerned" about the situation.

202.  After the first week of living in the new Spencer apartment W.P.Y., III noticed shortages in his medications. When he asked Paicopoulos about the missing medication she stated that she was "taking a few pills here and there" due to the pain she was experiencing in her shoulder. W.P.Y., III told Paicopoulos that he did not have enough medication to supply her and that she needed to get her own Physician to treat her pain.

203.  Paicopoulos reminded W.P.Y., III that she had no health insurance and could not

see a Doctor who would treat her pain until she had insurance.

204.  Paicopoulos wanted to speak to W.P.Y., III's Attorney in Springfield regarding her

injuries. W.P.Y., III did, in fact, bring Paicopoulos to the office of Attorney Anthony

Collins. Upon such meeting, Attorney Collins agreed to take Paicopoulos' case and sent a

letter to Javonovic placing her on notice over Paicopoulos' accident on her property.

205.  On or about the third week of December 2003, Paicopoulos returned to her father's

home in Stuart, Florida, to spend the holidays with him.

206.  Paicopoulos called the plaintiff's home almost each night, collect. She would speak

to the plaintiffs briefly during the first few calls. After Paicopoulos had been at her father's

for approximately three days, her nightly calls incorporated her complaints of being in pain

"from her broken shoulder". W.P.Y., III pointed out to her that when she was working at

D'Errico's she never complained of pain in her broken shoulder. Paicopoulos responded

that she was using both illegally obtained narcotic drugs and taking W.P.Y., III's

medication, which allowed her to work without pain.

207.  W.P.Y., III expressed his sympathy over Paicopoulos' pain complaints. Paicopoulos

requested W.P.Y., III "mail her ten of (his) morphine pills". W.P.Y., III told Paicopoulos

that was "out of the question". Thereafter, W.P.Y., III voiced his displeasure with her for

taking his medication without his permission. This revelation also answered W.P.Y., III's

question as to why his medication was coming up short.

208.  W.P.Y., III asked Paicopoulos how she was taking his medication. Due to previous

theft of his medication, he started hiding it in his room. Paicopoulos stated that she would

steal some of the medication when she would find W.P.Y., III's pill bottles without his

knowledge. Paicopoulos then stated that she was in "withdrawal" from drug addiction and could not find any of her father's pills.

209.   W.P.Y., III first voiced his displeasure with Paicopoulos' admission of stealing his medication, but told her that she better get some sort of help. Paicopoulos asked W.P.Y., III if that meant "she could not come back to Spencer". To that question W.P.Y., III answered that given her admission she was addicted not to just drugs, but his own medication, and her losing sight of why she was at the Plaintiff's home to begin with, that it would be best for her to remain in Florida.

210.   On New Years' Eve, 2003, Paicopoulos, being intoxicated, called W.P.Y., III at the residence of Donna Miner in Springfield, Massachusetts. Previous to her calling W.P.Y., III, W.P.Y., IV, who was being watched by a friend for the evening, called his father and said that his Aunt called the house "demanding to know where his Father was". The person who was watching W.P.Y., IV at the plaintiff's home, also called W.P.Y., III in Springfield, to inform him that "his sister was calling the house and making threats" to the effect of "screwing him when she returned".

211.   Upon Paicopoulos reaching W.P.Y., III, he demanded to know why she was calling everyone and hassling them. Paicopoulos slurred some profanities and the plaintiff hung up on her.

212.   On 1/1/04, Paicopoulos called the plaintiff's home. Speaking to W.P.Y., III, she apologized for her behavior on the previous evening. Thereafter, she requested to return to the plaintiffs' home. W.P.Y., III stated to Paicopoulos that in light of her admissions, being again addicted to drugs, and once again taking his medication, that he had decided that she needed to find her own home. Stating to W.P.Y., III that she "had no other place

to live" but wanted to return to Spencer and from there would probably move in with her son William. Paicopoulos stated that she was returning to Massachusetts tomorrow (1/2/04) and they would discuss it then.

213.  Paicopoulos did return to Massachusetts on 1/2/04 and came back to the plaintiffs home. Now not welcomed, she stated that she would be spending most of her time at the restaurant and with Gentile, until they could figure out something for new housing for her.

214.  In January, Paicopoulos asked W.P.Y., III to set up a meeting with his attorney in Springfield in order to get her damage action filed over her "falling accident". After the meeting that W.P.Y., III attended with Paicopoulos at Attorney Collins' Office, Paicopoulos told W.P.Y., III that she really did not break her shoulder in the Easthampton 'fall', but had broken the bone years prior in a car accident in Florida. She stated that "she never had the bone set and from an X-Ray no one could tell if it was an old injury or a new one".

215.  W.P.Y., III was annoyed once more with Paicopoulos with her now involving his attorney and himself in insurance fraud. W.P.Y., III told her to write Attorney Collins and to drop the case. Paicopoulos never did so, leaving W.P.Y., III to notify Collins. Due to an oversight and Paicopoulos lying that she would do so immediately, W.P.Y., III did not get the opportunity to notify Attorney Collins of Paicopoulos' scam until a few months later.

216.  Approximately the second week of January 2004, W.P.Y., III requested Gentile retrieve a prescription at the Spencer CVS Pharmacy. Gentile did so that same day. Upon taking one of the dosages of the prescription, W.P.Y., III noticed it did not resemble the medication he was accustomed to taking. Assuming it was a generic version W.P.Y., III

dismissed his concerns.

217.   In the same second week of January, 2004, W.P.Y., III received a call from a Verizon Account Representative. The Verizon employee called to inform W.P.Y., III that his telephone account had not been paid for over three months and his bill was overdue by $500.00 dollars. Previous to this call, Gentile claimed to have paid this bill.

218.   W.P.Y., III attempted to contact Gentile on his cell phone. The phone was on voice mail. W.P.Y., III called D'Errico's after calling Gentile's cell phone. The phone was answered by a D'Errico's employee who informed W.P.Y., III that Gentile was not at the restaurant. It was obvious to W.P.Y., III that Gentile was avoiding him.

219.   On the day following the above event, W.P.Y., III received another call from a Verizon representative who asked for Paicopoulos. The Verizon employee informed W.P.Y., III that an installation person would be there the following day to install the second line Paicopoulos had ordered.

220.   W.P.Y., III became suspicious behind the call for Paicopoulos' request to install her own phone line. Thereafter, he called Paicopoulos at D'Errico's to ask her why she was ordering phones in the plaintiff's home. Paicopoulos' response was "she was in the process of getting her own place and needed the phone".

221.   In January of 2004, Gentile and Paicopoulos started moving utilities to the Plaintiff's residence out of W.P.Y., III's name and into Paicopoulos' to legitimize her residence at 25 Clark Street, Unit 1F, Spencer, Massachusetts, without the plaintiffs' knowledge, as part of their conspiracy.

222.   On Sunday, January 25th, 2004, W.P.Y., III, having been ill since the day after Gentile brought him his medication, collapsed in his home. Paicopoulos and W.P.Y., IV

were present.

223.   W.P.Y., III regained his orientation moments later. Paicopoulos called Donna Miner

of Springfield, Massachusetts, and requested  Miner to watch W.P.Y., III in her home

until W.P.Y., III's upcoming series of medical testing. This call was made at W.P.Y., III's

request. Paicopoulos attempted to dismiss the collapse as part of the visual impairments

W.P.Y., III suffers from which, in the past, had caused dizziness.

224.   Miner agreed to monitor W.P.Y., III in her home and Paicopoulos drove W.P.Y.,

III to her home on that date.

225.   On 1/28/04, Miner took W.P.Y., III to his primary care Physician (David M. Slack,

M.D.) of Easthampton, Ma. Upon Dr. Slack's examination of W.P.Y., III, he ordered a

series of testing done at the Cooley Dickinson Hospital in Northampton.

226.   Later that same date Paicopoulos stated she needed $450.00 from W.P.Y., III to

obtain a washing machine and dryer for his home. W.P.Y., III replied to Paicopoulos'

request by telling her to get the funds from Gentile, since these were items he was

previously obligated to obtain for the plaintiffs. Paicopoulos knew W.P.Y., III had

received his benefit checks on that day.

227.   Paicopoulos stated that Gentile was being "cheap" and refusing to take the time to

obtain the appliances for the plaintiffs. Paicopoulos informed W.P.Y., III that he needed

these items and being aware of Gentile's conduct of most recent, with lying about paying

bills which he had not paid, "that she would iron everything out and get Gentile to pay the

back bills and repay the plaintiffs for the appliances".

228.   W.P.Y., III stated that he would give Paicopoulos the funds. Paicopoulos stated she

needed the funds "immediately" due to the owner of Scalamos' Appliances of Worcester

having two machines for the plaintiffs "at cost" but wanted the money "that evening".

229.   Within the hour Paicopoulos traveled from Worcester to Springfield to retrieve $450.00 from W.P.Y., III. When Miner and W.P.Y., III watched Paicopoulos leave, they noticed that Gentile was driving the vehicle and W.P.Y., IV was also in this vehicle.

230.   Upon making this observation, W.P.Y., III remarked to Miner that it was "odd that Gentile was too busy to get the machines but flew to Springfield when he (W.P.Y., III) had money to buy these items".

231.   W.P.Y., III called his son that night to confirm that Gentile drove his Aunt with him to Springfield. W.P.Y., IV responded that Gentile had indeed done so.

232.   The following day W.P.Y., III called Paicopoulos, who informed him that the appliances were being delivered that afternoon. W.P.Y., III had found out the previous day, after going to his Post Office Box to retrieve his monthly insurance checks, that Gentile had not paid the fee for the rental of his box. A mere thirty six dollars. W.P.Y., III informed Paicopoulos that he was certain "Gentile was lying about paying the bills he was obligated to pay" for the plaintiffs as their caretaker.

233.   W.P.Y., III attempted to call Gentile numerous times, but each time his phone would place the calls in his voice mail and Gentile would refuse to respond to the messages W.P.Y., III left for him. It was obvious Gentile was ducking W.P.Y., III.

234.   Upon Gentile failing to respond to W.P.Y., III's phone calls, W.P.Y., III proceeded to send Gentile a series of faxes. Within these faxes, written in pen by W.P.Y., III, he proceeded to voice his displeasure over Gentile's failure to honor his obligations to the plaintiffs and he could be sure that action would be initiated by Attorney Siegel.

235.   While W.P.Y., III was convalescing and awaiting various upcoming medical tests at

Miner's residence, Paicopoulos visited several times to ask W.P.Y., III "what he was going to do about Mark". These questions were to ascertain what actions W.P.Y., III might be planning about Gentile's failure to honor his agreement to the plaintiffs under the provisions of the agreement that existed between Gentile and the Plaintiffs.

236. W.P.Y., III informed Paicopoulos that he had an "upcoming trip to Boston for Medical treatments" and after these appointments he was "going to his attorney's office to enforce his loan to Gentile". W.P.Y., III informed Paicopoulos that he was already speaking to his Attorney, Marvin H. Siegel of Boston, to "weigh his options".

237. Paicopoulos stated that W.P.Y., III should withhold taking actions until Gentile caught up on his taxes. Paicopoulos also informed W.P.Y., III that "Gentile had been given his lease" but Gentile and Evangalista were "keeping it quiet". W.P.Y., III informed Paicopoulos that he had been hearing the tax excuse for far too long and that excuse was worn out.

