**UNITED STATES OF AMERICA**
**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FILED
IN CLERK'S OFFICE

2006 MAR 30  A 10: 53

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| WILLIAM P. YOUNGWORTH, III,<br>PLAINTIFF. | } |
| | } |
| v. | } CIVIL ACTION 05-30108MAP |
| | } |
| MARK A. GENTILE, AKA MARIO STILETTO, | } |
| MARYANNE PAICOPOULOS, AKA- | } |
| MARY E. YOUNGWORTH, | } |
| CHRISTINE HOYT, | } |
| CAROLE M. CRISTO, | } |
| JENNE McGINNIS | } |
| JAMES M. GENTILE, | } |
| JOHN J. CONTE, | } |
| THOMAS REILLY, | } |
| NANCY A. ALTERIO, | } |

*Amended*

**COMPLAINT**

## INTRODUCTORY STATEMENT

This is a claim for damages arising out of actions and inactions by the above identified

defendants who have deprived the plaintiff of his Constitutionally Guaranteed Rights

protected by the United States Constitution.

## PARTIES

1.   The plaintiff, William P. Youngworth, III (hereinafter identified as "W.P.Y., III"), a

disabled widower, resides in the Commonwealth of Massachusetts in the City of

Springfield.

2.  The defendant, Mark A. Gentile, AKA Mario Stiletto, has been previously identified in the first filing of this action and stands in his status as a defendant previously mentioned in the original filing of this action by order of this Court.

3.  The defendant, Maryanne Paicopoulos, AKA Mary E. Youngworth (hereinafter identified as "Paicopoulos"), has been previously identified in the first filing of this action and stands in her status as a defendant previously mentioned in the original filing of this action by order of this Court.

4.  The defendant, Christine (middle name unknown) Hoyt, has been previously identified in the first filing of this action and stands in her status as a defendant previously mentioned in the original filing of this action by order of this Court.

5.  The defendant, Carole M. Cristo, at all times relevant to this complaint, was employed as a non judicial official of the East Brookfield District Court and is employed as an Administrative Account Clerk and upon information and belief resides in Massachusetts.

6.  The defendant, Jenne McGinnis, at all times relevant herein was employed at the East Brookfield District Court and upon information and belief resides in Massachusetts.

7.  The defendant, James M. Gentile, at all times relevant herein, was employed as an Investigator for the Massachusetts Attorney General's Office, Worcester Division and upon information and belief resides in Massachusetts.

8.  The defendant, John J. Conte, at all times relevant herein, was employed as the District Attorney for Worcester County Massachusetts and upon information and belief resides in Massachusetts.

9.  The defendant, Thomas Reilly, at all times relevant herein, was employed as the

Attorney General for the Commonwealth of Massachusetts, and upon information and belief resides in Massachusetts.

10. The defendant, Nancy A. Alterio, at all times relevant herein, was employed as the Commissioner for the Massachusetts Disabled Persons Protection Commission and upon information and belief resides in Massachusetts.

## JURISDICTION

11. This action is brought pursuant to 42 U.S.C. sections 1983 and the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. sections 1331 and 1341 (3) and (4) and the aforementioned Constitutional and statutory provisions. Plaintiff further invoke the pendant Jurisdiction of this Court to hear and decide claims arising out of State Law.

## FACTS COMMON TO ALL COUNTS

12. The plaintiff, William P. Youngworth, III, a 46-year-old disabled widower, suffering from infra orbital nerve entrapment, optic nerve damage, trigeminal neuralgia, dipolpia, chronic vascular ailments effecting both his legs, a torn rotator cuff in his left shoulder which recently required a surgical reconstruction to repair, sleep apnea (which causes the plaintiff to stop breathing numerous times each evening and requires him to use a machine device to allow him to breath while he attempts to sleep), severe visual impairments and post traumatic stress disorders that causes the plaintiff to be a chronic

3

sleepwalker which has resulted in the plaintiff having suffered numerous injuries as a result of same.

13.    In July of 1997 the plaintiff was identified by an employee of a Boston tabloid newspaper as being an individual possessing knowledge of the whereabouts of certain artworks stolen during a 1990 Boston Museum robbery. As a result of these allegations the plaintiff has been targeted with a campaign of harassment and unlawful actions by law enforcement agents employed by the Commonwealth of Massachusetts.

14.    In October of 2000 the plaintiff and his minor child moved from the greater Boston, Massachusetts area to Springfield, Massachusetts to escape unwanted media attention and the campaign of illegal harassment being employed by agents of the Commonwealth of Massachusetts against the plaintiff

15.    In April of 2002, during the plaintiff's tasks of his employment in his profession, he was seriously injured in a Worcester, Massachusetts automobile accident.

16.    As a result of injuries the plaintiff sustained in this automobile accident, the right zygomatic arch, orbit and maxilla (previously sutured with steel wire) was re-injured, causing the majority of the plaintiff's present disabilities.

17.    From April 2002 to present date, the plaintiff has been unable to pursue employment and has been ruled permanently disabled by both the Social Security Administration and the Massachusetts Rehabilitation Commission.

18.    After sustaining the injuries in the April 2002 automobile accident, the plaintiff and his dependant child have needed the services of various individuals to act in the capacity as caretakers to assist them with the basic aspects of their day to day lives.

19.    The plaintiff has been treated with various forms of narcotic pain medications for

approximately four years to date. The plaintiff has now been on several hundred milligrams of Morphine daily to combat the chronic pain he suffers from for approximately the last three years. The plaintiff is a patient of the Baystate Pain Center in Springfield, Massachusetts. To date, the plaintiff has undergone four nerve blocking surgeries. These surgeries have been unsuccessful. The plaintiff's vision is rapidly decaying , he suffers from "low vision" due to permanent dipolpia and optic nerve damage caused by his injuries. At present, the only options available to the plaintiff is a radical Neurosurgery which would require the removal of all his nerves in the right side of his face. Physicians for the plaintiff have strongly urged him not to undergo this surgery.

20. At present, the plaintiff is under the care of numerous physicians and therapists, as is his child, who have both suffered severe emotional and physical trauma as a result of the deliberate actions and in-actions of the defendants.

21. During the summer of 2002, the plaintiff's health was in rapid decline. The plaintiff secured the services of a full time live in caretaker to assist him in providing for the care of his child and himself. (see original complaint)

22. In August of 2002 the plaintiff moved to the town of Easthampton, Massachusetts due to concerns for his child's safety in the secondary school system of the Springfield, Massachusetts public school system bringing with his household his then caretaker.