238. W.P.Y., III called his home everyday to insure W.P.Y., IV had made it home from school. He would call again around dinnertime to check if his son had been fed his meal. His son informed W.P.Y., III that his meals were being sent to him from the restaurant every night, but he would not receive his meals until 8:00 or 9:00 p.m. W.P.Y., IV complained that his meals were always "cold pizza".

239. W.P.Y., III called Paicopoulos to complain about the treatment his child was receiving. In addition to the late meals, W.P.Y., IV also informed his father that he often had no clean clothes for school. Despite Paicopoulos now having the new appliances to wash the child's clothes for school.

240. Upon the February School vacation break, Miner drove W.P.Y., III to his Spencer

home where he gathered up W.P.Y., IV, and brought him back to Miner's home for the vacation.

241. Paicopoulos called W.P.Y., III during the school vacation break and warned him "not to come near the restaurant" and to "watch out for Gentile". W.P.Y., III responded that if Gentile was planning something, as an alternative to his repaying the plaintiffs, that he wanted to know the exact details. Paicopoulos stated that she was "not going to get in the middle of the fight between the both of them".

242. W.P.Y., III had run out of his medication while at Miner's home and had Miner drive him to Spencer so he could retrieve the medication he had "stashed" in his room in a location secreted behind a dresser drawer that he felt was safe from Paicopoulos stealing it yet again.

243. Upon W.P.Y., III arriving at his home, he discovered that his room had been tossed about and upon finding his medication bottle (the Morphine), the bottle was empty of medication and contained sixty dollars.

244. Miner, being previously informed about the numerous problems he had with Paicopoulos "stealing his medication" was waiting outside his bedroom in the kitchen. W.P.Y., III went outside to her upon making this discovery and displayed what the medication bottle was containing, which was currency instead of the medication that they had driven from Springfield to Spencer to retrieve. Ms. Miner was furious that Paicopoulos had stolen the medication and they had driven some 80 miles round trip for nothing.

245. That evening, W.P.Y., III reached Paicopoulos on the phone. Asking her "what was he supposed to do with money instead of his Morphine". Paicopoulos directed her Brother

to "buy drugs on the street like she does".

246.   During the February School vacation, W.P.Y., III called his voice mail and retrieved a message from Hoyt that she had "not been paid the February rent".

247.   W.P.Y., III faxed Gentile a note stating "that if he did not pay Hoyt that day, he was going to travel to Worcester and personally get the funds from him".

248.   Paicopoulos called W.P.Y., III that same evening and informed him that she had "got the rent money from Gentile and gave it to Hoyt" and that Gentile was hiding from W.P.Y., III until he could come up with monies he owed and could commence repaying the plaintiffs the money he owed them.

249.   On Sunday morning February 22, 2004, W.P.Y., III called Paicopoulos and informed her that he and his son were coming home that afternoon. Paicopoulos said she wanted come to Springfield and "drive him home".

250.   Paicopoulos arrived at Miner's home in Springfield. Upon her entering the home, she displayed a digital recording device and stated "Gentile had sent her with it" to both W.P.Y., III and Miner. Paicopoulos informed both Miner and W.P.Y., III that Gentile wanted to hear on tape what W.P.Y., III "was planning to do" (about his failure to honor the terms of the loan).

251.   During the drive home, Paicopoulos informed W.P.Y., III that Gentile had been recording him for " a long time" in an attempt to learn something about the missing artwork so he could "rat out" the persons who had it and "collect the five million dollar reward" being offered for the return of the missing artwork. Paicopoulos informed W.P.Y., III that she had been informed by Gentile that he considered W.P.Y., III a "five million dollar lottery ticket and had only befriended him (W.P.Y., III) until he could

"figure out how to collect the reward money".

252. W.P.Y., III was due to appear before the Northampton District Court the following morning 2/23/04 at 8:30AM. Paicopoulos had agreed to drive W.P.Y., III to Northampton and afterward bring him back to Miner's home. W.P.Y., IV's vacation was over and resumed school on 2/23/04. W.P.Y., III was due at the Mass. General Hospital on 2/24/04 at 11:00AM, an appointment Gentile, Paicopoulos and Hoyt were all aware of which most likely would have required his admission.

253. During the drive to Northampton from Spencer, (approximately one hour in duration) Paicopoulos asked W.P.Y., III "exactly" what he was "going to do" about Gentile's obvious plans to "pocket" the funds the plaintiffs entrusted him with.

254. Paicopoulos, feigning to be "on the side of her own blood", made a point out of reminding W.P.Y., III how she "warned him that Gentile was scheming up a plan" to dispose of W.P.Y., III. She then mentioned that Gentile was considering concealing an illegal firearm in the plaintiffs' home and then "setting him up" by telling police that W.P.Y., III was in possession of an illegal firearm in his home, to showing him how Gentile "wired" her to obtain information. Most importantly, Paicopoulos "just wanted to know what was coming and to be prepared for it". W.P.Y., III informed her that right after his appointment, if he was not admitted, which was imminently possible, that he was going to his Attorney's office (two blocks away from the Hospital) and start the proceedings of seizing the restaurant, which, he had "the power to do by his (Gentile's) default of the Promissory Agreement" W.P.Y., III held on the loan(s) made to Gentile. Paicopoulos stated that if he had to seize the restaurant that she would run it for him. W.P.Y., III stated that he would bring professionals in to recover his assets and after that

was done he would turn the place back over to Mr. Evangalista.

255. W.P.Y., III arrived at the Northampton District Court, argued several motions Pro Se, and thereafter, Paicopoulos took him to Springfield and Ms. Miner's home.

256. On 2/23/04, at 3:00PM, at the request of Ms. Miner, W.P.Y., III, called his answering service to be assured his appointment in Boston was still on for the following date.

257. W.P.Y., III found a message waiting for him that his appointment at the Mass. General Hospital had indeed been cancelled due to his insurance coverage pulling the referral at the last moment due to the Hospital being out of the network of coverage.

258. Ms. Miner, awaiting her own daughter's arrival home from school, decided to return W.P.Y., III to his home in Spencer the following day. W.P.Y., III called his son and informed him that "he would be home tomorrow".

259. Ms. Miner and W.P.Y., III arrived at the Spencer home at 2:00 p.m., wanting to be certain to be home before W.P.Y., IV returned from school. Upon W.P.Y., III trying to enter his home via the back door (the door commonly used to come and go from the house), he found that his key did not work. Ms. Miner was waiting in her car parked in the driveway for W.P.Y., III to get into the house prior to leaving him. W.P.Y., III went around to the front door and found it unlocked. Whereupon Ms. Miner departed back for Springfield.

260. W.P.Y., III called Paicopoulos at the restaurant to inform her that he was home and had not been hospitalized. Paicopoulos was shocked to get this call and while fumbling for a response stated "I can't talk to you"." You have to call Mark, things are all fucked up". W.P.Y., III pressed her for a meaning as to what she was saying. Paicopoulos

then hung the phone up on W.P.Y., III.

261.  Attempting to discover what Paicopoulos was now talking about he called Gentile

on his cell phone. When Gentile answered he asked W.P.Y., III "what he was doing in the

house". W.P.Y., III asked Gentile "what he was talking about". Gentile informed W.P.Y.,

III " that he took a restraining and no trespass order out on him". And that he (Gentile)

"was calling the police to have W.P.Y., III arrested". W.P.Y., III had noticed that neither

of his vehicles were in the driveway of his home and asked Gentile "Where are my trucks".

To that Gentile stated "you have no trucks".

262.  W.P.Y., III called Ms. Miner on her cell phone and asked her to immediately return

to his home and told Miner what had just transpired.

263.  Miner returned within ten minutes. W.P.Y., III went outside and sat in her car while

telling her all he knew about what was going on. At that point he knew nothing. Miner and

W.P.Y., III waited in the driveway for W.P.Y., IV to come home from school and then go

to the Spencer Police Department.

264.  After collecting W.P.Y., IV, upon his arrival from school, W.P.Y., III and Miner, in

fact, went to the Spencer Police Department. W.P.Y., III and Miner went into the Spencer

Police Department and asked if there was a restraining order for W.P.Y., III. The

dispatcher stated "that there was". W.P.Y., III accepted service of a restraining order,

which had Paicopoulos' name listed as the plaintiff. En route to the Spencer Police

Department, Miner and W.P.Y., III asked W.P.Y., IV if he had heard Gentile or

Paicopoulos discussing "anything that they should know". To this question W.P.Y., IV

responded that Gentile had been at the Plaintiff's home the previous evening stating to

W.P.Y., IV that "he was going to take a restraining order out on his father". W.P.Y., IV

went on to say that he paid Gentile's ravings little mind as Gentile was always "sounding crazy" (in the opinion of the then 12 year-old W.P.Y., IV).

265.  Miner and the plaintiffs immediately went to the court where the restraining order was issued from. The East Brookfield District Court, arriving at approximately 3:00 p.m. on 2/24/04.

266.  Upon the arrival at this court, Miner and the plaintiffs proceeded to the clerks' office. Entering the clerk's office, Miner and the plaintiff's went to the counter where the clerks serve the public. An unidentified female clerk greeted them. She asked what could he do for them (Miner and the plaintiffs). W.P.Y., III produced the restraining order and asked this clerk "how can a person's guest throw them out of their own home"? Thereafter, another woman came to the counter. This woman got up from a desk that had a sign on it saying " Carole M. Cristo" "Account Clerk".

267.  This person, identifying herself as "Carole", asked W.P.Y., III "what he meant by what he said to the first clerk". W.P.Y., III explained that "the plaintiff the restraining order was issued for (naming W.P.Y., III as the defendant) was (his) the plaintiff's guest (their Sister/Aunt) and now the plaintiffs were homeless and W.P.Y., IV (then 12-years old) attended the Knox Trail Middle School, and now could not attend school".

268.  Account Clerk Cristo (herein "Cristo") informed W.P.Y., III he could ask for an emergency hearing, "but it being Wednesday no Judges would be available until next week". Miner pointed out to Cristo that it was only "Tuesday and not Wednesday". After seeing the mistake, Cristo assigned the Emergency Hearing request by W.P.Y., III on the Court's docket for 2/26/04 at 9:00 a.m. Cristo had W.P.Y., III fill out an application for the hearing with an affidavit he completed, stating under oath that "The Plaintiff in this

matter is a guest in my home. She is not on the lease. She filed this motion which has left my 12 year old child and myself homeless". Then W.P.Y., III affixed his signature to this affidavit attached to his request for an emergency hearing.

269.   Paicopoulos, after dropping W.P.Y., III at Miner's residence in Springfield at approximately 1:00 p.m. on 2/23/04, immediately went to Gentile and informed him that W.P.Y., III was going to have his lawyer seize the restaurant in the very near future and either recorded the conversation on the way to Northampton or informed Gentile of it verbatim. Thereafter, they went to the East Brookfield District Court and filed fraudulent application for a Restraining Order with Paicopoulos perjuring herself within the attached affidavit in her statement citing that "He (W.P.Y., III) comes at me and yells at me for money or to take one of the vehicles I have he throws things slams things  bang things he is not rational because he's under the influence of narcotics he will not take no for an answer" (quoted verbatim). This fraudulent representation made to the EBDC was committed with the full knowledge and participation of Hoyt and Gentile.

270.   Paicopoulos, in her affidavit, was in reference to the vehicles belonging to the Plaintiffs. The plaintiffs titled, registered, and insured them in Paicopoulos' name since she was the operator of the vehicles. Previous to this the proper ownership of these vehicles were resolved by an assignment of title W.P.Y., III held on several vehicles.