23. Within two weeks of the plaintiff's move to Easthampton, Massachusetts he came under the scrutiny of that town's police department.

24. In August of 2002 the plaintiff placed his then caretaker in charge of financial affairs for himself and his child.

25.  Shortly after the plaintiff placed considerable funds under his caretaker's control, his

caretaker embarked on a scheme to illegally deprive the plaintiff and his child of their

assets and to dispose of the plaintiff and his child by nefarious and illegal schemes.

26.  From August 2002 until December 2003 the plaintiff and his child were subjected to

numerous harassments by the Easthampton Police Department.

27.  In December of 2003 the plaintiff, his child and his caretakers moved to the town of

Spencer, Massachusetts. This move was made for the express reasons of escaping

persecution by the Easthampton Police department, a then plan by the plaintiff's

physicians to transfer his medical care to a Boston Hospital and to enable the plaintiff to

attempt to oversee a problematic business investment in the City of Worcester. (see

original complaint)

28.  The plaintiff found an apartment in the town of Spencer, Massachusetts suitable for

his living needs. This apartment was situated on 25 Clark Street in the town of Spencer

and its property owner (the plaintiff's landlord) was Christine Hoyt. The plaintiff entered

into a contractual lease agreement with Christine Hoyt and subsequently had his

caretaker, Mark A. Gentile, pay Hoyt the amount of $1,700 securing the residence for the

plaintiff and his child's use on November 18, 2003. (see original filing of this complaint)

29.  During the process of entering into a contractual agreement with defendant Hoyt the

plaintiff informed her of his being disabled, the status of his household, the sources of his

income and the fact of after getting settled into the new residence he would be

undergoing surgery at Boston's Massachusetts General Hospital.

30. The plaintiff, exercising his durable power of attorney rights, signed a lease

agreement with defendant Hoyt for defendant Gentile as a guarantor for the plaintiff's

lease and subsequent rent payments. The plaintiff's household was not intended to be the residence of defendant Gentile and at all times relevant hereto defendant Gentile maintained the address of 25 Delude Ave. Spencer, Massachusetts. (see original filing of this Complaint)

31.  Prior to the plaintiff moving his household to Spencer he experienced numerous problems with his caretakers' conduct by their failing to honor their obligations to the plaintiff and behavior which impacted upon their obligations.(see previous filing of original Complaint)

32.  In January of 2004 the plaintiff's caretaker (defendant Gentile) switched one of the plaintiff's medications with a lethal substitute after the plaintiff had defendant Gentile retrieve his medication from a Spencer CVS Pharmacy.

33.  The plaintiff, being unaware of the adulteration of his medication, ingested same numerous times until the substance his medication was switched with caused his collapse in his home. Prior to his collapse the plaintiff was seriously ill for several days from the effects of the substance his real prescription was replaced with.

34.  The act of defendant Gentile altering the plaintiff's medication was done with deliberate intent to cause the death of the plaintiff.

35.  The act (hereby "poisoning")of poisoning the plaintiff was done in a conspiracy between both of the plaintiff's caretakers to further a scheme to illegally deprive him of assets placed under the control of the defendants/caretakers. (see original filing of complaint)

36.  After the poisoning of the plaintiff caused his collapse the plaintiff was removed from his home for medical attention.

37.  The act of poisoning the plaintiff by his caretakers was done in a deliberate attempt to murder the plaintiff after several other conspiracies by the defendants to have the plaintiff murdered all failed.

38.  Upon the plaintiff being removed from his home after being poisoned the defendants conspired to take the plaintiff's child to the state of Florida and dispose of him.

39.  After the plaintiff had been removed from his home after the effects of the attack on his person the defendants abused the plaintiff's minor child.

40.  During the plaintiff's removal from his home the defendant caretakers broadened their conspiracy by enlisting the aid of defendant Hoyt to provide the defendant caretakers a new and fraudulent lease, moved utility services to the plaintiff's home out of his name and into the defendants, conspired and defrauded the plaintiff of other monies not under the caretaker's control all in part of an illegal scheme to remove the plaintiff and his child from their home as part of the overall object of their conspiracy to steal assets under the control of the caretaker defendants which belonged to the plaintiff.

41.  During February 2004 and other dates previous to which, the defendant caretakers deprived the plaintiff of his prescribed Morphine medication and knowingly caused him to suffer extreme pain, emotional distress and forced withdrawal side effects associated with depriving a patient of critical medication.

42.  On February 23, 2004 the defendants Hoyt, Paicopoulos and Gentile conspired and thereafter did file a fraudulent restraining order before the East Brookfield District Court in a conspiracy to deprive the plaintiff of his assets, home and records relating to funds belonging to the plaintiff under the control of the caretaker defendants.

43. On February 24, 2004 defendants Gentile, Paicopoulos and Hoyt illegally changed the locks on the plaintiff's home and using the fraudulently obtained restraining order issued on 2/23/04 to deliberately deprive the plaintiff of all his worldly assets and leave him and his minor child homeless and indigent.

44. On February 26, 2004 defendant Carole Cristo, a account clerk employed at the East Brookfield District Court located in East Brookfield, Massachusetts deliberately denied the plaintiff the right to seek the redress of the Court of jurisdiction by denying the plaintiff's request to file for protection from abuse by his caretakers pursuant to the Commonwealth of Massachusetts laws of domestic relations and more specifically depriving him of any opportunity to file an application for 209A protection.

45. Defendant Cristo on 2/26/04 threw the plaintiff out of "her office", denied the plaintiff's request for an application to seek 209A protection, informed the plaintiff that "he could not get a domestic protection petition heard before the Court unless she gave him the 209A application" . In denying the plaintiff's request to seek the redress of the Court for protection from domestic abuse defendant Cristo did deliberately deprive the plaintiff of his rights of due process of law, his right to petition the Courts, his right to be free from cruel and unusual punishment and his equal protection rights. Defendant Cristo's actions were knowingly deliberate and furthered a conspiracy to deprive the plaintiff of his rights.

46. On February 26, 2004 and on other dates, the defendants Gentile, Paicopoulos conspiring with Hoyt, entered a fraudulent document supplemented by perjured testimony into the record of the East Brookfield District Court in furtherance of their conspiracy to deprive the plaintiff of his home, possessions, assets, subject him to cruel

9

and unusual punishment by leaving him homeless and indigent.