271.   Paicopoulos, Hoyt and Gentile conspired together and filed this fraudulent instrument on 2/23/04 with the East Brookfield District Court and having it issued by that Court at 3:55 p.m.

272.   Paicopoulos' restraining order was issued docket number 0469RO0046 by the East Brookfield District Court and was issued by the Honorable Charles B Abdella, the First

Presiding Justice for the East Brookfield District Court.

273. W.P.Y., III filed his application for an Emergency Hearing at 4:32 p.m. Cristo

stated that "it might not get served on Paicopoulos before the 26th". This meant that

W.P.Y., III's application had to be served on Paicopoulos either that night (the 24th) or

the following day (2/25/04).While giving W.P.Y., III her phone number (so he could call

to discover if service had been made for the hearing on 2/26/04), she stated that "he

should bring a copy of his lease with him for the hearing". W.P.Y., III responded to Cristo

by saying that "his lease was in his home and the restraining (as it then stood) made it

illegal for him to go to his own home and retrieve it". Cristo suggested he call his landlord.

The restraining order also restrained W.P.Y., III from going near D'Errico's Restaurant

145 East Central St., Worcester.

274. With the plaintiffs now being homeless, they were kindly taken in by Ms. Miner and

allowed stay at her home until they could get their own home back. On their way to

Springfield from East Brookfield, Ms. Miner's cell phone rang with the caller

identification showing its origin being "D'Errico's". W.P.Y., III answered the phone.

Paicopoulos was on the line whispering on the call she was "sorry but Mark (Gentile)

made her do it". W.P.Y., III told Paicopoulos he did not care to hear it and she was as

much a party to what Gentile was doing.

275. W.P.Y., III, at the suggestion of Cristo, called Hoyt numerous times between the

early evening of 2/24/04 and late evening 2/25/04, leaving messages of exactly what

Paicopoulos and Gentile were doing with a Restraining Order, faxed her at her work

number and sent her e-mails, all requesting a copy of his lease. Hoyt refused to respond to

any of W.P.Y., III's communications deliberately in order to deprive the Plaintiffs of the

documentation they needed to regain possession of their home.

276.  On 2/25/04, Ms. Miner contacted Cristo, through the number Cristo had provided, to discover if Paicopoulos had been served W.P.Y., III's Emergency Order. Cristo answered that she had been served the evening of the 24th.

277.  On 2/26/04, Ms. Miner and the plaintiffs traveled from Springfield to the East Brookfield District Court (herein EBDC) for the purposes of being heard on the Emergency Hearing. Upon entering the EBDC the plaintiffs and Miner observed Gentile and Paicopoulos talking to a woman wearing a name tag on her clothing identifying her as the "Safety Plan Advocate" and a photo identification on a large string around her neck.

278.  Upon the Emergency Hearing being called before the court, W.P.Y., III representing himself Pro Se, was directed to the defendant's table and Paicopoulos, accompanied by the "Safety Plan Advocate", took up position at the Plaintiff's/ Prosecutor's table. With Judge Abdella presiding, W.P.Y., III was called on by him to begin the proceedings. W.P.Y., III introduced himself for the record and proceeded to move the Court to dismiss Paicopoulos' action as being complete fiction and nothing more than a scheme to defraud W.P.Y., III out of a substantial amount of money by his former business partner who was present in the court's audience. W.P.Y., III went on to inform the court that Paicopoulos was merely a guest in the plaintiffs home and if she was displeased for some reason she should simply go back to Florida from which she had came.

279.  W.P.Y., III went on to inform the Court that Paicopoulos' actions had left the Plaintiff's (with W.P.Y., III, being ill) homeless and W.P.Y., IV (present before the Court, without a school to attend). As to Paicopoulos' allegations that W.P.Y., III was "on

narcotics", W.P.Y., III informed the Court, as it was aware from another matter pending before that very Court, and Judge Abdella, that it was a well known fact that he was being treated with narcotic medication (namely Morphine) and Paicopoulos was merely "braiding a fact with a usable lie".

280.   Prior to Paicopoulos' rebuttal and both parties being sworn as to their testimony, she was being instructed how to respond to W.P.Y., III's allegations by the "Safety Plan Advocate", which was to create an on the spot outrageous and obvious lie.

281.   Paicopoulos testified that "not only was she not on the lease but neither were the plaintiffs" and then produced a document which she claimed was the lease. Paicopoulos testified that only Gentile was the tenant and the Plaintiffs, along with her, "were all Gentile's guests". Judge Abdella asked Paicopoulos to "see the lease" and she handed the document to a court officer who handed it to Judge Abdella.

282.   W.P.Y., III voiced an objection and asked to see this 'lease'. Judge Abdella allowed W.P.Y., III to view this document, which was offered as an exhibit of evidence by Paicopoulos, doing so in a conspiracy with at least Hoyt's and Gentile's participation.

283.   Despite being visually impaired, upon examination of this exhibit of evidence, not only offered by Paicopoulos but being instructed to do so by the "Safety Plan Advocate", after W.P.Y., III was given the 'opportunity' to see it, he instantly recognized that it was made out in red ink, done using Hoyt's own custom formatted leases, and it was signed by Gentile and Hoyt, obviating the plaintiff's on the lease, and backdating it to 11/18/03.

284.   W.P.Y., III informed the Court that this document was a "forgery" and an "Eleventh hour creation designed to deceive the Court". W.P.Y., III further testified that he could not obtain the real lease due to his being barred from his own home by

Paicopoulos' 'Restraining Order", and that "it defied credulity that the plaintiff's were not on the lease given W.P.Y., IV's attendance in a School 100 yards from this address and the utilities being in W.P.Y., III's name. Then, W.P.Y., III informed the court how Paicopoulos and Gentile were moving utilities out of his name behind his back to legitimize Paicopoulos' residence and showing that this entire restraining order affair was a scheme a long time in the planning.

285.    The "Safety Plan Advocate" observing that W.P.Y., III was making valid issues before the Court conferred with Paicopoulos in front of the Court audience, Miner, the Plaintiffs and the Court, thereafter Paicopoulos blurted out "and he (W.P.Y., III) had assaulted her" and the plaintiff's issues simply did not matter because "she was in fear of her life from him" (W.P.Y., III).

286.    W.P.Y., III objected to this accusation and directed the Court's attention to Paicopoulos' affidavit in her Restraining Order. Judge Abdella asked Paicopoulos "if she remembered the hearing in front of him that past Monday". Paicopoulos, at the direction of the "Safety Plan Advocate" furthered her acts of perjury and conspired with the "Safety Plan Advocate" along with Gentile and Hoyt to do so.

287.    The Court recessed to consider the matter. After the Court's adjourning, Judge Abdella denied W.P.Y., III's request to deny Paicopoulos' application for a restraining order. Judge Abdella issued a restraining order against W.P.Y., III, barring him from contacting Paicopoulos, abusing or coming within 100 yards from Paicopoulos and D'Errico's. Judge Abdella amended article number three of this order which allowed the plaintiffs back into their home.

288.    This action legally mooted the Plaintiffs' rights to return to their own home since all

Paicopoulos and Gentile need do was keep Paicopoulos in the plaintiff's home and
W.P.Y., III would be in violation of Judge Abdella's order just by entering his own home,
as later a Spencer Police Officer pointed out, "was not more than 100 yards long or wide",
and "make him subject to arrest".

289.   Judge Abdella's ruling intentionally left the plaintiffs homeless and W.P.Y., IV
without a School to attend. Despite the fact that he was then aware that Paicopoulos had
changed her story to bolster her position using a obvious lie at the direction of the "Safety
Plan Advocate".

290.   Upon the Court concluding this matter, W.P.Y., III sent Ms. Miner and W.P.Y., IV,
to the Spencer Police Department to inform them of the Court's ruling and to arrange an
escort to their home to retrieve certain items. W.P.Y., III's medications were in his home
when he was first forced to flee from it on 2/24/04. W.P.Y., III had not had any of his
medications since then and, in addition to being in severe pain, solely caused by the actions
of defendants, identified above, all the plaintiffs belongings were in their home.

291.   W.P.Y., III went from the Courtroom to the Clerk's office. Upon entering the
Clerk's office he was greeted by an unknown clerk who asked how she could help him.
W.P.Y., III requested a restraining order application so he could be the moving party and
have Paicopoulos and Gentile removed from his and his child's home. Upon making this
request to the Clerk mentioned above, Cristo leaped to her feet, came to the counter and
informed W.P.Y., III that "he could not have an application" and (she) "I am not playing
tit for tat with you". Thereafter, she threw out W.P.Y., III from what she called "Her
Office".

292.   Miner, with W.P.Y., IV, returned from the Spencer Police Department. Miner

informed W.P.Y., III that "Gentile was there (The Spencer Police Department) informing the police that W.P.Y., III was not allowed in his home at all. Miner stated "she left to get him (W.P.Y., III) so he could issue the Court's order upon the police".

293.    Miner and the plaintiffs left the EBDC and returned to the Spencer Police Department. Upon W.P.Y., III and Ms. Miner entering the building, the dispatcher had an Officer Morin come to the window to speak to W.P.Y., III. Amongst other issues discussed with Officer Morin, she examined the order W.P.Y., III produced from the EBDC. Gentile was not present at this point.

294.    While W.P.Y., III and Ms. Miner were speaking to Officer Morin, who was then behind the glass of the reception area (Lobby) of the Spencer Police Station, Gentile came into the building wildly waiving some piece of paper around, and attempting to interrupt the discussion W.P.Y., III was having with Officer Morin. Gentile would not cease his attempts to break into the discussion between Miner, W.P.Y., III and Morin.

295.    With Gentile still carrying on, despite numerous requests from Morin for him to" be seated and wait", Morin came out from around the glass and confronted Gentile. Officer Morin pointed to a bench and informed Gentile that "if he did not shut up and sit down she would arrest him". Gentile still kept ranting and raving. Morin then stated "You just did this to her (meaning Ms. Miner in her first visit to the Spencer Police Department) and if you say one more word your under arrest". It was only then that Gentile took a seat on the bench and ceased his disruptive behavior.

296.    Officer Morin, reviewing the document, agreed with W.P.Y., III's observation that "the situation was a mess". W.P.Y., III stated that he needed to get some items from his home. Officer Morin stated she would get an escort for him so he could enter his own

home.

297. Upon W.P.Y., III concluding his talk with Morin, Gentile then rose and attempted

to serve a paper on Morin. Morin asked Gentile what the paper was. Gentile stated it was

a "No Trespass Order" and "since it was his home he was not allowing the plaintiffs to

enter it", at all. Morin stated she was not accepting his (Gentile's) notice and that "The

Court had settled the matter and it was the plaintiff's home according to the Judge".

298. Morin instructed W.P.Y., III and Ms. Miner to "wait out in the parking lot and they

would be met by officers and escorted to their home". Upon going back to Miner's car to

await the police escort, Gentile came out of the building and went to Ms. Miner's side of

the car (the driver's) and began to shout to W.P.Y., III, "I have you on tape and he

(Gentile) was speaking to the FBI... (and amongst other ramblings) stated "you'll be

reading about yourself". To Gentile's diatribe, W.P.Y., III responded that" he had seen

many things but never anyone they (the police) almost had to arrest to shut up".

299. Gentile got into one of the plaintiffs vehicles and tore out of the police station

parking lot. W.P.Y., III noticed Gentile was alone in the car and commented to Miner that

"he was sure Paicopoulos was busy back at the house stealing the plaintiff's belongings

before they were allowed back into their house".