47.  On February 26, 2004 and other dates the defendant Jenne McGinnis, acting in her official capacity of a judicial advocate furthered the conspiracy as described in #46. by instructing her co-defendant Paicopoulos in an audible and clearly obvious fashion to enter knowingly perjured testimony in order to manipulate a trial court of the Commonwealth in assisting the defendants in furthering their conspiracy to cause the plaintiff irreparable injury and to violate his rights.

48.  On February 26, 2004 the defendants now listed in the above, again furthered their conspiracy to injure the plaintiff by introducing fraudulent exhibits of evidence into the record of a trial court of the Commonwealth, doing so knowingly and in furtherance of a conspiracy to violate the rights of the plaintiff.

49.  On February 27, 2004 defendants Cristo and McGinnis conspired with each other to suppress the plaintiff's second attempt to seek redress of the courts by using their influence vested by their employment at the East Brookfield District Court to intercept an application for the issuance of a criminal complaint citing their co-defendants with perjury which had occurred at their place of employment on the date previous. The plaintiff's pleading filed on 2/27/03 contained irrefutable proof that these defendants' co-defendants had come to that Court on 2/26/04 and committed criminal offenses while acting in their overall design to injure the plaintiff.

50.  On 2/26/04 the plaintiff was escorted to his home by the Spencer Police Department officers and allowed to recover what items of his property that he could for a duration of time not to exceed 20 minutes. During this escorted trip to the plaintiff's home the plaintiff was able to retrieve original records in the presence of the Spencer police

officers which proved that the defendant caretakers and Hoyt had conspired to manipulate the trial court with fraudulent exhibits of evidence. Notice of these documents recovery was made to both defendants Gentile and Paicopoulos in the presence of Spencer police officers Leburn and Sgt. Detective Agnew.

51.   On 2/26/04 and dates previous, defendants Gentile and Paicopoulos had informed the plaintiff that they had been making a series of secret recordings of his voice without his knowledge in furtherance of their conspiracy to deprive the plaintiff of his assets and to deliberately violate the plaintiff's rights.

52.   On March 3, 2004 the plaintiff, his new caretaker and a hired laborer were forced to hire a Spencer police detail, rent a truck and travel to the plaintiff's home which he had now been illegally evicted from. The plaintiff attempted to secure furnishings and other objects of his property from his residence. The plaintiff discovered the large amounts of his property was missing and had been stolen by the defendants after they were successful in ejecting the plaintiff from his home using a fraudulent instrument.

53.   The defendant's conduct was knowingly illegal and did deprive the plaintiff and his child of additional assets and items of immense sentimental value and in doing so did cause additional harm and violations of the plaintiff's rights.

54.   The defendant's conduct in illegally evicting him from his home in Spencer, Massachusetts did deprive his child of his basic educational needs and in doing so have further caused additional damages to the plaintiff.

55.   The defendant's conduct in throwing his child from his home and leaving the child homeless, abusing the plaintiff's child and depriving the plaintiff's child of his property has caused additional harm and damages to the plaintiff.

56.  On March 4, 2004 the plaintiff filed a complaint with defendant John Conte, the District Attorney for Worcester County citing that the defendants had committed the act of perjury within his jurisdiction and this act had left the disabled plaintiff and his child homeless and indigent.

57.  On March 7, 2004 the plaintiff filed a complaint for larceny of his property with the Spencer Police Department. This complaint only encompassed property of the plaintiff's stolen by the defendants after they had illegally evicted him from his home.

58.  On March 11, 2004 ABC News aired a program entitled "The Art of the Heist" on its nationally viewed program known as "Primetime". This program centered upon the 1990 robbery of a Boston Art Museum and focused on the extortive techniques that had been employed against the plaintiff by law enforcement entities and the subsequent harm that had been caused to the plaintiff and his family.

59.  On or about the second week of March 2004 defendants Gentile and Paicopoulos used an employee of a Boston tabloid to plant a story which was published in that tabloid that the plaintiff was an informant for the Massachusetts State Police and had informed on certain mafia figures as to their activities.

60.  Defendants Gentile and Paicopoulos did plant this information within this tabloid for the express purpose of targeting the plaintiff for reprisal in furtherance of their actions and conspiracy to either murder the plaintiff or bring about his death using additional methods after previous attempts on his life had failed.

61.  On March 22, 2004 the plaintiff received confirmation via telephonic communication from defendant Conte's office that he had received the plaintiff's perjury complaint and the complaint would be investigated.

62. The plaintiff thereafter augmented his complaint to defendant Conte to include a request for the prosecution of certain co-defendants for felony larceny after the Spencer Police Department refused to issue charges for felony larceny against certain defendants despite the admission of the defendants that they were in possession of property the plaintiff listed as stolen from him in his complaint filed with the Spencer police department.

63. In March of 2004, during the plaintiff inventorying his property that he was able to recover from Spencer home he discovered a box full of documents that was being used to support a terrarium. In this box of documents the plaintiff discovered numerous materials including hand written biographical notes recorded by defendant Gentile clearly indicating that he been collecting information on the plaintiff to use in authoring a novel without the plaintiff's knowledge.

64. On March 11, 2004 the plaintiff received a telephone call from a Mr. Brian Ross, the Chief Investigative Correspondent of ABC News. Mr. Ross informed the plaintiff that his office had just received a call from defendant Gentile informing him that an individual named Tom Mashberg had "played a role in the death of Judy Youngworth", the plaintiff's late wife.

65. The plaintiff alleges that this contact made by defendant Gentile to Mr. Ross at ABC News was done in an attempt to provoke the plaintiff into taking retaliatory actions against Tom Mashberg designed to bring about the arrest and subsequent criminal charging of the plaintiff in furtherance to the existing conspiracy to remove the plaintiff as an obstacle in the overall scheme in achieving the goal of depriving the plaintiff of his assets.

66.  From the date of the East Brookfield District Court issuing a restraining order against the plaintiff (2/23/04) until it was vacated (on 7/26/04) by the defendant Paicopoulos actions of failing to appear in subsequent hearings on the matter the plaintiff filed numerous challenges as to the validity of the issuing of the order by the court.

67.  During each time the plaintiff appeared before the East Brookfield District Court he was harassed by that Court's Security personnel at the express direction of defendant McGinnis as a retaliatory action for his complaining about her conduct in open court.