300. A Sgt. Detective Agnew and Patrolman Leburn greeted Miner and the Plaintiffs.

Thereafter, these police officers followed Miner and the Plaintiffs to 25 Clark Street.

301. Upon Miner, the Plaintiffs, and the Police Officers entering Unit 1F, the plaintiffs

noticed that the apartment had been tossed about. Paicopoulos was occupying the

bedroom that was W.P.Y., III's and would not come out of the room. The police officers

informed Miner and the Plaintiffs that "they had twenty minutes to get anything they

could". Gentile showed up several moments later. The Plaintiffs and Ms. Miner took

everything they could fit into her automobile. W.P.Y., III could not find his medications

and while W.P.Y., IV and Miner were stuffing clothing into trash bags, W.P.Y., III went

into the Plaintiff's living room and retrieved two plastic file storage boxes.

302.  Placing each of the boxes on top of the dinning room table, W.P.Y., III, knowing

exactly where the original leases were, retrieved them and thereafter, in the presence of

Detective Agnew and Officer Leburn pulled them out and displayed them to Gentile

stating "Good, now I have the original lease". Gentile pulled out the very same bogus

lease that Paicopoulos and the "Safety Plan Advocate" introduced before the EBDC, on

that very same date (2/26/04), as an exhibit of evidence, which the court returned to them,

and stated, "I have the original lease right here".

303.  Gentile and Paicopoulos never expected the plaintiffs to be allowed back in their

own home. W.P.Y., III went to his computer and on it's screen was the "No Trespass

Order" Gentile had just typed out still being displayed. W.P.Y., III pulled the hard drive

unit from his computer, out of the system. On the front and back doors of the Plaintiffs'

home this same notice was posted.

304.  W.P.Y., III asked Detective Agnew and Officer Leburn to note certain valuable

objects still in the home. Since Paicopoulos was now in W.P.Y., III's bedroom with the

door closed he could not show them the items of value within that room.

305.  When the plaintiffs moved to Spencer, they had too many possessions to fit in this

apartment, which was considerably smaller than their last home. They stored numerous

items at Gentile's shack on 11 Delude Ave., Spencer, Massachusetts until they could get

the items to more secure storage.

306. Gentile never resided at 25 Clark Street, Spencer. He maintained 11 Delude Ave. as his "legal" address and lived in the back office of the restaurant. Eleven Delude Ave. is also located in Spencer being approximately one quarter mile from the plaintiffs home. W.P.Y., III later discovered that Gentile, upon learning from the police that no matter what he thought he had illegally accomplished to date, that the plaintiffs were going to be allowed back into their home, scrambled from the Spencer Police Department, to the plaintiffs home and stuffed various items in one of the plaintiffs vehicles and stashed them at Delude Ave., before the plaintiffs could get in their home with the police. These items were the property of the plaintiffs.

307. While the plaintiffs were in their home with the police escort on 2/26/04, Gentile informed W.P.Y., III that 11 Delude Ave., Spencer was also posted "No Trespass" barring W.P.Y., III from retrieving his property stored at this address.

308. W.P.Y., III asked Officers Agnew and Leburn how could he get the remaining property in his home. These officers explained to W.P.Y., III that he would have to hire a police detail through the Spencer Police Department.

309. Ms. Miner and W.P.Y., III made plans to obtain a detail for the moving on 3/3/04 through the Spencer Police Department.

310. On 2/27/04, after W.P.Y., III obtained the real lease proving Paicopoulos, conspiring with Gentile and Hoyt, committed perjury before Judge Abdella, sitting for the EBDC in the previous day's hearing (2/26/04) with Ms. Miner and W.P.Y., IV, by submitting a forged instrument (the lease introduced into evidence by Paicopoulos on 2/26/04) traveled to the EBDC with Miner and W.P.Y., IV.

311. Upon arriving at the EBDC, the Plaintiffs and Ms. Miner entered the Clerk's Office.

They were greeted by the Clerk mentioned above in this complaint, whose identity is unknown to the plaintiffs. W.P.Y., III informed this Clerk that he was there (the EBDC) to file for an Application for Criminal Complaint. Thereafter W.P.Y., III handed this clerk his Application for Criminal Complaint seeking perjury charges against Paicopoulos, Gentile, and Hoyt. Attached to W.P.Y., III's application for criminal complaint was a copy of the original lease and related contractual documents signed between W.P.Y., III and Hoyt. These documents were copies of the documents that W.P.Y., III had retrieved on the previous day (2/26/04) in the presence of the Spencer Police Department.

312.  This Clerk helped W.P.Y., III add the Court's own application to his complaint and exhibits of attached evidence. As the Plaintiffs and Miner left the clerk's office after making in hand service of the Application for Criminal Complaint, he observed Cristo get up from her desk and take W.P.Y., III's application from this other Clerk. A moment later the "Safety Plan Advocate" was with Cristo both reading the complaint filed by W.P.Y., III.

313.  On 3/1/04 W.P.Y., III's Application for Criminal Complaint was denied without hearing . W.P.Y., III received this notification via U.S. Mail sent to his Springfield post office box. This document dated 3/1/04 denying the application W.P.Y., III made on 2/27/04, was signed by the Clerk Magistrate of the EBDC, Elizabeth M. Maunsell. (herein "Maunsell").

314.  W.P.Y., III's Application for Criminal Complaint was not based on a theory, conjecture or speculation. It was a foregone fact that just one day previous to W.P.Y., III filing his application for criminal complaint, Paicopoulos, conspiring with Gentile and Hoyt (with Gentile being present before the court and identified for the record as being

present by Paicopoulos) came before that court and committed perjury under oath and compounded that criminal offense by entering a forged document as an exhibit of evidence.

315.    On or about January 25th, 2004, Paicopoulos and Gentile conspired with one another to have Paicopoulos take W.P.Y., IV out of the Commonwealth of Massachusetts for the stated purpose of a "February School Vacation to Disney World" in Orlando, Florida, and murder W.P.Y., III by either contaminating his medication or killing him with a firearm in a staged home invasion.

316.    Several days before the above date, Gentile swapped W.P.Y., III's medication after W.P.Y., III had Gentile retrieve a medication prescription at the Spencer CVS, conspiring with Paicopoulos. Gentile replaced the contents of a bottle filled with a medication known as Klonopin with equal number of pills consisting a powerful dose of Methadone. Gentile and Paicopoulos speculated that W.P.Y., III, taking his daily prescribed Morphine dosage, combined with a powerful dosage of Methadone (three times per day as the Klonopin was prescribed), would "kill him in his sleep".

317.    On 3/03/04 Miner rented a moving truck from a U-Haul outlet in Springfield, Ma. Miner, W.P.Y., III, and a hired laborer drove this truck from Springfield to the Spencer Police Department.

318.    Arriving at the Spencer Police Department, Miner and W.P.Y., III were greeted by an Officer Scott Griffin (herein "Griffin"), a Spencer Police Department Patrolman. He informed Miner and W.P.Y., III that "he was assigned to the detail" that the plaintiffs were forced to hire so they could retrieve their property.

319.    Griffin followed Miner, W.P.Y., III, and the hired laborer to 25 Clark Street. Upon

arriving at the plaintiff's residence, Gentile opened the back door to allow them access to their home.

320.  W.P.Y., III directed the laborer to disconnect the washing machine and dryer, which were situated in the kitchen of the plaintiff's home. Gentile informed W.P.Y., III that "he was keeping them". W.P.Y., III ignored Gentile and started to attempt to disconnect the hoses to the machine. Gentile started crying out the word "Challenge" repeatedly. Ignoring Gentile, W.P.Y., III went for tools in the truck and a dolly to remove the appliances he had Paicopoulos purchase for him just one-month prior. While W.P.Y., III was outside at the truck; Griffin came out to where W.P.Y., III was getting the equipment to remove his property. Griffin informed W.P.Y., III that any items Gentile disputed he (W.P.Y., III) could not have. W.P.Y., III informed Griffin that "every single item in the apartment was his (the Plaintiffs) property and it was his intention to recover them. W.P.Y., III further stated to Griffin that if "he (Gentile) had a problem with that he could take W.P.Y., III to a court about it".

321. Griffin informed W.P.Y., III that if this were going to be a dispute, that W.P.Y., III would "not be allowed to recover any of his property and the four-hour paid detail would end right then and there".

322. Thereafter, Gentile went around the plaintiffs home pointing to items he was not going to allow W.P.Y., III to take. All of which was property belonging to the Plaintiffs.

323.  Miner, W.P.Y., III, and the laborer retrieved what items they could while Griffin and Gentile busied themselves with conversation. Several times Miner interrupted them asking Gentile where specific items were that W.P.Y., IV asked her to be careful and be sure to get for him. These items included cash belonging to him and his IBM lap top

computer. Gentile informed Miner that he "would send these things to her".

324.  Numerous items belonging to the Plaintiffs were removed from their home prior to arriving to 25 Clark Street with the Spencer Police detail to retrieve it. During this moving process W.P.Y., III found the old locks to both doors of his home, having been illegally changed by Gentile, Paicopoulos and Hoyt in order to illegally evict them from the home, in a desk drawer. W.P.Y., III retained these locks which were contained in a zip lock bag, for the express purposes of future prosecution of Paicopoulos, Gentile and Hoyt. These locks were changed with the express consent of Hoyt to lock out the Plaintiffs from their home, despite the fact that the plaintiffs had a legal right to enter their own home and possessed a valid lease.

325.  Miner, W.P.Y., III, and the hired laborer retrieved what items Gentile did not desire to outright illegally deprive them of. Thereafter, they returned to Miner's home in Springfield, emptied out the truck and returned it to U-Haul.

326.  On the evening of 3/03/04, the Plaintiffs spent the evening attempting to inventory what property of theirs Paicopoulos and Gentile had stolen. They discovered and noted numerous items missing. These items mainly consisted of jewelry, documents, and small valuable items.

327.  On 3/4/04, W.P.Y., III sent a letter to John J. Conte (herein "Conte"), The District Attorney for Worcester County Massachusetts. Within this letter W.P.Y., III requested the criminal prosecution of Hoyt, Gentile and Paicopoulos. As W.P.Y., III explained in careful detail the criminal violations of the Massachusetts General Law committed by Gentile, Paicopoulos and Hoyt (Perjury before the EBDC), Maunsell's deliberate indifference to an act of perjury being committed before her very Court, and exhibits of

evidence attached with the original complaint he filed before the EBDC on 2/27/04 which was denied without hearing.

328.   On 3/4/04, W.P.Y., III sent a letter to the Regional IV Administrative Justice (The Honorable Paul F. LoCanto) initiating a complaint for judicial misconduct against the EBDC Magistrate Maunsell. The Regional IV Administrative Justice is the Supervising Judicial Authority having jurisdiction over the EBDC of the Massachusetts District Courts.

329.   Within W.P.Y., III's complaint against Magistrate Maunsell, W.P.Y., III attached a copy of his Verified Compliant for Application of Criminal Complaint, notarized affidavit in support thereof, and carefully outlined within his complaint the various crimes of perjury having been committed before the EBDC and Maunsell's refusal to uphold the General Laws of The Commonwealth of Massachusetts, which was a matter of record before the EBDC.

330.   On 3/7/04, W.P.Y., III sent a letter to the Spencer Police Department seeking to initiate a complaint against Paicopoulos and Gentile for felony larceny. This complaint only encompassed the plaintiffs' property that had been removed from their home illegally, and not any property in dispute, from the time they initiated their scheme to dislodge the plaintiffs from their home using the restraining order, and the time it took the plaintiffs to recover what property belonging to them on the date they hired the Spencer Police detail. W.P.Y., III's letter to the Spencer Police Department was addressed to the Chief of the Spencer Police Department.