68.  During each of the plaintiff's subsequent appearances before the East Brookfield District Court in the matter of bogus restraining order defendant McGinnis, Gentile and Paicopoulos and Cristo would verbally harass the plaintiff. In one such encounter defendant Cristo sought the plaintiff out in the Courthouse's hallway and sarcastically taunted the plaintiff by asking him "if he had any other motions to file" indicating that she was acting as a player in the overall conspiracy in overseeing that all the plaintiff's challenges were all denied absent legal merit.

69.  The plaintiff in fact lodged a complaint over the various defendants conduct with that Courthouse's Chief of Security.

70.  On 4/10/04 the plaintiff sent another letter to Conte, after previously sending numerous letters seeking the original perjury charges, a complaint expanding the initial perjury complaint with a request for larceny prosecution(s) after the Spencer Police Dept. refused to charge certain defendants (identified above) with felony larceny.

71.  Within the 4/10/04 letter to defendant Conte the plaintiff both begged him for his assistance and noted that his lack of action to date was an indication that he intended to take no action behind the plaintiff's complaints and requests for assistance.

72.  On April 10, 2004 the plaintiff filed a complaint and request for assistance with the Massachusetts Attorney General's Office located in Worcester, Massachusetts (Mass. A.G.'s Central Massachusetts Office) stating what the nature of his complaint was and attached documents to support his allegations.

73.  On April 19, 2004, the plaintiff filed a second complaint with the Massachusetts Attorney General Thomas Reilly (defendant Reilly) seeking his assistance after his rights were violated by the above mentioned defendants. This second letter was sent directly to the attention of defendant Reilly and carefully noted that he and his child were the victims of multiple crimes committed against them which had left them "homeless and dispossessed", that the plaintiff was a handicapped citizen of the Commonwealth, that numerous law enforcement agencies had previously failed to uphold the rights of the plaintiff and that the plaintiff was making a demand within this letter that the defendant uphold his sworn duty and take action to protect  both the plaintiff and his child, as they were citizens of this Commonwealth.

74.  On 4/21/04, the plaintiff received a letter from James Gentile, "Investigator" assigned to the Worcester office of the Massachusetts Attorney General's Office, in response to the plaintiffs' 4/10/04 letter to that office.

75.  Within defendant James Gentile's response to the plaintiff he denied that the plaintiff's request for assistance (a civil rights violation) citing that such did not come under the purview of the Office of the Massachusetts Attorney General. Defendant James Gentile's action furthered a conspiracy to violate the plaintiff's rights and acted in retaliation against the plaintiff for his failure to cooperate with the Attorney General's office investigation into a 1990 art museum robbery, in addition to other illegal conduct.

76.  Previous to the plaintiff's complaint filed with the Worcester Office of the Attorney General's office the plaintiff was informed by defendant Gentile that he had a cousin employed by the Attorney General's staff and other "connections" that made him "untouchable" in Worcester.

77.  On April 23, 2004 the plaintiff sent a letter of complaint to defendant Reilly concerning the conduct of defendant James Gentile citing an inappropriate relationship between defendant James Gentile and defendant Mark A. Gentile.

78.  On or about May 3, 2004 the plaintiff was contacted by his sister, defendant caretaker Paicopoulos.

79.  During this contact defendant Paicopoulos stated that she was in fear of Defendant Gentile and then informed the plaintiff of Gentile switching his medication and other conspiracies to lure him to certain places to both murder him or have him murdered by other persons.

80.  Defendant Paicopoulos further informed the plaintiff of the scheme between herself and Gentile to split up the plaintiff's assets which they had stolen from him.

81.  Defendant Paicopoulos solicited the plaintiff with this information in an attempt to prevent him from seeking her prosecution for her prior criminal actions she had committed against the plaintiff and his child.

82.  The plaintiff informed defendant Paicopoulos that her informing him of this information would not alter his decision to seek both her and Gentile's criminal prosecution.

83.  On May 6, 2004 the plaintiff filed yet another complaint with Defendant Conte citing that he had received information about a conspiracy to murder him.

84. On May 8, 2006 the plaintiff received a letter from a member of defendants Conte's staff concerning the previous complaints the plaintiff filed with defendant Conte concerning the perjury and felony larceny offenses committed against the plaintiff.

85. This letter written to the plaintiff on behalf of defendant Conte denied the plaintiff relief he sought from defendant Conte and directed him to take his complaints back to entities that refused to hear them in the first place.

86. The plaintiff responded citing the futility of these directions by defendant Conte and put defendant Conte on notice that he would be forced to seek the federal court's intervention on this matter.

87. The plaintiff has never received any response from defendant Conte concerning his complaint of the conspiracy to murder him by his caretakers.

88. On or about the second week of May 2004 the plaintiff filed a complaint with the Massachusetts Disabled Persons Protection Commission citing he had been abused by his caretakers and sought the protection and services from this agency.

89. On May 19, 2004 the plaintiff received a response to his request for assistance from the Massachusetts Disabled Persons Protection Commission denying him any assistance.

90. On May 25, 2004 the plaintiff sent a letter to defendant Nancy A. Alterio stating that he had been previously denied her agency's assistance and this action was contrary to the Legislative intent within their enactment of the powers of her agency and the abuse of the disabled plaintiff by his caretakers contrary to state law was properly before her for investigation and subsequent prosecution of the offending parties.

91. On June 4, 2004 the plaintiff received a response directed by defendant Alterio. This response clearly indicated that the plaintiff had being illegally discriminated against by

17

defendant Alterio and had been intentionally treated as a disfavored minority.

92.  On July 26, 2004 the bogus restraining order was vacated by the East Brookfield District Court after defendant Paicopoulos failed to appear.

93.  Defendants Paicopoulos, Gentile and McGinnis all failed to appear before the court since the exercise was now moot and the defendants had long since accomplished the objectives of depriving the plaintiff of his home and assets and their overall conspiracy to violate his rights.

94.  In May of 2005 the plaintiff filed his original action before this Court.

95.  After filing this original action Daniel Savage and James Cunningham, both associates of defendant Gentile, began visiting the plaintiff at his new caretakers home in Springfield, Massachusetts starting in mid June of 2005.

96.  During the visits from Savage and Cunningham they expressed various discontents with Gentile after they were arrested with him in Vernon, Ct.

97.  The plaintiff at first suspected that Cunningham and Savage were sent by Gentile in an attempt to derail the plaintiff's prosecution of the defendants.

98.  Next Savage and Cunningham returned with the front page of a Sunday Worcester Telegram newspaper reporting a story about a rash of burglaries targeting the elderly.