331.   W.P.Y., III (approximately three days after sending his 3/7/04-felony larceny complaint to the Chief of the Spencer Police Department) received a phone call from

Griffin. Griffin informed W.P.Y., III within this call that "his Chief had received his (W.P.Y., III's) letter and he (Griffin) had been assigned by the Chief to investigate the matter".

332.    Griffin requested W.P.Y., III come to the Spencer Police Department for the purposes of "investigating his (W.P.Y., III's) felony larceny complaint".

333.    Griffin asked W.P.Y., III "why he had not said anything about the missing items while he (Griffin) was present at the detail on 3/3/04". W.P.Y., III reminded Griffin of what he said to W.P.Y., III concerning his threat to terminate the detail if he did not allow Gentile to keep property of the plaintiffs' he was refusing to allow them to recover. W.P.Y., III also reminded Griffin that " during the entire detail he was busy engaging Gentile in conversation," which did not give W.P.Y., III an opportunity to complain about the missing property. W.P.Y., III reminded Griffin that he was present when Miner requested Gentile return specific items that W.P.Y., IV sent her to retrieve. And that Gentile stated he "was going to mail them" to Ms. Miner. Which, Gentile never did. Griffin, in fact, had specific recollection of this incident.

334.    On 3/11/04, ABC News broadcasted a story concerning W.P.Y., III on their nationally viewed program "Prime Time". This broadcast, consisting of footage and interviews that were several years old, was dedicated to the "mystery of the missing artwork".

335.    On or about 3/12/04, Ms. Miner and W.P.Y., III traveled to the Spencer Police Department, at the request of Griffin. Upon entering the Spencer Police Department, Miner and W.P.Y., III were met by Griffin and escorted to a room with a sign on the door identifying the room as an "Interview Room".

336. Upon the 'interview' commencing by Griffin, he mentioned that he had viewed the ABC feature and found the affair "fascinating". One of the questions that Griffin started with was "why didn't (W.P.Y., III,) have Gentile taken care of by his friends". W.P.Y., III responded that Gentile had made this a police matter by using the police and the courts to rob the plaintiffs and W.P.Y., III would contain the dispute to the venue in which Gentile brought it.

337. Miner and W.P.Y., III informed Griffin that both Paicopoulos and Gentile were care providers to the plaintiffs. Then displayed various medications W.P.Y., III was being prescribed. After that, showed Griffin numerous financial documents and explained how the entire affair was nothing but a ruse to use his police department and courts to restrain W.P.Y., III, allowing Paicopoulos and Gentile to rob the plaintiffs, and it was a conspiracy long in planning. During this interview W.P.Y., III displayed the door locks that he had recovered from his home and showed Griffin the instructions on Paicopoulos' restraining order stating that changing locks (barring access) was a violation of law and how it was an premeditated action by Gentile, Paicopoulos, and Hoyt.

338. Griffin informed Miner and W.P.Y., III that he would speak to Gentile, Paicopoulos, and Hoyt about the complaint W.P.Y., III had filed with his police department. Griffin took copies of the materials that Miner and W.P.Y., III had brought to the interview and asked W.P.Y., III to furnish him a complete listing of what was stolen and where in his home it was formerly located.

339. Throughout this interview Griffin remained fixated on W.P.Y., III's alleged involvement in the previous evening's broadcast concerning the whereabouts of the "mystery of the stolen artwork". Griffin had to be reminded by both W.P.Y., III and Ms.

Miner why they were at the Spencer Police Department. That was to file felony larceny charges against certain individuals and their trip to Spencer had nothing to do with the Museum affair. The exception to that was one caveat in where W.P.Y., III forewarned Griffin that there could possibly be publicity surrounding this affair and that he (Griffin) should not be distracted by it.

340.   On 3/14/04 W.P.Y., III, as per Griffins' request, sent Griffin the detailed list of the items that had been stolen from their home and the areas within their home that these items were stored.

341.   Throughout the entire remaining days of March 2004, W.P.Y., III sent Griffin various redactions to his list of stolen property. In some cases W.P.Y., III amended the stolen property list as to values and additional items that the plaintiffs had realized later on which had also been stolen.

342.   Griffin made numerous calls to W.P.Y., III at Ms. Miner's residence. The plaintiffs were left homeless and indigent after Gentile, Paicopoulos, and Hoyt had illegally evicted them from their home. The plaintiffs were without funds to obtain new housing after they were defrauded by the actions of the defendants. The plaintiffs are not capable of living independently due to W.P.Y., III's disabilities. W.P.Y., III had informed Griffin of these facts so Griffin knew where to reach W.P.Y., III via phone. Soon after the calls by Griffin kept coming, W.P.Y., III made requests to Griffin that he would like Griffin to start documenting the information he was providing via the telephone and start sending his comments and updates via written report form.

343.   W.P.Y., III informed Griffin that upon past observations he was certain that Gentile was concealing items stolen from the plaintiffs in his office safe, but, forewarning Gentile

of W.P.Y., III's allegations would give Gentile advanced warning and he would most certainly remove all illegal items from his safe which was property stolen from the plaintiffs.

344.   Griffin, in response to W.P.Y., III's carefully detailed and numerous letters to Griffin, refused to comply with W.P.Y., III's desire that Griffin start documenting the progress of the investigation into the felony larceny complaint the plaintiffs filed with the Spencer Police Departments' Chief. Griffin remained fixated on using the fact that he had been blatantly robbed as a tactic to turn W.P.Y., III into his informant out of revenge. It was clearly obvious at this point that Griffin was doing nothing about the plaintiff's felony larceny complaint, but yet kept at W.P.Y., III for information into other criminal conduct by others. W.P.Y., III asked Griffin to stop calling Ms. Miner's home and for him to take action on the plaintiff's larceny complaint. Griffin never had any intentions to perform his duties and protect the plaintiff's rights.

345.   In the last part of March 2004, Griffin again called Ms. Miner's home to speak with W.P.Y., III. W.P.Y., III had previously requested Ms. Miner to screen Griffin's calls, as they were non-productive to the plaintiff's original complaint. Within this call made by Griffin he informed Ms. Miner that he had spoken to Paicopoulos and Gentile and that despite the fact "they admitted" to having certain items the plaintiffs listed as being stolen from them, that the Spencer Police Department found a lack of probable cause to charge either Gentile or Paicopoulos with a criminal offense.

346.   Within this same telephone conversation between Griffin and Miner, Miner asked Griffin how there could be no probable cause to charge Gentile and Paicopoulos after he (Griffin) informed her that "they admitted" to having items which were stolen from the

plaintiff's. Griffin ended his call with Miner by saying "he had all his ducks in a row". To Ms. Miner, Griffin was fully aware that his failure to charge the defendants was tantamount to a violation of the plaintiffs rights and that the plaintiffs would be seeking judicial redress despite the plaintiffs' written assurance that they did not desire to do so since, at that point in time, the plaintiffs were of the opinion that the Spencer Police Department were innocent pawns being duped by Paicopoulos and Gentile. Thereafter, it was obvious that the Spencer police were backed off, if they ever intended to take any action at all, by Gentile's Law Enforcement connections within the Worcester County Law Enforcement Community.

347.    Upon W.P.Y., III connecting the rest of his computer that he recovered on 3/3/04, he discovered that Gentile had wiped out massive amounts of data within his computer in an attempt to destroy inculpatory material.

348.    On 3/7/04, W.P.Y., III responded to the EBDC Magistrate Maunsell's declining to issue criminal charges against Gentile, Paicopoulos and Hoyt, by noting (in writing) his exception to her declining to take the appropriate actions mandated by state law for individuals committing perjury before her court.

349.    On 3/22/04, a representative of John J. Conte, the District Attorney and Chief Law Enforcement Officer for Worcester County, contacted W.P.Y., III by phone in response to the complaint letter he generated to Conte on 3/4/04. The representative identified himself as "Michael Salloum", an Assistant District Attorney for Worcester County, (herein "Salloum"). Ms. Miner received this call. Within this call Salloum stated that "he would be looking into the complaint" that W.P.Y., III filed with the District Attorney's Office regarding the perjury offenses committed before the EBDC by Gentile, Paicopoulos and

Hoyt.

350.  On 3/23/04, W.P.Y., III responded to Salloum's call by sending Conte a letter thanking him for the response to the complaint he filed on 3/4/04 and gave Conte extensive detailed information concerning exactly how these individuals committed the aforementioned conspiracy.

351.  On or about the last week of March 2004, W.P.Y., III called Attorney Murray of Worcester seeking his advice. Upon reaching Attorney Murray, W.P.Y., III was informed by him that Gentile had also "conned" him and that he never gave him the funds Gentile borrowed from the plaintiffs for Mr. Savage's defense.

352. On or about the last week of March 2004, W.P.Y., III phoned both Attorneys Marvin Siegel and Attorney Lisa Siegel-Belanger, seeking their advice on what the actions the plaintiffs should take next in their seeking redress of the violations of their rights.

353.  Attorney Marvin Siegel was fully aware of the entire circumstances of the health issues of W.P.Y., III. Additionally, Attorney Siegel still had documents that related to the loan made to Gentile. W.P.Y., III had sent these documents to Attorney Siegel for his review. Attorney Siegel was never sent a copy of the actual signed agreement after it was executed by Gentile and W.P.Y., III, but he still had the document which W.P.Y., III sent him for his review. Attorney Siegel chastised W.P.Y., III reminding him that he informed Attorney Siegel that he Gentile was trustworthy when in the end Gentile proved to be a "duplicitous con man", a "pathological liar" and had resorted to the most "cowardly and despicable" conduct Siegel had ever heard of in his entire life for robbing the plaintiffs. One being a very sick man and the other, a small child and then leaving them homeless.

354.  Attorney Lisa Siegel-Belanger reminded W.P.Y., III of the time he had hired her to

get Gentile out of jail. Attorney Lisa Siegel-Belanger was later forced to withdraw from
representing Gentile on an appeal from a criminal conviction after visiting Gentile in jail
and finding him to be "delusional" and so irrational that he was impossible to attempt to
represent. Both of the Siegels directed W.P.Y., III to exhaust his remedies with the
Commonwealth and not to expect any official of the Commonwealth to "lift a finger" to
enforce the plaintiff's rights, as retaliation for W.P.Y., III refusing to become an informant
over the Museum affair. They further advised W.P.Y., III that his best avenue to pursue
was within the Federal Court system. Thereafter, the Siegels provided W.P.Y., III with
various templates of federal civil rights suits that had been filed by persons who also had
their rights violated by the Commonwealth of Massachusetts.

355.    Attorney Lisa Siegel-Belanger reminded W.P.Y., III of how the FBI was forced, by
its own policy, to divulge a conspiracy by certain individuals to kidnap W.P.Y., IV when
he was six years-old and how the Commonwealth gave these people a "pass" for such a
serious crime, because it was a crime in which the plaintiffs were the victims.