99.  Savage and Cunningham informed the plaintiff that Gentile was using his police connections to place culpability on them for these burglaries and it was in fact Gentile, Paicopoulos and his "new gang" committing these crimes while laying the blame off on Savage and Cunningham.

100. Each Savage and Cunningham expressed  their anger to the plaintiff at what the result of Gentile's alleged conduct had done to the lives of their families and their own.

101. Cunningham informed the plaintiff that Gentile and Paicopoulos had been married, that Gentile's motivations were purely based on his desire to obtain the plaintiff's father's assets and Gentile had solicited Cunningham to travel to Florida and murder the plaintiff's father while making the act appear to be accidental.

102. The plaintiff immediately contacted the Martin County Sheriff's Office in Florida and the Elder Affairs Division for the State of Florida to obtain protection for his father.

103. The plaintiff was asked by Savage and Cunningham to contact anyone he could think of in an attempt to get the suspicions for committing the Worcester burglaries off of them.

104. The plaintiff, in fact, took actions at the requests of Savage and Cunningham while collecting physical evidence that they were coming to his caretaker's home and informing him of these various allegations.

105. In one of these visits, the plaintiff was informed that his nephew William Paicopoulos was in jail behind an incident where he had been threaten by Gentile in taking certain action against individuals after drugs given to him by Gentile for resale had been stolen and that Gentile and Paicopoulos was labeling him an "informant".

106. Savage and Cunningham further informed the plaintiff of various plots by Gentile to lure him someplace and have him murdered and "many things had happened that he [the plaintiff] was unaware of".

107. As a result of the information received by Cunningham and Savage about the plaintiff's nephew the plaintiff sent his nephew (William Paicopoulos) a letter at the Worcester County Jail.

108. On 7/25/05 the plaintiff received a response from William Paicopoulos in which,

amongst of facts, William Paicopoulos informed the plaintiff that his mother, defendant Paicopoulos and Gentile had informed him of a conspiracy to murder the plaintiff by luring him to a Worcester restaurant where both defendants Paicopoulos and Gentile were employed, their actions of poisoning the plaintiff and their soliciting him to murder the plaintiff.

109.  On August 4, 2005 the plaintiff sent yet another complaint to defendant Conte seeking the charging of Gentile and Paicopoulos with attempted murder. The plaintiff attached a copy of the letter he received from William Paicopoulos to this complaint.

110.  On August 10, 2005  two Massachusetts State Police detectives arrived at the plaintiff's caretaker's home. The plaintiff was not at his caretaker's home that week and was with his caretaker on their children's school vacation.

111.  The plaintiff's caretaker's house sitter called his caretaker and informed her of this visit on that same date along with the contact information left by the detectives.

112.  On that same date the plaintiff called the number left by the detectives. Upon doing so he was connected with a Massachusetts State Police detective named "Mike Lyver" of the Worcester County CPAC Unit (the District Attorney's investigators). Upon contact being made by phone the plaintiff set up an appointment with Detective Lyver to meet at his caretaker's home on Tuesday 8/16/05 at Noon.

113.  On August 16, 2005 the plaintiff, his caretaker, Detective Trooper Lyver and Detective Trooper Keith Eagan did in fact meet at the plaintiff's caretaker's residence in Springfield, Massachusetts.

114.  At the start of this interview Detective Lyver asked the plaintiff if he was "recording him". The plaintiff stated that he was not. Thereafter the plaintiff thanked

them for coming over the letter he sent defendant Conte. Detective Lyver (herein "Lyver") immediately informed the plaintiff, in the presence of his caretaker, that he was "not here behind any complaint send to the D.A,'s office" but instead to investigate the plaintiff based on "information Gentile provided [him] with concerning you".

115.   The plaintiff proceeded with his interview with detective Lyver. Detective Eagan was present along with the plaintiff's caretaker, Donna M. Miner. The plaintiff quickly addressed the stated reason for Lyver's visit, dismissed the allegations and went on to inform Lyver about the visits he had received from Cunningham and Savage, their various allegations concerning Gentile's and Paicopoulos'conduct,  provided Lyver with a copy of William Paicopoulos' letter concerning the poisoning attack on the plaintiff with the plaintiff's caretaker corroborating all the information the plaintiff provided Lyver

concerning his collapse in his home and subsequently his seeking medical attention over the then mysterious episode of his health crisis occurring in January of 2004. Which physician's and hospitals he was seen at and by and his caretaker verifying all the above information citing "she took him to every appointment".

116.   Lyver took notes, informed the plaintiff that he would speak with William Paicopoulos and asked the plaintiff if he could convince Cunningham and Savage to speak with him.

117.   The plaintiff did contact both Savage and Cunningham concerning Lyver's request. The plaintiff was immediately informed by both individuals that they would not speak with Lyver and that "Lyver was Gentile's boy". This statement was made to inform the plaintiff that Lyver was connected to Gentile in an inappropriate relationship.

118.   On August 21, 2005 the plaintiff faxed Lyver an eight page letter memorializing his interview with the plaintiff and his caretaker. The plaintiff further contacted William Paicopoulos and stated that Lyver said he would be up to interview him.

119.   Approximately 6-7 days after Lyver's visit to the plaintiff's caretaker's home the plaintiff was visited again by Cunningham and Savage. Both informed the plaintiff that their homes had been raided by Lyver on August 19, 2005, leading a team of other police. The searches appeared to be punitive as opposed to probative. That Gentile had contacted both of them prior to the raids and informed each of them that "his boy" had told him all about their visits to the plaintiff . That Gentile called Savage and informed him that "he was going to be raided in the next 15 minutes", which, in fact, occurred as a demonstration to both Savage and Cunningham as to the influence he held over Lyver.

120.   The plaintiff called Lyver immediately upon learning about the raids and asked Lyver if it was his practice to tear persons houses apart whom he desired cooperation from. Lyver responded by informing the plaintiff that "he followed them (Cunningham and Savage) to the scene of a burglary and witnessed them break into a building".

121.   The plaintiff asked Lyver why then didn't he arrest them if that was true. This question drew no response from Lyver. The plaintiff then asked him if he had interviewed his nephew yet. To that question Lyver stated that "[he] had not, would not and will not assist him[the plaintiff] with his [expletive] 1983 suit" [the civil rights actions pending before the U.S. District Court]. Thereupon Lyver hung up on the plaintiff.