356.    Late in the month of March, 2004, while the plaintiffs were searching through their
recovered property, of which had been stuffed into Ms. Miner's basement, they came upon
a red plastic storage box containing documents belonging to both Gentile and W.P.Y., III.
Within this box the Plaintiffs, and Ms. Miner, discovered an assortment of documents.
Some of these documents were a treatise written by Gentile containing biographical notes
of W.P.Y., III, making it obvious that Gentile was planning to write a book about W.P.Y.,
III, without his knowledge or consent to do so. Within this treatise Gentile inserted
himself as an "important" figure in the Museum mystery. These documents were sent to
Brian Ross, the Chief Investigative Correspondent for ABC News for future use in a story

based upon Tom Mashberg's unethical conduct in his reporting about W.P.Y., III, and for use in a possible story about the erosion of standards in the journalistic community.

357. In March 2004, W.P.Y., III received a call from Mr. Ross at ABC News. Mr. Ross informed W .P. Y., III that he had just received a call from Gentile "out of the blue" and within this call Gentile had informed him that he had recently befriended Mashberg and Mashberg had informed him that "he had played a role" in the death of Judith Youngworth. Mashberg, by his own accounts in numerous articles and interviews, concluded that with W.P.Y., III being incarcerated, Judith Youngworth was in possession of the whereabouts of the missing artwork. Mashberg knew Judith Youngworth would succumb to an overdose in her condition while in his presence and with Judith Youngworth "out of the way" he would be free to rifle through the Youngworth's home searching for clues as to where Mrs. Youngworth might have placed these materials while her husband was incarcerated.

358. After Judith Youngworth's remains were removed from her home, Mashberg leading a team of Myles Connor associates, tore the Youngworth's residence apart and removed the entire contents of their home for later inspection of their personal papers and effects.

359. Upon discovery that his home had been robbed and all its valuable contents removed, W.P.Y., III filed a complaint from prison with the Randolph, Massachusetts Police Department. The robbery of the plaintiffs home went uninvestigated and no individuals were ever questioned regarding the robbery. Additionally, the suspicious circumstances of Judith Youngworth's death went uninvestigated.

360. The Commonwealth of Massachusetts possesses a rich history of allowing various

individuals to abuse the Plaintiffs within the jurisdiction of the Commonwealth by and
through its various agencies and police departments.

361.    On the advice of counsel, W.P.Y., III filed a motion to vacate the restraining order
filed within the above-described illegal conspiracy. In addition to the motion to vacate
filed with the EBDC, W.P.Y., III also filed Writs for Subpoenas Ad Testificandum and
Duceus Tectum compelling the production of certain documents from Hoyt and Gentile,
along with compelling their testimony at an evidentiary hearing on W.P.Y., III's motion to
vacate the restraining order. Within the filings of these motions, W.P.Y., III filed an
additional motion to preserve evidence.

362.    These motions were filed with the EBDC on 3/9/04 with service made upon
Paicopoulos via first class certified mail.

363.    On 3/25/04 the plaintiff's service made upon Paicopoulos via certified mail was
returned to W.P.Y., III notating that the service was "unclaimed" by Paicopoulos.

364.    On 4/6/04 W.P.Y., III filed a motion before the EBDC seeking summary default
judgment against Paicopoulos for her failure to accept service of the plaintiff's motion to
vacate the restraining order. Within the plaintiff's motion for summary default judgment
W.P.Y., III clearing stated that Paicopoulos had deliberately refused to accept and answer
the plaintiff's motions filed before the EBDC, and because of such he was entitled to
summary default judgment pursuant to Mass. Laws Of Civil Procedure.

365.    On 4/10/04 the plaintiff's filed motions to recuse, change of venue and the motion
to mark these motions for hearing with the clerk of the EBDC. Within these motions filed
by W.P.Y., III, he presented the issues that since he was forced to seek complaints for
judicial misconduct and that the issues contained therein dealt with matters and personnel

of the EBDC, that this court was no longer a disinterested third party but an actual party to the controversy and had a conflict of interest in hearing any additional matters having to do with the plaintiffs.

366.    On 4/10/04, W.P.Y., III sent a second complaint to the Regional IV Administrative Justice, The Honorable Paul LoCanto. Within this second complaint W.P.Y., III initiated a complaint for conflict of interest by officials of the EBDC.

367.    The plaintiff's never received any response to any of their complaints from the Office of the Regional IV Administrative Justice. The Regional IV Administrative Justice deliberately ignored the complaints of the plaintiff's and discriminated against them by failing to intercede in a subordinate court's actions in violation of the General Laws of the Commonwealth of Massachusetts, in addition to this court's violating the Mass. Supreme Judicial Court's Rules of Judicial Conduct, thus again demonstrating the deliberate indifference of the Administrative Justice having supervisory powers over the EBDC, a court under his jurisdiction.

368.    On 4/10/04 the plaintiffs sent another letter to Conte, after previously sending numerous letters seeking the original perjury charges, a complaint expanding the initial perjury complaint with a request for larceny prosecution(s) after the Spencer Police Dept. refused to charge certain defendants (identified above) with felony larceny. Within this document the plaintiffs begged Conte to take some actions to uphold the rights of the plaintiffs. At the date in time this letter was sent, Conte had ample opportunity to take some action on behalf of the plaintiffs, and it was evidentially certain that Conte was following suit with every other law enforcement official that the plaintiffs had previously requested for assistance.

369. On 4/10/04, the plaintiffs sought the intervention of the Office the Attorney General of the Commonwealth of Massachusetts by sending a letter to the Worcester Office of the Attorney General. Within this letter the plaintiffs attached numerous documents demonstrating a prima facie case that the plaintiff's civil rights were flagrantly violated and no agent of the Commonwealth (to date) was taking any action to enforce the violations of the plaintiffs rights.

370. On 4/19/04, the plaintiffs filed a second complaint with the Massachusetts Attorney General Thomas Reilly (herein "Reilly'). Within this second letter to a second office of Mr. Reilly (this time to the Boston / Main Office of the Attorney General). Within this letter the plaintiffs carefully noted that they were the victims of multiple crimes committed against them which had left them "homeless and dispossessed", that W.P.Y., III was a handicapped citizen of the Commonwealth, that numerous law enforcement agencies had previously failed to uphold the rights of the plaintiffs, and that the plaintiffs were making a demand within this letter that the office of the Attorney General of the Commonwealth of Massachusetts uphold their rights and protect them, as they were citizens of this Commonwealth.

371. On 4/21/04, the plaintiffs received a letter from James Gentile, "Investigator" assigned to the Worcester office of the Massachusetts Attorney General's Office, in response to the plaintiff's 4/10/04 letter to that office. Within James Gentile's letter to the plaintiffs, he denied any relief to the plaintiff's requests for protection of their Constitutionally guaranteed rights by stating that "the issues eluded to within your letter (civil rights violations and crimes committed against a disabled person) do not fall within the purview of the Attorney General's Office".

372. On 4/21/04, W.P.Y., III appeared before the EBDC with Judge Abdella presiding, to conduct a hearing into the previously filed motions to recuse and change of venue. Upon the commencement of this hearing into the merits of the plaintiff's motion, W.P.Y., III argued that the EBDC and his Honor (Judge Abdella) should recuse himself from hearing any further matters having to do with W.P.Y., III and that the venue should be changed due to the Judicial complaints W.P.Y., III had been compelled to file regarding the conduct of that very court and his court was no longer a disinterested third party.

373. Upon the conclusion of this hearing Judge Abdella took the matter under advisement but denied the plaintiff's motions within hours after this hearing. Officials of the EBDC deliberately withheld this decision and never sent notification of Judge Abdella's ruling to the plaintiff's.

374. On 4/23/04, the plaintiffs sent a letter of complaint to the Boston Office of the Massachusetts Attorney General regarding the response in the 4/21/04 letter denying the plaintiffs relief by James Gentile. Within this same letter the plaintiffs requested information as to the relationship between Mark Gentile and the Attorney General's Investigator James Gentile whom are both from the city of Worcester. The plaintiff's suspicions were based on the fact of Gentile's previous (and obvious) claims that a "member of his family had squashed" numerous criminal charges and investigations within Worcester County. The plaintiffs never received any response from any of their complaints filed before defendant Reilly's agency, with the exception of a response from one of his staff, not merely sharing the coincidental same last name, but from a city where the "huge" Gentile family are politically entrenched and a member of the Gentile family was leaking State Police Investigations concerning a member of the Gentile family while being a

member of that Counties Law Enforcement Community.

375.   On 4/26/04, the Plaintiffs and Ms. Miner traveled to the EBDC for the purposes of conducting hearings into several motions previously filed and which that Court's Clerk had marked up for hearing on that date.

376.   Present before the court was Paicopoulos and the "Safety Plan Advocate". Again, Gentile was present within the court's audience.

377.   Upon the commencement of the proceedings with Judge Robert Gardner presiding, W.P.Y., III informed the court that he was before the court on this date to argue several motions. Judge Gardner attempted to pass the entire matter back to Judge Abdella. W.P.Y., III informed the court that at no time did Judge Abdella ever invoke exclusive jurisdiction over this matter. W.P.Y., III then informed Judge Gardner that these matters had been placed on the Court's calendar for this date and they rightfully should go forth.

378.   After consulting the Clerk available to Judge Gardner within the courtroom, Judge Gardner allowed W.P.Y., III to proceed. The first motion W.P.Y., III argued was the summary default he had filed upon Paicopoulos for refusing to accept service of the plaintiff's motion to vacate the previous restraining order. Upon W.P.Y., III informing the court that Paicopoulos had deliberately refused to accept service on his motion to vacate, he moved the court to grant his motion as within the request of his previously filed motion for summary default judgment. Paicopoulos, receiving her answers from the "Safety Plan Advocate" present with her and giving her answers to the motions being argued by W.P.Y., III, in a fashion audible to witnesses in the first few front rows, responded to W.P.Y., III's request for a summary default judgment to be entered against her by stating at the express direction of the "Safety Plan Advocate" that she (Paicopoulos) "went to the

Spencer Police Department and sought the Spencer Police's advice of being sent an item of mail (a legal service clearly indicated by notation on the parcel's cover) from W.P.Y., III." Paicopoulos then testified under oath that the Spencer Police Department advised her not to accept the certified mail parcel sent by W.P.Y., III. Thereafter the "Safety Plan Advocate" directed Paicopoulos to seek the court's ruling that W.P.Y, III had violated the restraining order by contacting and "harassing" her. Paicopoulos went on to further inform the court that she had filed a complaint with the Spencer Police Department alleging that W.P.Y., III "had vandalized her automobile". Paicopoulos failed in her requests as Judge Gardner pointed out that W.P.Y., III was representing himself in the matter at bar. To her accusation of her car being vandalized by W.P.Y., III, he inquired with the court if he was being accused of committing a criminal act.

379.    Paicopoulos had damaged this automobile by striking a pothole and filed a false police report with the Spencer Police Department. Yet, another illegal action that this Police Department failed to prosecute.

380.    Upon hearing the "Safety Plan Advocate", in yet another hearing before this court, advise Paicopoulos to testify to false and perjerous representations, W.P.Y., III requested the identity of the "Safety Plan Advocate" from Judge Gardner. W.P.Y., III's request for the identity of the "Safety Plan Advocate" was denied.

381.    Judge Gardner denied W.P.Y., III's motion for summary default judgment due to the deliberate and misrepresentative testimony Paicopoulos testified to at the express direction of the "Safety Plan Advocate".

382.    W.P.Y., III then brought forth his motions for issuence of Writs of Habeas Corpus Ad Testifcandum and Deuces Tectum seeking to compel the testimony and production of

certain documents from Hoyt and Gentile. These motions were granted setting an Evidentiary Hearing on 5/3/04 when Judge Abdella returned to hear the plaintiff's motion to vacate the restraining order filed by Paicopoulos and her co-conspirator Gentile which Judge Gardner passed on hearing until Judge Abdella's return. The last of W.P.Y., III's motions argued during that hearing was the plaintiff's motion to preserve evidence, which was allowed by Judge Gardner.