122. The plaintiff, after his nephew failed to re-contact him for worrisome period of time, wrote his nephew on 9/5/05. The plaintiff received no response to his letter

123.  The plaintiff called Daniel Savage September 8, 2005 attempting to discover more information between Gentile, Lyver, a source called the "fat girl" who was passing information to Gentile from the Worcester Attorney General's office, James Gentile and others.

124. Savage informed the plaintiff that the "fat girl" was arrested by the state police for being suspected of passing information on criminal investigations, however the charges were dismissed, that James "Jamie" Gentile was busy spreading rumors on the street that he wasn't related to Mark Gentile and then recounted an incident where he was present with Gentile (during the previous winter) when Gentile received a warning call on his cell phone tipping him off that "the ATF would be showing up in about within 15 minutes" to search for automatic weapons that Gentile had secreted in a storage trailer adjacent to his Worcester restaurant.

125.  According to Savage, Gentile was told during this call that the ATF's informant was a girl named "Missy", a former girlfriend of James Cunningham who harbored a grudge against Gentile for interfering in her relationship with Cunningham and the warning call was placed by "his boy".

126.  Savage told the plaintiff that Gentile had scrambled to move his weapons cache and the ATF had shown up to search for the weapons his warning call tipped him off to. Gentile had moved the weapons to his family's property on 12 Lyons street in Worcester, less than an 1/8th of a mile from the restaurant and Gentile was able to return in time to greet the ATF agents and open the storage area where they desired to search to show them no weapons were present.

127.  On this same date the plaintiff called the Worcester office of the ATF to attempt to

confirm the information he was told by Savage. The plaintiff was connected to an "Agent Mike Finnety" whereupon the plaintiff immediately stated his reason for his call. To confirm if an incident as Savage described to him had ever occurred.

128.   Agent Finnety appeared to the plaintiff to be stunned that the plaintiff's command of the facts in his call. Agent Finnety informed the plaintiff that "exactly what he was asking about ever happening did happen" and that "he was the agent who searched the storage trailer". The plaintiff then informed Agent Finnety that "Gentile was tipped off you were coming and moved the items [he] just minutes before you got there".

129.   Agent Finnety became very upset and stated that he knew something had just been moved from the place in which he searched and asked your plaintiff if he knew where Gentile could be found "right now". The plaintiff informed Finnety of his former home's address to which Finnety stated that "he was going to confront Gentile that afternoon".

130.   On September 9, 2005 while Daniel Savage was entering the 99 Restaurant on Shrewsbury Street in Worcester with his wife, another couple and while holding that couple's four year old child in his hands, a knife wielding attacker attacked Savage. Savage was able to place the child out of harm's way and thereafter grappled with the attacker who ended up being seriously wounded while Savage escaped injury through what he described to the plaintiff as a "miracle".

131.   On September 10, 2005 at 1:00 AM the plaintiff received a call from Savage who was with Cunningham. Within this call Savage informed the plaintiff of what had occurred at the 99 Restaurant. Savage was extremely scared and he stated he fled the scene fearing both the Worcester and State Police due to Gentile's connections within either one or both of these agencies.

132.  The plaintiff first asked Savage if he had been injured and needed medical attention. He replied that he had not. The plaintiff then asked Savage if he knew the attacker. Savage stated that he did and the person was "one of Gentile's coke dealers". Thereafter Savage asked the plaintiff if he could figure out a way to surrender to the police but "make it to court alive". The plaintiff suggested using the ATF to work out his surrender. Savage agreed to this suggestion and asked the plaintiff to attempt to make that happen.

133.  At 8:30 AM on September 10, 2005 the plaintiff called the Worcester Office of the ATF. Upon reaching their switchboard he stated that he needed to get a message to agent Finnety of the most dire nature. The operator informed the plaintiff that she would attempt to forward his message.

134.  At approximately 10:00 AM on 9/10/05 the plaintiff received a call from Agent Finnety. The plaintiff stated his reason for calling him. Agent Finnety stated that he would need to "check out if any of this really happened and if there was a warrant for Savage". Upon verifying that information he would call the plaintiff back.

135.  Approximately 45 minutes later Agent Finnety did place another call to the plaintiff. Within this call he stated that he verified what the plaintiff had told him within his earlier call on that date. Thereafter, agent Finnety gave the plaintiff specific instructions in what Savage should do until the following Monday morning and thereafter be at the Flagship Bank Building at 9:00AM on Monday (9/12/05). That there would be a "rent-a-cop" in the lobby and for that "not to spook him [Savage]" and that "he would not see any other police waiting for him". Agent Finnety told the plaintiff to inform Savage that "he was going to speak with him first and afterward bring him to the Courthouse to

answer to the warrant issued for his arrest".

136. The plaintiff called Savage's cell phone and left a detailed message on the phone's recording feature explaining that his surrender was worked out and the instructions relayed to him by Agent Finnety.

137. On September 12, 2005 Daniel Savage did, in fact, surrender to Agent Finnety as per his instructions.

138. In the later afternoon hours of 9/12/05 the plaintiff called Vicky Savage, the wife of Daniel Savage, inquiring as to what happened with her husband's surrender.

139. Mrs. Savage informed the plaintiff that her husband and James Cunningham went to the ATF in accordance with the surrender terms the plaintiff negotiated with Agent Finnety. Thereafter "Lyver showed up", a violation of agent Finnety's promise and after a debriefing session agent Finnety drove Daniel Savage to the Worcester Police Station, showed them his credentials, and let the Worcester Police arrest him.

140. Mr. Savage was arraigned on that date before the Worcester District Court. During this hearing a prosecutor reading the arrest report stated that "Mr. Savage had been arrested by the Worcester Police on the warrant outstanding". No mention was made of his surrendering to the charges or the ATF's involvement. Mrs. Savage did not see Lyver present but witnessed colleagues of Lyver's she had seen previously at her home during the raid speaking to the prosecutor prior to her husband's hearing.

141. Mr. Savage was subsequently detained with an extraordinarily high bail exceeding $300,000 as the prosecutor accused Mr. Savage of "attacking a witness against him".

142. This representation was completely false and designed to be a punitive retaliation for Mr. Savage's cooperation in the plaintiff's prosecution of Gentile before the Federal

Courts. When he in, in fact, survived an assassination attempt from an individual Gentile sent to kill Savage due to his providing information to the plaintiff.