383.    The plaintiffs caused Gentile and Hoyt to be served with the above mentioned Writs by having same served by the Worcester County Sheriff's Service ordering their appearance on the next scheduled event (The hearing on the plaintiffs motion to vacate) granted by Judge Gardner on 5/3/04.

384.    Shortly after service was made on Hoyt and Gentile, W.P.Y., III was contacted via telephone by Paicopoulos. Paicopoulos informed W.P.Y., III that Gentile was going to make an attempt on his life. Additionally, Paicopoulos informed W.P.Y., III that Gentile had already attempted to murder him by switching one of his medications prescribed for anxiety with Methadone. Thereafter, Paicopoulos asked W.P.Y., III to recall the time he had Gentile "pick up a prescription for him at the Spencer CVS". Paicopoulos went on to inform W.P.Y., III if he remembered an associate of Gentile's calling him asking him to come look at a Willard Clock collection that had supposedly come into his possession. This person calling, seeking W.P.Y., III to give an opinion about these rare clocks, never called back but Paicopoulos, who was in Florida during this time period, had knowledge of this event without being informed from W.P.Y., III regarding it. According to Paicopoulos, if W.P.Y., III had went to inspect these clocks (which never existed), Gentile was going to attempt to kill him by luring him to a remote location where these clocks

were supposedly at.

385.   Upon receiving this information, W.P.Y., III asked Paicopoulos "why she was telling him this". Paicopoulos responded that she did not trust Gentile and feared that he would murder her as opposed to paying her off as he promised for her assistance in helping him rob her brother and nephew with their restraining order scam.

386.   W.P.Y., III informed Paicopoulos that while he would note her information, that she had chosen her side and the damage she had already done was irreparable. W.P.Y., III further informed Paicopoulos that he would pursue prosecutions against everyone involved in this affair to the fullest extent of the law. In ending this call W.P.Y., III informed Paicopoulos to never call him again. Before W.P.Y., III could end the call, Paicopoulos stated "good luck, you'll never get him in his family's city" (meaning Worcester and the County thereof).

387.   On 5/3/04, the Plaintiffs and Ms. Miner appeared before the EBDC for the purposes of conducting a hearing on the plaintiff's motion to vacate the restraining order filed before Judge Abdella. Present before the Court was Hoyt and Gentile who were compelled to appear by the plaintiff's previously filed Writs. Along with Hoyt and Gentile were Paicopoulos and the "Safety Plan Advocate".

388.   Upon the plaintiff's action being called before the EBDC with Judge Abdella presiding, W.P.Y., III moved to proceed with his evidentiary hearing by calling Hoyt and Gentile to the stand and examine them as to the plaintiff's allegations that Paicopoulos, Hoyt and Gentile had previously conspired with one and another to deceive the court by using falsified exhibits of evidence and perjury to mislead the court into granting its initial ruling.

389. With Hoyt and Gentile before the court under subpoena, Judge Abdella refused to allow W.P.Y., III to examine these witnesses and thereafter modified the evidentiary hearing previously granted to him by Judge Gardner on 4/26/04.

390. Judge Abdella's actions were intentionally designed to keep the plaintiff's from making the fact that Paicopoulos, Hoyt and Gentile had conspired together to commit perjury before his court as part of that Court's record. Judge Abdella's ruling denying W.P.Y., III was done in a deliberate fashion in order to protect the officers of his own court.

391. Instead, Judge Abdella only allowed W.P.Y., III to argue issues of "imminent threat". W.P.Y., III strenuously objected stating that "crimes were committed before his very court" and "his initial ruling was one where his court was duped by perjury and fraudulent exhibits of evidence". Judge Abdella adjudicating this matter in face of a conflict of interest, while he unethically ran block for his court's personnel, who had previously demonstrated bias and deliberate indifference to the violations of the laws of the Commonwealth of Massachusetts and the plaintiff's constitutionally guaranteed rights, remained deliberately indifferent to these facts and ordered W.P.Y., III to proceed in a fashion which would not allow the facts of this matter become a matter of record before his court.

392. W.P.Y., III reminded Judge Abdella that he had pending motions to recuse and change of venues "under advisement" before his Honor. The court acknowledged this fact, but at no time during this hearing did Judge Abdella ever inform the plaintiffs that he had denied these motions on 4/21/04 (the day they were filed). Additionally, at no time did the Clerk's Office of the EBDC ever send the plaintiffs any notice of this decision. It was not

until 5/27/04 when an Attorney representing W.P.Y., III, before the EBDC on another matter (Attorney Roger Banks), discovered this fact while reviewing records within the EBDC's Clerk's office.

393.   Being barred from putting on the evidentiary hearing granted by Judge Gardner on 4/26/04, W.P.Y., III was not allowed to examine his witnesses present before the Court for this hearing. In an attempt to salvage this hearing, W.P.Y., III initiated his now limited hearing by demonstrating to the court that Paicopoulos possessed no evidence at all to support her allegations that she had been abused by W.P.Y., III. Additionally, she lacked corroboration of any kind. That she never filed any previous police complaints or that there was never even an incident at the plaintiff's home in where any other tenant within the apartment building complained of any loud arguments or fights, as Paicopoulos complained was a regular occurrence. Paicopoulos could not show the Spencer Police any evidence of any physical abuse which she claimed W.P.Y., III had inflicted upon her as she previously testified at the express direction of the "Safety Plan Advocate".

394.   In response to W.P.Y., III's limited scope of examination, due to Judge Abdella's deliberate actions in denying the plaintiffs the full evidentiary hearing where he was fully aware that the plaintiffs would have prevailed in documenting his Court's intentional design to deny the plaintiffs the relief they were rightfully entitled to (while protecting his court's staff by limiting the record to exclude a proof positive showing that serious crimes were committed before his court) the "Safety Plan Advocate", still concealing her identity by removing her identification badge that all court employees are required to wear pursuant to Certified Massachusetts Regulations governing the security of the Commonwealth's Trial Courts, (as she had done every time she came into any proceeding

where the plaintiffs were present before the EBDC while she was present) again instructed

Paicopoulos how to respond to the allegations made by W.P.Y., III.

395.  Paicopoulos, at the direction of the "Safety Plan Advocate", accused W.P.Y., III of

"planning to kill Gentile with a Russian Assault Rifle". W.P.Y., III immediately objected.

Judge Abdella sustained this objection. Paicopoulos, again operating under the express

direction of the "Safety Plan Advocate", responded to the effect that her having no proof

of her allegations of abuse "did not matter". Thereafter, she went into her now same

response to any challenge of her allegations that "none of what the plaintiff stated

mattered...that she was in fear of her life and that she wanted a restraining order".

396.  Judge Abdella extended the restraining order yet again until 7/26/04 while taking

the plaintiff's motion to vacate under advisement. As had now become a regular

occurrence after each hearing that would bring the plaintiffs to the EBDC, Gentile,

Paicopoulos and the "Safety Plan Advocate" would position themselves in the courthouse

corridor to taunt the plaintiffs with various remarks as they would be forced to pass them

to exit the building. On this date Gentile's taunting included his remark of "see, I can't be

touched in Worcester County". This remark had brought loud round of laughter from their

party. W.P.Y., III witnessed Cristo standing nearby as Gentile made his "untouchable"

remark. Upon her hearing this statement made by Gentile, she began laughing at W.P.Y.,

III, and as she was walking back toward the direction of her office asked W.P.Y., III if

"he had anymore motions to file".

397.  On 5/6/04, W.P.Y., III sent yet another request for prosecution to Conte after

learning from Paicopoulos that there was a conspiracy to murder him. Again Conte failed

to take any action or even investigate the allegations made by the plaintiffs. Conte's

action's were done in a discriminatory fashion, with deliberate indifference to the

violations of the plaintiff's rights, that as the Chief Law Enforcement Officer of his

Jurisdiction had taken an oath to uphold the laws of the Commonwealth of Massachusetts

and protect the citizens within his jurisdiction (Worcester County).

398.    On 5/8/04, W.P.Y., III received a response from Worcester County District

Attorney (Conte) by and through Assistant District Attorney Michael G. Salloum, via

letter sent to W.P.Y., III's address (P.O. Box 2663 Springfield, Ma. 01101). Mr.

Salloum's letter was dated on 5/6/04.

399.    The gist of Mr. Salloum's letter, written at the direction of his boss, Conte, was that

the office of the Worcester County District Attorney would take no action based on the

plaintiff's allegations concerning the larceny and perjury offenses committed within

Worcester County. Mr. Salloum stated that the plaintiff's needed to bring their complaints

back to the officials of the Town of Spencer and officials of the EBDC since "this office

cannot direct the police to take a particular action". And that "under Massachusetts

General Laws, Chapter 268, 4, "if a court believes that perjury may have been committed

before it, it should formally send notice to this office". Mr. Salloum summed up his letter

that no assistance from Conte's office would be offered to the plaintiffs.

400.    W.P.Y., III wrote an immediate response to the letter from Mr. Salloum in which he

clearly pointed out the exhaustion of remedies he had already engaged with the EBDC and

the Spencer Police. Thereafter, W.P.Y., III stated that enforcing the laws of the

Commonwealth was the responsibility of each Counties Chief Law Enforcement Officer

(The District Attorney) and failing to take action on the behalf of the plaintiffs was

denying them equal protection rights under the law and that he would now be forced to

seek remedies before the Federal Courts.

401.   The Plaintiffs never received any further response from Conte's office despite the fact that on 5/6/04 he lodged a complaint of conspiracy to commit murder by the very same individuals he initially lodged his complaints with Conte.

402.   On 5/12/04, the Plaintiffs filed complaints with the Chief Justice of the Massachusetts District Courts. These complaints encompassed the conduct of Judge Abdella who, as stated in this complaint, had taken deliberate actions to deprive the plaintiffs of due process and to block evidence coming into the record before his court. His court had allowed serious violations of the law to occur. Regarding the complaint against the Regional IV Administrative Justice who had supervisory powers over the EBDC, was to the effect that despite numerous requests/complaints, that he had taken no actions and ignored the plaintiff's requests.

403.   On or about the second week of May, 2004, W.P.Y., III, on behalf of himself (a disabled citizen of the Commonwealth of Massachusetts) and his minor dependant child (the plaintiffs) wrote the Disabled Person's Protection Commission for the Commonwealth of Massachusetts initiating a complaint that they had been abused by their caretakers (enclosing a brief outline of the complaint) and that W.P.Y., III was, in fact, a disabled citizen of Massachusetts, seeking assistance over the abuse these caretakers (identified within the complaint) had subjected him to.

404.   On 5/19/04, the Plaintiffs received a response from the Disabled Person's Protection Commission (herein DPPC) denying them relief, as their complaint was "financial in nature and not included in the definition of MGL 19C".

405.   After researching the legislative intent in the enactment of MGL 19C, W.P.Y., III

sent a second letter to the Director of the DPPC, Nancy A. Alterio (herein Alterio) on

5/25/04. Enclosed within this second request for assistance was a careful listing of the

exact abuses W.P.Y., III had suffered at the hands of his former caretakers quoting her

agencies own guidelines outlining abusive conduct by caretakers. The fact these caretakers

(Paicopoulos and Gentile) had stolen funds entrusted to them by the plaintiffs violated

another of the DPPC guidelines.