143.   During the debriefing of Savage and Cunningham at the ATF's office, with Lyver present, information of a strictly confidential nature concerning the criminal activities of Gentile was immediately brought to Gentile's attention by Lyver. Cunningham was confronted by Gentile within 24 hours of the ATF's interview possessing specific and exact information which was only disclosed in a debriefing where Lyver was present.

144.   On Tuesday September 13, 2005 the plaintiff received a phone call from Lyver. Lyver asked the plaintiff "what was going on". The plaintiff informed Lyver "that he knew exactly what was going on". Thereafter Lyver informed the plaintiff "that he was a fucking asshole for involving the ATF". The plaintiff informed Lyver that he would not tolerate his speaking to him in such a fashion and demanded that he never phone his caretaker's residence again or he would name him as defendant in the federal action. In terminating the call Lyver told the plaintiff that "he couldn't give a shit about his [plaintiff's] federal suit".

145.   Upon the date of the plaintiff filing his original action and up to the present date of this action's re-filing this abbreviated Complaint, certain defendants and agents acting on the behalf of defendants have tampered with, intimidated, assaulted and threatened witnesses for the plaintiff.

146.   The in-actions and actions of defendant Reilly, the Attorney General and highest ranking law enforcement agent for the Commonwealth of Massachusetts, was designed as a punitive retaliation for the plaintiff's refusal to cooperate with his investigators in a previous investigation.

147.  The conduct of defendant Reilly at all times alleged herein was designed to discriminate against the plaintiff and to treat him as a disfavored minority while acting in a conspiracy with other defendants to retaliate against the plaintiff by allowing his co-defendants to commit serious crimes against the plaintiff , cause him serious injury and to violate his most basic of protections afforded to him by his constitutional rights.

148.  The conduct of defendant Alterio at all times alleged herein was designed to discriminate against the plaintiff and to treat him as a disfavored minority while acting in a conspiracy with other defendants to retaliate against the plaintiff by allowing her co-defendants to commit serious crimes against the plaintiff, cause him serious injury and to violate his most basicof protections afforded to him by his constitutional rights.

149.  Defendant Conte, at all times relevant to this complaint discriminated against the plaintiff, treated that plaintiff as a disfavored minority, both acted in a conspiracy with his co-defendants and deliberately took no actions to protect the rights of the plaintiff or cure serious injuries which were inflicted upon him all while acting to protect his informants and to conceal an inappropriate and illegal relationship between a violent felon and an investigator in his employ.

150.  In furthering a conspiracy to violate the plaintiff's rights defendant Conte has obstructed justice and after being notified of which and allowed witnesses for the plaintiff to be tampered with, intimidated and retaliated against.

151.  Defendant James Gentile at all times relevant to this Complaint acted in a conspiracy to discriminate against the plaintiff and treat him as a disfavored minority, retaliate against the plaintiff by intentionally failing to uphold his sworn duties to protect the rights of the plaintiff and furthered his role in an overall conspiracy while enjoying an

28

inappropriate relationship with certain co-defendants named within this Complaint.

152.  Defendant Jenne McGinnis at all times relevant to this Complaint acted in an overall conspiracy to violate the plaintiff's rights while in the course of her employment knowingly assisted and instructed certain co-defendants to further the overall conspiracy to violate the plaintiff's rights.

153.  Defendant Carole Cristo at all times relevant discriminated against the plaintiff while acting in an overall conspiracy with her co-defendants to deprive the plaintiff of a meaningful access to the courts while furthering an overall conspiracy to deprive the plaintiff of his rights.

154.  As stated within the original Complaint, which still stands before this Court, defendant Christine Hoyt acted in a conspiracy and took deliberate overt actions with her co-defendants to inflict cruel and unusual punishment on the plaintiff, deprive him of his assets, his home, injured his minor child by said conduct, conspired to violate the plaintiff's most basic rights and was an actor in the above described overall conspiracy operating on the top tier of such that, in fact, caused serious injury to the plaintiff.

155.  As stated within the original Complaint, which still stands before this Court, defendant Maryanne Paicopoulos acted in a conspiracy and took deliberate overt actions with her co-defendants to inflict cruel and unusual punishment on the plaintiff, deprive the plaintiff of his assets, his home, injured his minor child by said conduct, conspired to violate the plaintiff's most basic rights and was an actor operating on the top tier of such that, in fact, caused serious injury to the plaintiff.

156.  As stated within the original Complaint, which still stands before this Court, defendant Mark A. Gentile was the original architect and thereafter acted in a conspiracy

and took deliberate overt actions with his co-defendants to inflict cruel and unusual punishment on the plaintiff, deprive the plaintiff of his assets, home, injured his minor child by said conduct, conspired to violate the plaintiff's most basic rights and was an actor operating on the top tier of such that, in fact, caused serious injury to the plaintiff.

## COUNT ONE

## VIOLATION OF 42 USC SEC. 1983

157.   The plaintiff repeats and re-alleges each and every allegation above stated as though such allegations were set forth herein.

158.   By engaging in the conduct described above, the individual defendants deprived the plaintiff of clearly established and well-settled Constitutional Rights while acting under color of law. Specifically, the defendants deprived the plaintiff of rights secured and guaranteed to them by the United States Constitution including, but not limited to, their First, Fourth, Fifth, Eighth and Fourteenth Amendment rights.

159.   Further, the wrongful acts were undertaken with deliberate and grossly reckless disregard of the plaintiff's Constitutional Rights, and include without limitation the following:

A.   The defendants engaged in a scheme to defraud the plaintiff out of assets under their control as their caretakers that provided for the plaintiff's very existence.

B.   The defendants attempted to murder plaintiff by deliberately contaminating his medication with a lethal substitute.

C.   The defendants subjected the plaintiff to cruel and unusual punishment by depriving

the plaintiff of medication that alleviated his severe debilitating pain causing him additional excruciating agony due to the forced withdrawal pains he suffered by the defendant's theft of his medication.

D.  The defendants subjected the plaintiff to cruel and unusual punishment by illegally depriving him of his home, possessions, abused the plaintiff's minor child by their intentional actions which have left the plaintiff homeless and indigent.

E.  The defendants discriminated against the plaintiff by refusing to protect his rights by applying equal protection under the law and protect him from serious felony crimes that had been committed against him for the express reason to retaliate against the plaintiff and to insulate the defendants from improper and illegal conduct and relationships with each other .

F.  The defendants denied the plaintiff due process of law by filing false documents before a Trial Court and then blocked the plaintiff's access to the courts by refusing to allow him to seek protection under the Commonwealth's Domestic Protection Laws, redress the defendant's actions by barring the plaintiff meaningful access to the courts in violation of his equal protection rights under the law while the defendants acted in a manner to

discriminate against the plaintiff and treat him as a disfavored minority.