406.   On 6/4/04, W.P.Y., III was sent a letter in response to his 5/25/04 letter to Alterio

by Emil DeRiggi "responding for Nancy A. Alterio". This letter, once again, declined to

involve the DPPC, an Agency of the Commonwealth of Massachusetts designed to protect

the rights of disabled persons residing within Massachusetts, despite the fact W.P.Y., III's

enclosures to his 5/25/04 letter clearly demonstrated that he was an individual who

certainly falls within the guidelines of a disabled person who had been abused by his

caretakers. A strict reading of the operative meanings of MGL 19C clearly demonstrates

that this law was designed to protect the rights of the disabled W.P.Y., III, and no where

within a strict reading of the statute did MGL 19C state that this General Law was

designed to protect every disabled citizen of Massachusetts with the exception of W.P.Y.,

III.

407.   On 5/28/04, W.P.Y., III wrote a second letter to the Chief Justice of the

Massachusetts District Courts after failing to receive a response to his first letter to the

Chief Justice's Office.

408.   On 7/23/04, W.P.Y., III received a response to his two previous letters of complaint

to the office of the Chief Justice. Within this letter, W.P.Y., III's complaints regarding the

conduct of Judge Abdella was dismissed by rational not relevant to the facts of the matter.

There was no mention at all of the conduct of the Region IV Administrative Justice's failure to take action on the plaintiff's complaints.

409.   On 7/26/04, the Plaintiffs and Ms. Miner appeared before the EBDC for the scheduled hearing into the restraining order filed by Paicopoulos. Upon calling the matter before the Court neither Paicopoulos, Gentile or the "Safety Plan Advocate" appeared. Upon the failing to appear by Paicopoulos, Judge Abdella attempted to dismiss the restraining order by "expiration of statute". W.P.Y., III objected to Judge Abdella's attempt to dispose of this matter in such a fashion and moved to vacate the previous restraining order. Without any opposition, Judge Abdella was compelled to allow W.P.Y., III's motion. After Paicopoulos and Gentile had succeeded in stealing the plaintiff's home and all their assets they needed to support themselves, along with any of the plaintiff's possessions they desired, while the courts, the police, the District Attorney and the Attorney General of Massachusetts turned a blind eye to these multitude of crimes committed against the plaintiffs, they had little motive to appear before the EBDC on 7/26/04.

410.

## COUNT ONE

### VIOLATION OF 42 USC SEC. 1983

411.   The plaintiffs repeat and reallege each and every allegation above stated as though such allegations were set forth herein.

412.   By engaging in the conduct described above, the individual defendants deprived the plaintiffs of clearly established and well-settled Constitutional Rights while acting under color of law. Specifically, the defendants deprived the plaintiffs of rights secured and

guaranteed to them by the United States Constitution including, but not limited to, their First, Fourth, Fifth, Eighth and Fourteenth Amendment rights.

413.  Further, the wrongful acts were undertaken with deliberate and grossly reckless disregard of the plaintiff's Constitutional Rights, and include without limitation the following:

A.  The defendants engaged in a scheme to defraud the plaintiffs out of assets under their control as their caretakers that provided for the plaintiff's very existence.

B.  The defendants attempted to murder plaintiff W.P.Y., III by deliberately contaminating his medication with a lethal substitute.

C.  The defendants subjected the plaintiffs to cruel and unusual punishment by depriving plaintiff W.P.Y., III of medication that alleviated his severe debilitating pain causing him additional excruciating agony due to the forced withdrawal pains he suffered by the defendant's theft of his medication.

D.  The defendants subjected the plaintiffs to cruel and unusual punishment by illegally depriving them of their home, possessions, and a school to attend with their intentional actions which have left the plaintiffs homeless and indigent.

E.  The defendants discriminated against the plaintiffs by refusing to protect their rights by applying equal protection under the law and protect them from serious felony crimes that had been committed against them.

F.  The defendants denied the plaintiffs due process of law by filing false documents before the trial court and then barring the plaintiffs access to the courts by refusing to allow them to seek protection under the Commonwealth's Domestic Protection Laws, redress the defendant's actions by barring the plaintiffs meaningful access to the courts in

violation of their equal protection rights under the law while the defendants acted in a manner discriminating against the plaintiffs.

G.  Plaintiff W.P.Y., III, a disabled person, was discriminated against in a deliberate fashion by the defendants depriving him of equal protection under the law and discriminated against him for failing to protect his rights as a disabled person under the color of law.

H.  The defendants conspired to transport plaintiff W.P.Y., IV outside of the jurisdiction of Massachusetts in a conspiracy to violate the plaintiffs rights by conspiring to make a second attempt on the life of W.P.Y., III.

I.  Each of the defendants together with defendant Town of Spencer, and the individual defendants in civil action, together with additional employees of the Commonwealth who enjoy absolute immunity for their acts and therefore not named herein as defendants, engaged in a conspiracy to deprive the plaintiffs of their rights, privileges and immunities as guaranteed and protected by the Constitution of the United States in violation of the provisions of 42 USC sec. 1983.

J.  As a result of the defendant's violations of the plaintiff's civil rights, the plaintiffs suffered a loss of enjoyment of life, choice in where they desired to reside and attend school, loss of ability to live independently in their own home, deprivation of their property, loss of ability to fund a college education, extreme emotional distress and were otherwise damaged, loss of ability to obtain health insurance of their choosing, loss of an ability to provide W.P.Y., IV with a private Hebrew Education so he could be Bar Mitzvahed in accordance with Jewish Law with his thirteenth birthday now passing without him being Bar Mitzvahed.

K.  The above constitutes violations of 42 USC sec. 1983.

414.

## **COUNT TWO**

## **CONSPIRACY IN VIOLATION OF 42 USC sec. 1983**

A.  The plaintiffs repeat and reassert the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

B.  By engaging in the conduct described above, including restraining the plaintiffs from enjoyment of their home, assets and possessions. The defendants allowed and conspired with their co-defendants to destroy inculpatory evidence belonging to the plaintiffs while the defendants restrained the plaintiffs using knowingly falsified evidence to accomplish their conspiracy.  Additionally, the defendants conspired with their co-defendants and certain immune Judicial Officials to interfere with the plaintiffs due process rights in seeking a court's redress, while discriminating against the plaintiff's rights of equal protection under the law.

C.  The defendants conspired together to deprive the plaintiffs of their due process rights, their rights to be free from warrantless search and seizure of their papers and possessions.

B.  The defendants conspired together (along with judicially immune employees of the Commonwealth) to employ a cover up of their illegal conduct of their intentional violations of the plaintiff's rights by systematically barring the plaintiffs from making the crimes committed against plaintiffs part of a Massachusetts Trial Court's records and failing to charge certain other defendants with crimes that had already been made part of a trial court's records thus, discriminating against the plaintiffs by denying them equal protection under the law and further violating their rights to due process.

D.   The defendants conspired to further their illegal cover up of the violations of the plaintiffs rights by obstructing justice in furtherance to the defendant's illegal scheme to violate the plaintiff's due process rights.

E.   The defendants conspired to discriminate against the plaintiffs and deprive them of protections under the color of state law to protect them from civil rights violations secured to them under the General Laws of the Commonwealth of Massachusetts.

F.   The above constitutes an illegal conspiracy to violate 42 USC sec. 1983.

415.

## COUNT THREE

## DELIBERATE INDIFFERENCE

A.   The plaintiffs repeat and reassert the allegations contained in the above paragraphs and incorporates them in reference as if fully and completely set forth herein.

B.   The defendants were deliberately indifferent to the violations of the plaintiff's constitutionally protected rights. The defendant's action and in-actions were committed with full knowledge and deliberate in design to violate the rights of the plaintiff's under the color of law.

C.   The defendants were notified repeatedly by the plaintiffs of the illegality of the violating of the plaintiff's rights and not only remained indifferent in a deliberate scheme, but took further actions to cover up these violations in concert with each other. The defendants' deliberate indifference to the violations of the plaintiff's rights was done with knowing and willful intent.

D.   Such deliberate indifference to the violations of the plaintiff's rights while acting under the color of law constitutes deliberate indifference to violations of the plaintiff's

rights as held within 42 USC sec. 1983.

416.

## COUNT FOUR

### VICARIOUS LIABILITY

A.  The plaintiffs repeat and reassert the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

B.  To the fullest extent allowable under any theory of law, the Town of Spencer and the Commonwealth of Massachusetts are vicariously liable for the acts of its agents, servants, and employees, including all persons named as defendants, but also including any other person involved in the unconstitutional and otherwise illegality of their actions in violating the rights of the plaintiffs.

417.

## COUNT FIVE

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### AGAINST ALL DEFENDANTS

A.  The plaintiffs repeat and reasserts the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

B.  The intentional and or grossly reckless actions described above attribute to each defendant, jointly and severally were outrageous and beyond the scope of common decency.

C.  The intentional and or grossly reckless and deliberately indifferent actions described above attributable to each defendant, caused the plaintiffs to suffer great emotional distress.

418.

WHEREFORE: The Plaintiffs demand judgment against the defendants for damages and such other relief this Court deems just and equitable.

A.   The Plaintiffs seek compensatory damages against each of the Defendants in the amount of $100,000.

B.   The Plaintiffs seek punitive damages against each of the Defendants in the amount of $100,000.

C.   The Plaintiffs reserve the right to amend this complaint.

D.   The Plaintiffs demand a trial by Jury.

E.   Reasonable Attorney costs, filing fees and all other costs related to the filing of this matter.

Respectfully submitted
By the plaintiff's Pro Se,

William P. Youngworth, III, Pro Se

William P. Youngworth, IV, Pro Se
Address for the Plaintiffs
P.O. Box 2663
Springfield, Ma. 01101
413-736-5727

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

*William P. Youngworth, III*
*William P. Youngworth, IV*

**DEFENDANTS**

*Mark A. Gentile, et al*

05 - 30108 - MAP

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF *Hamden*
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT *Worcester*
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
*Pro Se P.O. Box 2663 Springfield*
*MA. 01101*
*413-736-5727*

ATTORNEYS (IF KNOWN)
*11 Delude Ave*
*Spencer, MA. 01562*

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☒ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

*42 U.S.C sec. 1983 - Violation of Constitutional Rights*

**VII. REQUESTED IN COMPLAINT:**
CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $ *200,000 Per Defendant*
CHECK YES only if demanded in complaint
JURY DEMAND: ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE *3/21/05*

SIGNATURE OF ATTORNEY OF RECORD
*William P. Youngworth, Pro Se*

FOR OFFICE USE ONLY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) _Youngworth, et al_ _V. Gentile, et al_

_____

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

    ___    I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    X    II.    195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
            740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    for patent, trademark or copyright cases

    ___    III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
            315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
            380, 385, 450, 891.

    ___    IV.    220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
            690, 810, 861-865, 870, 871, 875, 900.

    ___    V.    150, 152, 153.    05 - 30108 - MAP

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

    _none_ _____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

        YES ☐    NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

        YES ☐    NO ☒

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

        YES ☐    NO ☒

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

        YES ☐    NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

        YES ☐    NO ☒

    A.    If yes, in which division do all of the non-governmental parties reside?

        Eastern Division ☐    Central Division ☐    Western Division ☐

    B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division ☐    Central Division ☐    Western Division ☒

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)

        YES ☐    NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _William P. Youngworth, III   Pro Se_
ADDRESS _P.O. Box 2663 Springfield, MASS  01101_
TELEPHONE NO. _413-736-5727_

Coversheetlocal.wpd - 10/17/02)