G.  The plaintiff, a disabled person, was discriminated against in a deliberate fashion by the defendants depriving him of equal protection under the law and discriminated against him for failing to protect his rights as a disabled person under the color of law for both self serving and retaliatory motives.

H.  The defendants conspired to transport the plaintiff's minor child outside of the

jurisdiction of Massachusetts in a conspiracy to violate the plaintiff's rights by conspiring to make a second attempt on the life of the plaintiff and thereafter dispose of the plaintiff's minor child.

I.  Each of the defendants together and the individual defendants in civil action, together with employees of the Commonwealth who enjoy absolute immunity for their acts and therefore can not be named herein as defendants, engaged in a conspiracy to deprive the plaintiff of his rights, privileges and immunities as guaranteed and protected by the Constitution of the United States in violation of the provisions of 42 USC sec. 1983.

J.  As a result of the defendant's violations of the plaintiff's civil rights, the plaintiff suffered a loss of enjoyment of life, choice in where he desired to reside and raise his minor, loss of ability to live independently in his own home, deprivation of his property, loss of ability to fund a college education for his child, extreme emotional distress and was otherwise damaged, loss of ability to obtain health insurance of his choosing, loss of an ability to provide the plaintiff's minor child with a private Hebrew Education so he could be Bar Mitzvahed in accordance with Jewish Law with his thirteenth birthday now passing without him being Bar Mitzvahed.

K.  As a result of the attempts to murder the plaintiff and dispose of his child and conspire to employ others to murder the plaintiff, the plaintiff has suffered severe exacerbation of post traumatic stress disorders as well as yet to be determined neurological injuries.

L.  As a result of the conduct of the defendants as described in the above the plaintiff's minor child has been irreparably injured and will cause the plaintiff indefinite future damages in addressing his child's traumatic injuries which were caused by the direct

result of the conduct of the defendants

M.   The above constitutes violations of 42 USC sec. 1983.

## COUNT TWO

## CONSPIRACY IN VIOLATION OF 42 USC sec. 1983

160.   The plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

A.   By engaging in the conduct described above, including restraining the plaintiff from enjoyment of his home, assets and possessions. The defendants allowed and conspired with their co-defendants to destroy inculpatory evidence belonging to the plaintiff while the defendants restrained the plaintiff using knowingly falsified evidence to accomplish their conspiracy.  Additionally, the defendants conspired with their co-defendants and certain immune judicial officials to interfere with the plaintiff's due process rights in seeking a Court's redress, while discriminating against the plaintiff's rights of equal protection under the law for deliberate and self serving motives

B.   The defendants conspired together to deprive the plaintiff of his due process rights, his right to be free from illegal seizure of his papers and possessions.

C.   The defendants conspired together (along with judicial officials) to employ a cover up of their illegal conduct of their intentional violations of the plaintiff's rights by systematically barring the plaintiff from making the crimes committed against plaintiff part of a Massachusetts Trial Court's records and failing to charge certain other defendants with crimes that had already been made part of a Trial Court's records thus, discriminating against the plaintiff by denying him equal protection under the law and

further violating their rights to due process.

D.  The defendants conspired to further their illegal cover up of the violations of the plaintiff's rights by obstructing justice, intimidating witnesses and using their powers of office in furtherance to the defendant's illegal scheme to violate the plaintiff's due process rights.

E.  The defendants conspired to discriminate against the plaintiff and deprive him of protections under the color of state law to protect them from civil rights violations secured to him under the General Laws of the Commonwealth of Massachusetts.

F.  The above constitutes an illegal conspiracy to violate 42 USC sec. 1983.

**COUNT THREE**

**DELIBERATE INDIFFERENCE**

161.  The plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporates them in reference as if fully and completely set forth herein.

A.  The defendants were deliberately indifferent to the violations of the plaintiff's constitutionally protected rights. The defendant's action and in-actions were committed with full knowledge and deliberate in design to violate the rights of the plaintiff under the color of law.

B.  The defendants were notified repeatedly by the plaintiff of the illegality of the violating of the plaintiff's rights and not only remained indifferent in a deliberate scheme, but took further actions to cover up these violations in concert with each other. The defendants' deliberate indifference to the violations of the plaintiff's rights was done with knowing and willful intent.

C. Such deliberate indifference to the violations of the plaintiff's rights while acting under the color of law constitutes deliberate indifference to violations of the plaintiff's rights as held within 42 USC sec. 1983.

## COUNT FOUR

## VICARIOUS LIABILITY

162. The plaintiff repeats and reasserts the allegations against all defendants contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

## COUNT FIVE

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## AGAINST ALL DEFENDANTS

163. The plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

A. The intentional and or grossly reckless actions described above attributed to each defendant, jointly and severally were outrageous and beyond the scope of common decency.

B. The intentional and or grossly reckless and deliberately indifferent actions described above attributable to each defendant, caused the plaintiff to suffer great emotional injury and distress.

C. The intentional and or grossly reckless and deliberately indifferent actions described above attributable to each defendant caused the plaintiff's minor child to suffer great

emotional injury and distress. The conduct alleged herein against each defendant has

caused additional damages to the plaintiff by injuries suffered by his minor child.

WHEREFORE: The Plaintiff demands judgments against the defendants for damages and

such other relief this Court deems just and equitable.

A.  The Plaintiff seeks compensatory damages against each of the defendants in the

amount of $100,000.

B.  The Plaintiff seeks punitive damages against each of the defendants in the amount of

$100,000.

C.  The Plaintiff reserve the right to amend this complaint.

D.  The Plaintiff demands a trial by Jury.

E.  Reasonable Attorney costs if any are so incurred, filing fees and all other costs

related to the filing of this matter.

Respectfully submitted
By the plaintiff. Pro Se,

William P. Youngworth, III, Pro Se
P.O. Box 2663
Springfield, Massachusetts 01101
413-736-5727
Yworth3@MSN.com

36

## CERTIFICATE OF SERVICE

Now comes the plaintiff William P. Youngworth, III, Pro Se who causes the plaintiff's abbreviated Complaint to be served upon this Court's Clerk by order of this Court by making in hand service upon the Clerk at his usual place of business.

The plaintiff causes same to be served upon the defendants in this matter by United States Marshal Service.

William P. Youngworth, III